# Exhibit Cover Page

**EXHIBIT NUMBER** H



**UNITED STATES DEPARTMENT OF EDUCATION**
**OFFICE FOR CIVIL RIGHTS**

8TH FLOOR, 5 POST OFFICE SQUARE
BOSTON, MA 02109-3921

REGION I
CONNECTICUT
MAINE
MASSACHUSETTS
NEW HAMPSHIRE
RHODE ISLAND
VERMONT

April 3, 2023

President Suresh V. Garimella
University of Vermont
Office of the President
85 South Prospect Street
344-353 Waterman Building
Burlington, VT 05405

*By email*: President@uvm.edu

Re:   Complaint No. 01-22-2002
      The University of Vermont and State Agricultural College

Dear President Garimella:

This letter is to advise you of the outcome of the complaint that the U.S. Department of Education (Department), Office for Civil Rights (OCR) received against The University of Vermont and State Agricultural College (the University) on October 2, 2021. The Complainant alleged that the University failed to respond appropriately to complaints that students were subjected to discrimination at the University based on their Jewish ancestry.

OCR is responsible for enforcing Title VI of the Civil Rights Act of 1964 (Title VI) and its implementing regulation at 34 C.F.R. Part 100, which prohibit discrimination on the basis of race, color, or national origin, including shared ancestry or ethnic characteristics, under any program or activity that receives Federal financial assistance from the Department. As a recipient of Federal financial assistance from the Department, the University is subject to these laws and regulations.

OCR reviewed records and information provided by the Complainant, the University, and publicly available information. In particular, OCR reviewed the University's student code of conduct as well as its policies and procedures for resolving complaints of discrimination on the basis of national origin. OCR also reviewed records relating to alleged 2021 antisemitic incidents and the University's responses. Additionally, OCR reviewed documents that the University provided relating to antidiscrimination initiatives as well as publicly available news reports and press releases. OCR also interviewed seven current University employees, one former employee, and the [redacted content]. Through the University and Complainant, OCR requested interviews with students who complained and/or were witnesses to incidents described in this letter; none of the students responded to OCR's requests.

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.*

www.ed.gov

Page 2 – OCR Complaint No. 01-22-2002

As explained further below, before OCR completed its investigation, the University entered into the enclosed resolution agreement (Agreement) that OCR will monitor to ensure the University's compliance with the Agreement's terms and with Title VI and its implementing regulation.

**Legal Standard**

The regulation implementing Title VI, at 34 C.F.R. § 100.3, provides that no person shall, on the basis of race, color, or national origin, be excluded from participation in, be denied the benefits of, or otherwise be subjected to discrimination under any program to which Title VI applies. Harassment that creates a hostile environment for individuals with a shared ancestry, such as students of Jewish descent, is national origin discrimination under Title VI.

A recipient violates Title VI if one of its agents, acting within the scope of their official duties,[1] has treated an individual differently on the basis of national origin in the context of an educational program or activity without a legitimate, nondiscriminatory reason so as to interfere with or limit the ability of the individual to participate in or benefit from the services, activities, or privileges provided by the recipient.

Harassment creates a hostile environment when the conduct is sufficiently severe, persistent or pervasive that it interferes with an individual's ability to participate in or benefit from a recipient's program. The harassment in most cases consists of more than casual or isolated incidents based on national origin. If OCR determines that the harassment was sufficiently severe that it would have adversely affected the enjoyment of some aspect of the recipient's educational program by a reasonable person, of the same age and national origin as the victim, under the same circumstances, OCR will find that a hostile environment existed. A recipient may be found to have violated Title VI if it has effectively caused, encouraged, accepted, tolerated, or failed to correct a hostile environment based on national origin harassment of which it has actual or constructive notice.

To establish a violation of Title VI under the hostile environment theory, OCR must find that: (1) a hostile environment based on national origin existed; (2) the recipient had actual or constructive notice of a hostile environment based on national origin; and (3) the recipient failed to respond adequately to redress the hostile environment based on national origin. Whether conduct constitutes a hostile environment must be determined from the totality of the circumstances. OCR will examine the context, nature, scope, frequency, duration, and location of the national-origin-based harassment, as well as the identity, number, and relationships of the persons involved.

A recipient is charged with constructive notice of a hostile environment if, upon reasonably diligent inquiry in the exercise of reasonable care, it should have known of the discrimination. In other words, if the recipient could have found out about the harassment had it made a proper inquiry, and if the recipient should have made such an inquiry, knowledge of the harassment will be imputed to the recipient.

---

[1] When determining whether an agent or employee was acting within the scope of their official duties such that the individual has actual or apparent authority over the individuals involved, OCR takes into account such factors as the relationship between the parties and the time, location, and context of the alleged conduct.

Page 3 – OCR Complaint No. 01-22-2002

Once a recipient has actual or constructive notice of a hostile environment, the recipient has a legal duty to take reasonable steps to eliminate it. OCR evaluates the appropriateness of the responsive action by assessing whether it was reasonable, timely and effective. The appropriate response to a hostile environment based on national origin must be tailored to redress fully the specific problems experienced at the recipient as a result of the harassment.

**Summary of Evidence Obtained**

The University is located in Burlington, Vermont and enrolls 11,326 undergraduate and 1,395 graduate students. The University houses more than 5,800 students on campus. UVM Hillel (Hillel) is an affiliate organization of the University with a mission "to enrich the lives of Jewish undergraduate and graduate students so that they may enrich the Jewish people and the world." Hillel leases its on-campus building from the University; the building's second floor houses University students (affiliation with Hillel and/or identification as a student of Jewish ancestry is not a requirement for Hillel housing).[2] According to the [redacted content], the University enrolls between two and three thousand students who identify as Jewish. Over 80% of the University's students are involved in at least one club or organization; there are over 200 such organizations recognized by the University's Student Government Association (SGA).

The Complainant alleged that the University failed to respond appropriately to the following incidents:

- In April and May 2021, a University [redacted content][3] who identified herself as a teaching assistant (Teaching Assistant) made a series of antisemitic public tweets.

- On September 24, 2021, students threw "small rocks" and "items with a sticky substance" at the Hillel building. When one student living in the dormitory portion of the building called out and "asked them to stop throwing things," one of the students outside responded, "Are you Jewish?"

- In May 2021, two student groups excluded Jewish students from group membership and one of the groups made antisemitic comments on social media.

Relevant Policies and Procedures

The University's Equal Opportunity in Educational Programs and Activities and Non-Harassment Policy (Equal Opportunity Policy) prohibits discrimination, including but not limited to harassment, on the basis of national or ethnic origin, among other protected classes, in the University's programs or activities.[4] The University's Discrimination, Harassment, and Sexual

---

[2] https://www.uvm.edu/news/story/hillels-new-home.
[3] [redacted content].
[4] https://www.uvm.edu/sites/default/files/UVM-Policies/policies/equaledu.pdf (citing Title VI). The University's Handling and Resolving Discrimination, Harassment, and Sexual Misconduct Complaints Operating Procedure (Operating Procedure) clarifies that this prohibition extends to discrimination, including but not limited to

Page 4 – OCR Complaint No. 01-22-2002

Misconduct Policy (Discrimination Policy) applies to all students and employees, amongst other groups. The University's Code of Student Conduct (Code) provides that alleged violations of the Discrimination Policy are governed by that policy, rather than by the Code.[5]

The Discrimination Policy states that, upon receipt of information indicating that an incident of discrimination occurred involving members of the University community, a "UVM Reporter"[6] must, among other actions, immediately complete a Bias, Discrimination, & Harassment Incident Reporting Form (Reporting Form)[7] or send an email to the University's Affirmative Action & Equal Opportunity Office (AAEO) with all information the individual knows; anyone who is not a UVM Reporter is strongly urged to notify AAEO when they receive information that an incident of discrimination has occurred. The Discrimination Policy specifically references, and provides a hyperlink to, the University's Designation and Responsibilities of UVM Reporters Operating Procedure. It also notes that individuals may contact AAEO directly to make a disclosure and learn about University-based options for support and resolution, with information regarding how to do so in person, by phone, by email and online via the Reporting Form. The Discrimination Policy further provides the AAEO Director's name, title, office and email address, and telephone number; and hyperlinks to the University's Handling and Resolving Discrimination, Harassment, and Sexual Misconduct Complaints Operating Procedure (Operating Procedure).

Off-campus conduct that does not occur in connection with a University sponsored or affiliated program or activity is subject to the Discrimination Policy where the conduct may reflect adversely on the respondent's fitness to remain enrolled in an academic program or employed in their position, pose an imminent or continuing threat of harm to the safety of University community members, or create or contribute to a hostile environment on campus. Resolution options and procedures for incidents covered by the Discrimination Policy are detailed in the Operating Procedure.

The Operating Procedure provides that, upon notice to AAEO that an individual has been the subject of alleged discrimination, AAEO will provide outreach to that individual. The University's policies and procedures do not state whether AAEO will contact the individual reporting discrimination, to solicit additional information or for any other reason, if the reporting

---

harassment, on the basis of ancestry. *See* https://www.uvm.edu/sites/default/files/UVM-Policies/policies/discrimcomplaints.pdf. The University's Discrimination, Harassment, and Sexual Misconduct Policy (Discrimination Policy) clarifies that this prohibition extends to all academic, extracurricular, and other programs and activities sponsored by the University, and further clarifies that harassment may encompass verbal, written, visual, or physical communications and/or conduct. *See* https://www.uvm.edu/sites/default/files/UVM-Policies/policies/sexharass.pdf. Both the Discrimination Policy and the Operating Procedure prohibit retaliation against persons who report discrimination, including but not limited to harassment, or participate in related proceedings.
[5] https://www.uvm.edu/sites/default/files/UVM-Policies/policies/studentcode.pdf.
[6] UVM Reporters include, but are not limited to, members of the University's Police Services and contract security personnel; a supervisor, manager, or higher level employee; a chair, director, or dean of an academic unit; full and part time faculty members; personnel with oversight responsibilities for students or student employees; advisors to recognized student organizations; coaches and coaching staff; and any other individuals considered to be a Campus Security Authority pursuant to the Clery Act. *See* https://www.uvm.edu/sites/default/files/UVM-Policies/policies/campussecruity.pdf.
[7] https://cm.maxient.com/reportingform.php?UnivofVermontAAEO&layout_id=5Done.

Page 5 – OCR Complaint No. 01-22-2002

individual is not the subject of the alleged discrimination. The Operating Procedure further provides that if the individual who has been the subject of alleged discrimination expresses interest in a University resolution process, or if the nature of the disclosure prompts the AAEO Director to take independent action, AAEO will determine (1) whether the respondent was subject to the Discrimination Policy at the time of the alleged conduct and (2) whether the conduct as alleged could be a violation of the Discrimination Policy. If the AAEO Director determines that AAEO lacks jurisdiction or the matter is not otherwise appropriate for resolution, AAEO will provide appropriate referrals to other resources.

The University's policies and procedures do not state a timeframe for completion of this intake and jurisdictional review process, nor do they specify the circumstances in which the AAEO Director would take independent action, as described above. If an individual subjected to alleged discrimination does not want to participate in the resolution process or expresses a desire for their identity to be kept confidential, the Operating Procedure states that the AAEO Director will weigh such requests against the University's responsibility to provide a safe and nondiscriminatory environment for all members of the campus community.

If the AAEO Director determines that AAEO has jurisdiction and the matter is otherwise appropriate for resolution, the Operating Procedure specifies the procedures that will be used to receive, investigate, and resolve alleged discrimination. This includes how to file complaints, the availability of supportive measures, the steps that will be taken as part of an investigation (including, but not limited to, review of any documents related to the complaint and a requirement for documented interviews with individuals who have information about the complaint, including the complainant, the person accused of discrimination, witnesses, and anyone mentioned as having relevant information), and how the parties will be notified of the outcome of the complaint. Upon a finding of discrimination, the Operating Procedure specifies that the University will take all necessary steps to prevent recurrence and remedy discriminatory effects.

Allegations Concerning the Teaching Assistant

On May 17, 2021, the [redacted content] filed a Reporting Form with AAEO alleging that University students had subjected Jewish students at the University to antisemitic harassment. The Reporting Form included an attached document containing a collection of tweets, including many from the Teaching Assistant with an accompanying photograph of her. Amongst the tweets from the Teaching Assistant were the following that she posted in April and May 2021:

- "its [sic] good and funny" "for me, a TA, to not give zionists credit for participation" and to give the students for whom she was a teaching assistant "-5 points for going on birthright," "-10 points for posting a pic with a tank in the Golan heights," and "-2 points just cuz I hate ur vibe in general";
- "why do so many zionists work for the writing center[?]";
- the word "Kristallnacht" above a picture of a damaged storefront with accompanying Hebrew text from another user;

Page 6 – OCR Complaint No. 01-22-2002

- "i get the indelible [sic] surge [sic] to cyber bully" when receiving "posts from UVM Zionist Instagram accounts";
- "serotonin rush of bullying zionists on the public domain";
- an Instagram account that the Complainant asserted had been organized by a group of Jewish students at the University had "turned off comments :(," tweeted in response to another post stating "let the cyber bullying [of that account] begin";
- "free trips, both sides discourse," and the statement "my family lives in tel aviv" should be "politically unthinkable, worthy of private and public condemnation, [and] likened to historical and contemporary segregationist movements"; and
- "who stole the israeli flag on [redacted content]? i just wanna. . . tell you how cool and special and loved you are" and "defend [your] honour" for "anonymously doing good."

The [redacted content] informed OCR that he received these tweets from Jewish students at the University who felt threatened by them. In the Reporting Form, the [redacted content] also cited a tweet by another student stating that "it'd be a shame if something happened to the israeli flag" off campus, noting that a student's Israeli flag at that location had been "vandalized" shortly afterward. While the [redacted content] used the word "vandalized," all of the other evidence OCR reviewed indicated that the flag had been stolen. As noted above, the Teaching Assistant subsequently tweeted in praise of this theft.

The [redacted content] filed another Reporting Form with AAEO the same day alleging that University students had subjected Jewish students to additional antisemitic harassment. OCR reviewed the Reporting Form, which included the Facebook posts with a handle containing the Teaching Assistant's first and middle name and another photograph with a likeness to the one accompanying her Twitter account handle. The Reporting Form included an attached document containing numerous Facebook posts, including many from an individual whom the [redacted content] informed OCR was the Teaching Assistant based on the name and photograph associated with the account. The [redacted content] informed OCR that he received these Facebook posts from a Jewish student at the University who had participated in, and felt threatened by, this conversation.

That same day, the [redacted content] filed another Reporting Form with AAEO alleging that he had been subjected to antisemitic harassment when the Teaching Assistant had tweeted earlier that day that the [redacted content] . . . issu[ed] defamatory statements against students of color," noting that "[h]e blocked me and . . . unlisted his account from search even when I use a different account." Other University students agreed that he was "bully[ing]" and "disenfranchis[ing]" students. The [redacted content] wrote in the Reporting Form that these tweets made him "feel like I may be unable to participate in university activities for fear of my personal safety" and wanted "to ensure that nobody at UVM is harassed for being Jewish."

Page 7 – OCR Complaint No. 01-22-2002

On May 28, 2021, a member of the University's Bias Response Team[8] emailed the [redacted content] that AAEO had forwarded to the Bias Response Team all his Reporting Forms and attachments and thanked him "for noting the significant impact all of this has had on so many students (and you!)."

On August 2, 2021, the [redacted content] emailed the [redacted content] that he "had not received any follow up" regarding the Reporting Forms since the above-referenced communications. The next day, the [redacted content] responded that he would "check in with the Bias Response Program and we will be in touch soon."

On September 6, 2021, the [redacted content] sent a letter to the University President thanking him for speaking with the [redacted content] three days earlier "about the pressing issues facing Jewish students" at the University. The letter states that the [redacted content] "continue to hear from parents, students, and alumni about the egregious bias Jewish students have experienced." The [redacted content] appended some, but not all, of the social media posts included with the May 2021 Reporting Forms he had previously filed, which he stated "were referenced in your call" with the [redacted content] as well as "student quotes about the bias and harassment regarding their shared ancestry and ethnicity."

On September 14, 2021, the University's Provost met with twelve Jewish students at Hillel. According to notes taken by the Provost as she listened to the students' concerns, which the University provided to OCR, the students "wanted to discuss their experiences . . . with antisemitism," including, amongst other incidents, a teaching assistant who had "threatened to decrease grades of all Jewish students." The Provost wrote that she would "follow-up" on this report "with [a] possible misconduct complaint" and subsequently wrote that the University could not "find if [the Teaching Assistant] did any TA'ing in the spring." The Provost subsequently informed OCR that she concluded that the Teaching Assistant had not served as a teaching assistant during the spring 2021 semester because she could find no record indicating that she had. However, the Provost also informed OCR that she was unsure if anyone had asked the Teaching Assistant if she had served as a teaching assistant prior to the fall 2021 semester.

On September 21, 2021, the [redacted content] emailed the chair of the Teaching Assistant's department ("Department Chair") to inform him that the Teaching Assistant had "made statements on Twitter that implied that students' ethnicity, religion, or national origin may impact her grading decisions." The [redacted content] attached a memo to the Department Chair entitled "Report about [Teaching Assistant]." The memo states that the University's Vice Provost for Student Affairs (Vice Provost) had emailed the [redacted content] the social media posts that the [redacted content] had sent to the University President on September 6, 2021. The memo further states that on September 16, 2021, the [redacted content] met with the Teaching Assistant's course coordinator, who confirmed that the Teaching Assistant's "duties . . . include grading assignments on a bi-weekly basis and answering student questions" and "there have been

---

[8] The University's website states that "[a]ll incident reports [submitted on the Reporting Form] are directly routed to [AAEO] to review for policy violations. If the report does not violate University policy, it will be sent to the Chair of the Bias Response Team for review." https://www.uvm.edu/deanofstudents/frequently_asked_questions. While University employees confirmed that this is how incident reports are routed, the University's policies and procedures do not otherwise specify the role of the Bias Response Team.

no complaints or concerns about [her] work so far." The memo quotes the Teaching Assistant's tweets about deducting points from certain students and "zionists work[ing] for the writing center"; it does not reference any of the other social media posts that the [redacted content] had provided to AAEO in May 2021 or to the President earlier in September. In the [redacted content]'s memo, she concludes that "there is insufficient information for AAEO to conduct a formal investigation[9] for discrimination or harassment" because "AAEO has not received any complaints from students that [the Teaching Assistant] discriminated against or harassed them in connection with her role as" a teaching assistant.

The [redacted content] subsequently said to OCR that the fact that AAEO had not received any complaints from students regarding the Teaching Assistant was dispositive of her decision that AAEO would not investigate the Teaching Assistant's actions. When told of this assertion by the [redacted content] informed OCR that he agreed with her conclusion. While the [redacted content] could not specifically recall discussing the Teaching Assistant, he informed OCR that the [redacted content] would have brought it to his attention and he would have had to approve her determination. Both the [redacted content] confirmed that they had only considered the tweets that she quoted in the memo, and not any of the Teaching Assistant's other social media posts, when deciding whether to investigate the Teaching Assistant's actions. They also confirmed that AAEO did not interview anyone prior to reaching its decision. The [redacted content] informed OCR that she expected the Teaching Assistant's professor to decide whether any action, outside the jurisdiction of the Discrimination Policy, should be taken in response to the Teaching Assistant's actions.

On September 24, 2021, the University's counsel informed the [redacted content] that the Teaching Assistant's professor met with the Teaching Assistant, who "admitted they were her tweets" and "was apologetic." Counsel noted that the Teaching Assistant "no longer ha[d] any grading responsibilities in the course." On September 30, 2021, the professor emailed the University's counsel that he had informed the Teaching Assistant "that she could no longer be a TA for" his course and had "regraded all items she originally graded."

While not acknowledging a misstep in his Title VI jurisdictional analysis, the [redacted content] told OCR that he believed the University's policies are "flexible enough to conduct an investigation with an unknown complainant" and AAEO would exercise discretion to conduct an investigation depending on the particular facts presented. However, the [redacted content] informed OCR that he could not recall AAEO investigating any potentially discriminatory incident that had come to the University's attention without a complaint having been filed with an identified victim or victims.

Allegations Concerning the UVM Hillel Building

On the evening of September 24, 2021, a University police officer (Responding Officer) received a call from a [redacted content] about items being thrown at the Hillel building. The Responding Officer observed "pieces of foam all over the ground and stuck to the [rear] door." He met with the [redacted content] ("the complainants") and summarized his conversation with them in his written report as follows: "They advised they'd seen a group of college-aged men outside the

---

[9] The University's policies and procedures do not distinguish between formal and informal investigations.

building tampering with bikes . . . [and] yelled down to the men to leave the bikes alone. The complainants advised the males then began throwing . . . rocks . . . at windows but I . . . did not observe any damage to any windows." The Responding Officer determined that there was no video of the incident available. The [redacted content] filed a Reporting Form regarding this incident and called the Responding Officer to report that the complainants "told him that the males had asked [them] if they were Jewish" and threw foam and rocks at the building after learning that they were Jewish. The Responding Officer wrote that, "[a]s this would constitute a bias or hate-motivated incident," the [redacted content] "was advised so the bias-response team could be made aware."

The next morning, another police officer (Follow-up Officer) went to the Hillel building and identified the foam as debris from large puffball mushrooms. One of the complainants told the Follow-up Officer that she did not know if "the group was targeting her or [Hillel] because of their Jewish affiliation," but "described the question about if she was Jewish as 'random.'" The other complainant told the Follow-up Officer that she "advis[ed] them not to break anything, as then they would have to call [the] police," then closed the window to her room after "[t]he group mocked that statement" and "started to throw small rocks at the window they just closed."

Another [redacted content] student informed the Follow-up Officer that the group might have been there to talk to [redacted content] subsequently called the Follow-up Officer and informed her that "his friends . . . 'threw rocks at his window until he came out.'" He emphasized "that his friends 'were not racist'" and had no ill-intent." When the Follow-up Officer asked "if he would feel comfortable sharing the[ir] names," he "seemed extremely unsure about that and wanted to check in with his friends." The Follow-up Officer asked him to call her if he felt as though he could provide any further information, but the [redacted content] never did.

Prior to the Follow-up Officer's inquiry, the [redacted content] emailed the [redacted content] that he would "put out a campus message on this" and emailed the [redacted content] a draft campus advisory regarding a "Bias Related Incident (Antisemitism)" at the Hillel Building. The [redacted content] subsequently emailed the [redacted content] to inform her that he told the [redacted content] he was "not sure this fits with a . . . campus advisory." He noted that the [redacted content] had "disagree[d] in terms of knowing it is an antisemitic event."

On September 27, 2021, the [redacted content] spoke with the [redacted content] to discuss AAEO's role in matters like this and emailed the students who had spoken with the police officers to notify them of their ability to file a complaint with AAEO and offer supportive resources such as counseling.

Later that day, the [redacted content] emailed the [redacted content] and Vice Provost to inform them that the Bias Response Team had convened and did "not see this case as an act of targeted identity based bias." She noted that the "Team was also in support of a larger community-wide communication going out from the Provost to support and affirm the Jewish community given the totality of the adverse experiences they have had for several years"; she did not recall receiving a response to this recommendation.

Page 10 – OCR Complaint No. 01-22-2002

Allegations Concerning @ShareYourStoryUVM

On May 14, 2021, a Jewish University student filed a Reporting Form regarding an Instagram account allegedly run by University students with the handle @ShareYourStoryUVM. The student alleged that the account made "antisemetic [sic] and hateful" comments, including "zionists make me sick." She also alleged that the account "said they will not engage in discussion with zionists." Another Jewish student filed a Reporting Form on May 16, 2021, similarly complaining about antisemitic comments made by the @ShareYourStoryUVM account.

As described above, on May 17, 2021, the [redacted content] filed three Reporting Forms with AAEO alleging that University students had subjected Jewish students at the University to antisemitic harassment. The document attached to one of those forms contains several posts from @ShareYourStoryUVM, including posts stating that the account was created "by a small team of college students" who believed that "Israelis have put so many Palestinians through" "disgusting sexual abuse"; stated that they "cannot stand with . . . Israel and Zionists" and must "hold our peers accountable for their pro-Israel or Zionist stances"; and noted that "we follow the same policy with zionists that we follow with those trolling or harassing others: blocked."

AAEO received these Reporting Forms but did not investigate them or document the reason for its decision not to do so. Instead, AAEO referred the matter to the Bias Response Team. The [redacted content] informed OCR that AAEO did not have jurisdiction over the account because it was run anonymously and was not associated with a registered student organization at the University. The other University employees that OCR interviewed shared this understanding regarding the account's operation and lack of affiliation with the University.

In late May 2021, a member of the Bias Response Team emailed both students who had submitted the Reporting Forms referenced above and offered to meet with them to discuss the matter and offer supportive resources. The Bias Response Team member also emailed an address associated with the account on July 8 and September 17, 2021, to share the students' concerns, but the owner of the account did not respond.

Allegations Concerning the Revolutionary Socialist Union Book Club

As referenced above, on September 14, 2021, the Provost met with Jewish students at Hillel to listen to their concerns about antisemitism at the University. The Provost's notes from that meeting state that the "UVM Book Club was identified as one group that had specifically excluded Jewish students or Zionists from participating" and "it is unclear if there are subgroups under this group but it looks like the Revolutionary Socialist Union [RSU] is one."[10]

---

[10] On May 1, 2021, the "UVM Revolutionary Socialist Union" posted on Instagram that "[n]o . . . Zionism . . . of any kind will be tolerated." https://www.instagram.com/p/COVe0nSnDM9/. An archived version of the UVM Book Club's website as it appeared on August 25, 2021, shows a link to RSU which, when clicked, states that RSU is "[u]naffiliated with" the University.
https://web.archive.org/web/20211011171849/https://bookclub.w3.uvm.edu/groups/rsu/.

Page 11 – OCR Complaint No. 01-22-2002

On September 15, 2021, the Vice Provost emailed Student Affairs staff to ask if RSU was an "individually recognized SGA club[]." On September 20, 2021, the University's [redacted content] responded that the [redacted content] had informed him that the UVM Book Club "promote[s] various other book clubs off campus" on its website, one of which was the RSU book club. The [redacted content] reminded the [redacted content] of that club's obligations, as a registered student organization, to comply with the University's nondiscrimination policies.

On September 30, 2021, a student emailed the Provost a link to RSU's draft constitution, which states that every RSU member must pledge "no" to Zionism. On October 4, 2021, the [redacted content] emailed the Vice Provost that he had confirmed that RSU was an "unrecognized SGA organization," "receive[d] no funding from SGA," and was not "afforded any University privileges," so the University did "not have any jurisdiction over" it.

On September 22, 2022, the [redacted content] emailed the [redacted content] to remind them "that you cannot sponsor" "non-UVM affiliated[] book clubs" and requested that they add language to the UVM Book Club's website "that makes it clear that these groups are unaffiliated with the UVM Book Club" and are not "sponsored by you or the University." The [redacted content] confirmed the following day that the website had been updated.

The [redacted content] informed OCR that they could not recall if AAEO was notified of this incident, and they confirmed that they did not investigate this incident.

<u>Jewish Students Shared Other Experiences with the University</u>

As referenced above, on May 17, 2021, the [redacted content] filed Reporting Forms with AAEO. In addition to the Teaching Assistant allegations and the @ShareYourStoryUVM allegations, he alleged that University students subjected Jewish students to other antisemitic harassment. The [redacted content] attached statements Jewish students shared with him such as: a Jewish student "was "upset [and] feared for her safety" as a result of vulgar social media posts; another Jewish student felt scared and unsafe due to residence hall neighbors who were "all posting very anti-Semitic posts on their social media accounts" and had been "physically aggressive in the past"; another Jewish student was "strongly considering transferring to a campus that is safe for Jewish students because of the[se] incidents"; another Jewish student was "frustrated, scared, and upset with the things their friends were posting on social media" and "felt alone and targeted for her . . . identity"; and another Jewish student who "is Israeli" had begun to "fear to share where her family is from." In total, the [redacted content] presented statements from 23 Jewish students. No names were provided; rather, the statements were attributed to the students' initials and class year. The [redacted content] recalled reaching out to the [redacted content] to encourage him to share the names of the affected students. Neither the [redacted content] nor the [redacted content] could recall whether any names were ultimately shared.

On September 17, 2021, the [redacted content] wrote to the [redacted content] that, "during the April/May 2021 timeframe," the University had "received information about . . . deeply frustrated and frightened students connected to Hillel." She noted that she had "met with a few students and your staff to learn what they were experiencing," "informed Senior Leaders," and

the Vice Provost and Provost subsequently met "with the concerned students on May 19, 2021." The [redacted content] wrote "that the discussion resulted in both leaders feeling informed and expressed their commitment and care for the students and the Jewish community."

As referenced above, on September 14, 2021, the Provost met with twelve Jewish students at Hillel who wanted to discuss their experiences with antisemitism at the University. According to the Provost's contemporaneous notes, student reports included: "feel[ing] they cannot wear a star of David or any other signs of Jewish heritage as they will be belittled and berated"; Jewish students received "no support or communication from the administration to call out the antisemitism that exists" at the University; "formal AAEO . . . complaints were [not] made because they don't want to reveal their names for fear of retribution [and] increased harassment"; and a request that the University "[e]stablish a clear and timely disciplinary process for students . . . perpetuating antisemitic incidents on campus."

The University did not conduct investigations or otherwise try to ascertain additional information regarding any of the incidents or comments that the Provost captured in her meeting notes. The Provost offered her support to the students during the September 14, 2021 meeting and a follow-up meeting on September 30, 2021.

Actions Taken by the University Since the Opening of the OCR Complaint

Soon after OCR commenced its investigation of this complaint and in response to media coverage that immediately followed, the University's President issued a letter to "Members of the UVM Community" asserting that media coverage of OCR's opening of this investigation "has painted our community in a patently false light" and detailing the University's actions and perspective responsive to the allegations in the complaint that prompted this investigation. The letter went on to note "[t]here is no doubt that antisemitism exists in the world and, despite our best efforts, in our community. Exploitation of fear and divisiveness by advancing false claims that UVM failed to respond to complaints of antisemitic behavior creates confusion and a sense of insecurity for the entire community." Later in his statement, he wrote "[once] opened, the OCR investigation gives the [U]niversity the opportunity to respond to the allegations. UVM vigorously denies the false allegation of an insufficient response to complaints of threats and discrimination, as will be demonstrated in our response to OCR."[11]

Since the President's initial statement, the University has taken numerous steps to demonstrate support for Jewish students, faculty, and staff. For example, the President issued another public statement condemning antisemitism at the University.[12] In fall 2022, the University launched a website "for those who want to learn more about opportunities to explore, connect with, and celebrate Jewish life at" the University, "to provide information about resources the [U]niversity has employed to combat antisemitism," and "to support our Jewish students."

The website notes that various University offices have met with and reviewed climate data with Jewish students; sent University leaders to national and international meetings focused on combating on-campus antisemitism and otherwise engaged with outside organizations in these

---

[11] https://www.uvm.edu/news/president/ocr-investigation.
[12] https://www.uvm.edu/news/story/president-suresh-garimella-condemns-antisemitism-uvms-campus.

Page 13 – OCR Complaint No. 01-22-2002

efforts; and began a review of the Discrimination Policy. The [redacted content] informed OCR that, since the commencement of OCR's investigation, the University was "actively listening" to the concerns of the University's Jewish community "in a way that I wasn't sure they were before."

## Analysis

As noted above, a recipient violates Title VI if one of its agents, acting within the scope of their official duties, has treated an individual differently on the basis of national origin in the context of an educational program or activity without a legitimate, nondiscriminatory reason so as to interfere with or limit the ability of the individual to participate in or benefit from the services, activities, or privileges provided by the recipient. Whether the harassment was by an employee or other agent or a peer, once a recipient has notice of a national origin hostile environment, OCR evaluates the appropriateness of the recipient's responsive action by assessing whether it was reasonable, timely, and effective. While a recipient need not adopt a grievance procedure to resolve alleged Title VI violations, OCR will evaluate whether it followed any such procedure it chooses to adopt.

OCR has concerns that the University's failure to investigate, consistent with Title VI, allegations of antisemitic harassment that it received from the [redacted content] may reflect University officials, acting within the scope of their official duties, treating individuals differently on the basis of national origin in the context of an educational program or activity without a legitimate, nondiscriminatory reason, resulting in interference with or limitation of the ability of the individuals to participate in or benefit from the University's educational program. Likewise, OCR is concerned that the failure to investigate allegations of harassment of which the University had notice may have allowed a hostile environment for some Jewish students to persist at the University.

While the University's policies and procedures do not require an identified victim in order for AAEO to investigate, the University declined to investigate the Teaching Assistant's conduct. That decision was made without interviewing the Teaching Assistant, whom they could have identified based on the social media handle names associated with her actual name and two accompanying photographs, students in her course, or staff in the writing center. Additionally, the University only considered a small subset of the allegedly discriminatory social media posts (including those sent from a different account but which the University may have connected to the Teaching Assistant upon a reasonably diligent inquiry) when reaching this determination. While the University ultimately responded to the Teaching Assistant's conduct, it was done outside of the Discrimination Policy and not until four months after the [redacted content]'s complaints were filed.[13] Further, while the Teaching Assistant wrote that she was a teaching assistant during the spring 2021 semester, it is not clear that the University fully investigated whether she had served as a teaching assistant prior to the fall of 2021. There is also no

---

[13] As relevant here, the University's policies and procedures do not state a timeframe for completion of AAEO's intake and jurisdictional review process, specify the circumstances in which the AAEO Director would take independent action without a complaint being filed, or state whether AAEO will contact the individual reporting discrimination, to solicit additional information or for any other reason, if the reporting individual is not the subject of the alleged discrimination.

indication that the University informed any of the students who were affected by the Teaching Assistant's harassing statements that the University had taken steps to ameliorate any hostile environment and to ensure that the students' equal access to education would not be affected, including because the course professor independently evaluated the students' grades.

With respect to the Hillel incident, it is not clear that the University's police or other staff responding to the incident were applying the Discrimination Policy or Operating Procedure to the allegations. For example, it appears that the Bias Response Team, rather than AAEO, concluded that the group's allegedly antisemitic actions were not discriminatory. Further, while the Code prohibits students from impeding or obstructing a University investigation, it does not appear that the University considered whether there was a need to compel the [redacted content] to disclose the identities of his friends so that the University could interview them, as may have been required to determine whether their conduct violated the Discrimination Policy. In this instance again, there is no indication that the University took steps to ameliorate any hostile environment for affected students who had experienced or learned about rocks thrown at windows with the associated question whether the residents were Jewish and to ensure that the students' equal access to education would not be affected.

With respect to the allegations concerning @ShareYourStoryUVM and RSU, it is similarly not clear that the University applied the Discrimination Policy or Operating Procedure to the allegations. First, it does not appear that AAEO was involved in the University's response to allegedly discriminatory conduct by University students. While the University appears to have determined that it lacked jurisdiction over the conduct because it occurred in the context of organizations that were not affiliated with the University, it does not appear that the University considered that the members of these organizations were allegedly University students engaging in off-campus conduct, to which the Discrimination Policy applies, or that it consulted with its IT department or University police to attempt to identify these students.

It does not appear that the University determined whether the cumulative effects of these incidents created a hostile environment based on students' shared ancestry (Jewish)[14] or took action regarding the cumulative effects of the incidents until after the commencement of OCR's investigation of this matter.

OCR is also concerned that the President's initial letter to the UVM community in response to OCR's investigation may have perpetuated a hostile environment. As previously noted, the President "vigorously denied" what he characterized as "false allegation[s] of an insufficient response" to antisemitic incidents at the University shortly before OCR requested to interview the students who had complained about or were witnesses to the harassing incidents. OCR is concerned that the President's statements may have discouraged these students from speaking with OCR about their experiences. Likewise, OCR is concerned that the President's letter, including its explanatory statement that "No student reported to the university" any discrimination claims, may have discouraged both the students who in fact had reported to the

---

[14] The University's policies and procedures do not specify whether, or how, AAEO will assess whether the cumulative effects of a series of incidents not reported in a single complaint may have resulted in a hostile environment at the University.

Page 15 – OCR Complaint No. 01-22-2002

Provost their concerns as well as University employees from further raising concerns either to OCR or to the University.

**Conclusion**

Prior to the conclusion of OCR's investigation and pursuant to Section 302 of OCR's *Case Processing Manual*, the University expressed an interest in resolving this complaint and OCR determined that a voluntary resolution is appropriate. Subsequent discussions between OCR and the University resulted in the University signing the enclosed Agreement which, when fully implemented, will address the evidence obtained and all of the allegations investigated. The Agreement provides that the University will:

- Review and revise its policies and procedures to ensure that the University's response to notice of discrimination including national origin harassment on the basis of shared ancestry is consistent with Title VI;
- Develop protocols clarifying the roles and responsibilities of AAEO and the Bias Response Team[15] and monitor implementation of the protocols by the Provost;
- Provide training to University staff responsible for investigation of Title VI complaints;
- Provide training to University senior leadership, all other staff, and students on the Title VI prohibition against harassment based on national origin, including shared ancestry, in the University's programs and activities;
- Issue a statement of commitment to address discrimination based on shared ancestry, including antisemitism, within 30 days of the signing of the Agreement and again with its annual antidiscrimination statement;
- Review the University's 2022 Climate Survey results to determine if other actions, beyond those memorialized in the Agreement, are needed to improve the campus climate; and
- Annually submit to OCR during the monitoring of the Agreement copies of case files of complaints of antisemitism filed during the preceding academic year.

This concludes OCR's investigation of the complaint. This letter should not be interpreted to address the University's compliance with any other regulatory provision or to address any issues other than those addressed in this letter. This letter sets forth OCR's determination in an individual OCR case. This letter is not a formal statement of OCR policy and should not be relied upon, cited, or construed as such. OCR's formal policy statements are approved by a duly authorized OCR official and made available to the public. The complainant may have a right to file a private suit in federal court whether or not OCR finds a violation.

Please be advised that the University must not harass, coerce, intimidate, discriminate, or otherwise retaliate against an individual because that individual asserts a right or privilege under a law enforced by OCR or files a complaint, testifies, assists, or participates in a proceeding under a law enforced by OCR. If this happens, the individual may file a retaliation complaint with OCR.

---

[15] The University informed OCR that the Bias Response Team will henceforth be called the Bias Education and Resource Team.

Page 16 – OCR Complaint No. 01-22-2002

Under the Freedom of Information Act, it may be necessary to release this document and related correspondence and records upon request. If OCR receives such a request, we will seek to protect personally identifiable information that could reasonably be expected to constitute an unwarranted invasion of personal privacy if released, to the extent provided by law.

                                              Sincerely,

                                              /s/

                                              Mia Karvonides
                                              Senior Legal Advisor to the
                                              Assistant Secretary and Deputy Assistant Secretary

Enclosure

cc:     General Counsel Trenten Klingerman (*by email*: Trenten.Klingerman@uvm.edu)
           Associate General Counsel Meghan Siket (*by email*: Meghan.Siket@uvm.edu)