IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


ALLY LANDAU,
HJSB, HJSC, and
JEWS AT HAVERFORD,                         :
                                           :
                  Plaintiffs,              :        Civil Action No. 2:24-cv-02044 (GAM)
                                           :
v.                                         :
                                           :
THE CORPORATION OF                         :
HAVERFORD COLLEGE,                         :
                                           :
                  Defendant,               :

MEMORAMDUM IN OPPOSITION TO MOTION TO DISMISS

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................................ ii

WHAT THIS CASE IS NOT ABOUT ......................................................................................... 1

HAVERFORD'S IRRELEVANT AND IMPROPERLY FACT-LADEN STORY ABOUT ITSELF ........ 4

THE CASE HAVERFORD IGNORES BUT THAT THE COMPLAINT ACTUALLY PLEADS ............ 5

  A. The Hostility of Haverford's Campus to Plaintiffs' Beliefs, Commitments and Identity .................... 9

  B. The FAC Clearly Alleges Defendant's Intent to Maintain, and Deliberate Indifference Toward, an Environment Hostile to Plaintiffs ................................................................ 18

  C. The FAC Allegations Regarding the Plaintiffs ........................................................... 19

ARGUMENT ........................................................................................................................ 21

  I.  PLAINTIFFS HAVE STANDING ........................................................................ 21

  II. PLAINTIFFS HAVE PROPERLY PLED THAT HAVERFORD IS DISCRIMINATING AGAINST THEM ON THE BASIS OF RACE, NATIONAL ANCESTRY AND ETHNICITY ...................... 22

    A. Haverford's Dismissal of Plaintiffs' Beliefs, Commitments and Identity as Mere Political Opinion Expressly Contradicts the Complaint's Allegations ......................... 23

    B. The Case Law Directs Courts to Respect Allegations Regarding A Plaintiff's Sincerely Held Religious Belief ......................................................................... 24

    C. The U.S. Department of Education, Office of Civil Rights has determined that the Jewish commitment to Israel and to Zionism is an element of shared Jewish ancestry and ethnic identity. ................................................................................ 25

  III. THE PLAINTIFFS HAVE ADEQUATELY PLED INJURY FROM SEVERE, PERVASIVE AND OBJECTIVELY OFFENSIVE HARASSMENT ............................................................ 28

    A. Each Individual Plaintiff or Member of Jews at Haverford Has Been Directly Injured By Identified Acts of Harassment ................................................................... 28

    B. The Complaint's Allegations of Harassing Actions Must Be Assessed as a Whole ...................... 30

  IV. PLAINTIFFS HAVE CLEARLY ALLEGED HAVERFORD'S DELIBERATE INDIFFERENCE TO, AND INDEED INTENTIONAL SUPPORT OF, THE HARASSMENT HERE AT ISSUE ..... 32

  V. THE FAC PROPERLY ALLEGES HAVERFORD'S BREACH OF ITS CONTRACTUAL OBLIGATIONS TO THE PLAINTIFFS ..................................................................... 34

  VI.  PLAINTIFFS' REQUEST FOR ANONYMITY IS NO REASON TO DISMISS THEIR CLAIMS ............................................................................. 35

IF ANY ASPECT OF HAVERFORD'S MOTION IS GRANTED PLAINTIFFS SHOULD BE GRANTED LEAVE TO AMEND ............................................................................... 36

CONCLUSION .................................................................................................................... 37

## TABLE OF AUTHORITIES

**Cases**

*Petruska v. Gannon Univ.*
   448 F.3d 615 (3d Cir. 2006)...................................................................23

*L.T. v. Eleanor Murray Fallon Middle Sch.,*
   2024 WL 3678014, at *6 (N.D. Cal. Aug. 5, 2024)...................................30

*Anjelino v. New York Times Co.,*
   200 F.3d 73, 90 (3d Cir. 1999)................................................................32

*Anspach ex rel. Anspach v. City of Phila.,*
   503 F.3d 256, 273 n. 11 (3d Cir. 2007)....................................................4

*Ashcroft v. Iqbal,*
   556 U.S. 662, 678 (2009).........................................................................23

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544, 570 (2007).........................................................................23

*Brandeis Center v. President and Fellows of Harvard College,*
   2024 WL 4681802, at *4 (D. Mass. Nov. 5, 2024)...................................22

*Burwell v. Hobby Lobby Stores, Inc.,*
   573 U.S. 682, 724 (2014).........................................................................24

*Camel Hair & Cashmere Inst. of Am., Inc. v. Assoc. Dry Goods Corp.,*
   799 F.2d 6, 12 (1st Cir. 1986).................................................................22

*Castleberry v. STI Grp.,*
   863 F.3d 259, 264 (3d Cir. 2017)..............................................................6

*Church of Lukumi Babalu Aye v. City of Hialeah,*
   508 U.S. 520 (1993).................................................................................24

*Frankel v. Regents of Univ. of California,*
   2024 WL 3811250 (C.D. Cal. Aug. 13, 2024)........................................29

*Hunt v. Wash. State Apple Advert. Comm'n,*
   432 U.S. 333, 342 (1977).........................................................................22

*In re Burlington Coat Factory,*
   114 F.3d 1410, 1426 (3d Cir. 1997)..........................................................4

*J.G. on behalf of K.C. v. Hackettstown Pub. Sch. Dist.,*
   2018 WL 3756952, at *5 (D.N.J. Aug. 8, 2018).......................................6

*Kade v Workie,*
   238 F. Supp. 3d 625 (D. Del. 2017)..........................................................6

*L. L. v. Evesham Twp. Bd. of Educ.,*
   710 F. App'x 545, 549 (3d Cir. 2017)........................................................6

*Link v. Trinity Glass Int'l, Inc.,*
   2007 WL 2407101, at *4 (E.D. Pa. Aug. 22, 2007).................................30

*Novotny v. Great Am. Fed. Savings & Loan Assn.,*
   584 F.2d 1235, 1240–45 (3d Cir. 1978)...................................................32

*Oran v. Stafford,*
   226 F.3d 275 (3d Cir. 2000).......................................................................4

Reeves v. C.H. Robinson Worldwide, Inc.,
   594 F.3d 798, 807 (11th Cir. 2010)..........................................................30

*Sharp v. Activewear, L.L.C.*
   69 F.4th 974, 978 (9th Cir 2023)............................................................30

*Tannous v. Cabrini Univ.,*
   2024 WL 1998499, at *6 n.4 (E.D. Pa. May 6, 2024) ............................26

*Tannous v. Cabrini University,*
    697 F. Supp.3d 350, 360 (E.D. Pa. Oct. 4, 2023)...................................................25
*Trafficante v. Metropolitan Life Ins. Co.,*
    409 U.S. 205, 209–10 (1972) ...................................................................................31
*Twin City Fire Ins. Co. v. Glenn O. Hawbaker, Inc.,*
    118 F.4th 567, 574 (3d Cir. 2024)...............................................................................5
*United States v. Jones,*
    29 F.3d 1549, 1553 (11th Cir 1994)............................................................................5
*Werner v. Werner*
    267 F.3d 288, 295 (3d Cir. 2001) ...............................................................................4

**Statutes**

42 U.S.C. § 3610(a)...........................................................................................................31

Haverford's Motion to Dismiss ("Motion") the First Amended Complaint ("Complaint," or "FAC") must be denied not only because it ignores and avoids the applicable law, but because it fatally misstates Plaintiffs' claims.  It attacks a case Plaintiffs have not brought; it accuses Plaintiffs of making factual allegations they have not made; and it faults Plaintiffs for seeking relief they have not asked for.  It cites paragraph after paragraph of Plaintiffs' Complaint, claiming these paragraphs say things they simply do not say.

To this list of non-existent allegations, Haverford has inserted its own counternarrative allegedly describing what is happening on its campus and to these Plaintiffs—going so far as to add "evidence" to the record on this Motion to Dismiss about such matters as what Haverford now claims are procedures for addressing the wrongs here at issue, and what actions Haverford now claims were taken by the College's president, Wendy Raymond.

At the same time, Haverford has nothing to say about many if not most of the allegations supporting the claims Plaintiffs actually do make.  Whole swaths of the Complaint are simply ignored. The parts that are discussed at all in Haverford's memorandum are, when they are not so misstated as to be virtually unrecognizable, disaggregated by Haverford as if they had nothing to do with each other, and as if they were unrelated to the claim put before this Court by the case Plaintiffs actually have brought, and which Plaintiffs' Complaint addresses in elaborate detail:  that the campus of Haverford College is a hostile learning environment for Jews who share the ancestral, cultural and historic commitment of the Jewish people to the land of Israel.

## WHAT THIS CASE IS NOT ABOUT

Rather than attacking the Complaint actually on file, Haverford seeks dismissal of a claim Plaintiffs simply do not make.  Haverford falsely asserts that Plaintiffs are suing because others at Haverford merely disagree with them on a foreign policy question; that Plaintiffs seek to prevent people from articulating political views that Plaintiffs disagree with; and that Plaintiffs are asking this Court to

1

decide what the "true" content of Judaism is, or who is right and who is wrong about the conflict in the Middle East.

Haverford has created a *tromp l'oiel* Complaint with which to do battle. What follows are examples of the false claims Haverford pretends are at issue, followed by Plaintiffs' actual claims.

- Haverford claims that "*Plaintiffs ask this to Court to hold that criticism of Israel equates to antisemitism,*" Motion at 9, 27 (citing FAC ¶¶ 57-58). In reality, FAC ¶¶ 57-58 allege the content of Plaintiffs' beliefs, and the sources of those beliefs. Not one word of the paragraphs Haverford invokes say anything whatsoever about what constitutes antisemitism.

- Haverford claims that "*Plaintiffs ask the Court for an injunction ordering the College to punish those whose views they disagree with when Plaintiffs are confronted with those viewpoints. And Plaintiffs ask this Court not just to compel the College to speak about issues of political significance, but to compel its viewpoint as well.*" Motion at 9 (citing FAC ¶ 425). In reality, in this paragraph Plaintiffs ask the Court to end the persistent "harassment," and "hostile treatment" to which they have been subjected. There is not one word suggesting Plaintiffs seek to mandate agreement with Plaintiffs or the silencing of anyone who disagrees with them on Israel.

- Haverford claims that "*Plaintiffs take issue with the fact that during the College's Fall Plenary on November 5, 2023, students speaking at the Plenary, on balance, allegedly presented pro-Palestinian viewpoints.*" Motion at 46 (citing FAC ¶¶ 225-29). In reality, these paragraphs allege that there was *no* balance between pro-Palestinian views and other views. Plaintiffs were completely silenced, and thereby denied the opportunity to speak *at all* at this event. In contrast, student members of anti-Israel organizations were given advance notice that the topic would be the demand for a ceasefire by Israel, so they had the opportunity to sign up for speaking slots which were denied to Plaintiffs when they sought to respond.

- Haverford claims that "*Plaintiffs[] desire to litigate the merits of the war in Gaza in this Court, for the Court to say who is wrong and who is right.*" Motion at 9. In reality, not a single paragraph of

Plaintiffs' pleading asks this Court to decide who is right and who is wrong on the merits of any

substantive issue, much less to decide who is right about the war in Gaza—which is why this claim

about Plaintiffs' Complaint does not identify any such paragraph.  There is none.  Instead,

Plaintiffs' seek only to vindicate their rights to a learning environment that is free of pervasive

hostility and discrimination against them on the basis of their shared ancestry and religious beliefs.

- According to Haverford, Plaintiffs assert that "*the College allegedly breached a purported legal
duty to voice unequivocal, full-throated support for the actions of a foreign government and []
Landau and the anonymous members were exposed to their classmates' anti-Israel, pro-
Palestinian viewpoints which they considered to be antisemitic.*" Motion at 11.  In reality, as
shown below, not a single paragraph in Plaintiffs' Amended Complaint asks this Court to mandate
support for the actions of any government or asks that anyone not be "exposed" to any
"viewpoint."

- Haverford mischaracterizes Plaintiffs' claim as the "*right to have their political views adopted by
Haverford's administration or to have the College censor the political expression by fellow
community members.*" Motion at 11.  Again: Haverford's brief cites no paragraph supporting this
mischaracterization of Plaintiffs' Complaint, because there is none.  Seeking an end to hostility,
discrimination, and intentional interference with one's educational experience does not require
censoring protected speech, because the law recognizes a key distinction between expressive
speech on public issues and pervasive harassment of private individuals such as Plaintiffs based on
their ethnic, political, and religious commitments.

- Haverford further distorts Plaintiffs' claim to be that "*sharing a college campus with individuals
who voice political opinions with which one disagrees*" constitutes "*an 'injury in fact.'*" Motion at
27.  But the Complaint is filled with paragraph after paragraph of denunciations, shunning,
intimidation, statements even by professors that they will refuse to engage with or forgive anyone
who espouses publicly Plaintiffs' beliefs or commitments or manifests Plaintiffs' ethnic identity.

3

This is not disagreement. This is a de facto policy to socially exile anyone like the Plaintiffs from Haverford's campus. In fact, FAC ¶¶ 322-324 describe Haverford President Wendy Raymond's solicitous engagement with demands that Zionists not be allowed on Haverford's campus. What the Complaint asserts is the exact opposite of what Haverford tells this Court. It is not Plaintiffs who seek to avoid encountering anyone who disagrees with them. Instead, the FAC describes the Administration's pandering toward *anti*-Zionists' objections to ever encountering anyone who disagrees with *them* on Haverford's campus.

**HAVERFORD'S IRRELEVANT AND IMPROPERLY FACT-LADEN STORY ABOUT ITSELF**

Haverford impropery asks this Court to rule on a motion to dismiss on the basis of disputed evidence Haverford puts forward. Some is advanced with a declaration testifying to its authenticity; other such evidence is proffered on the basis of the legal argument that a statement issued by the College's president is a "public record." None of this evidence has any place in a brief supporting a motion under Federal Rule of Civil Procedure 12(b)(6).

President Wendy Raymond's statements are certainly not a self-authenticating public record, nor, as Haverford concedes, are they "integral to or explicitly relied upon in the complaint." *In re Burlington Coat Factory*, 114 F.3d 1410, 1426 (3d Cir. 1997); *cf* Motion at 5 (claiming that "[t]he FAC strategically omits" this statement). The "public records" at issue in *Anspach ex rel. Anspach v. City of Phila.*, 503 F.3d 256 (3d Cir. 2007)*,* and in every other case known to Plaintiffs' counsel regarding the taking of judicial notice, are *government records* or other documents which have already been authenticated by a government agency, such as properly-authenticated public disclosure documents filed with the SEC. *Oran v. Stafford*, 226 F.3d 275 (3d Cir. 2000). *See generally* Federal Rule of Evidence 201(b)(2) (allowing a court to take judicial notice of facts that are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned").[1]  A contemporaneous statement purportedly shared by Haverford's

---

[1] See *Werner v. Werner* 267 F.3d 288, 295 (3d Cir. 2001 (taking judicial notice even of the truth of the contents of a filing from a related action  "could reach, and perhaps breach, the boundaries of proper judicial notice. See *United States v. Jones*, 29 F.3d

president—taken from Haverford's self-serving webpage—hardly rises to the level of such a thoroughly authenticated and unquestionably accurate document.

Beyond its injection of extraneous factual material, Haverford's brief tells Haverford's own glowing story about the College's categorical opposition to antisemitism and its success in eliminating it on campus. Motion at 2-3. This rose-colored myth flatly contradicts the allegations in the FAC, however, and is therefore irrelevant now.. *See Twin City Fire Ins. Co. v. Glenn O. Hawbaker, Inc.*, 118 F.4th 567, 574 (3d Cir. 2024) ("[A] district court must accept as true the well-pleaded allegations in the pleading of the non-moving party and draw all reasonable inferences in that party's favor.").

Nor can Haverford summarily dismiss the bulk of Plaintiffs' allegations on the ground that they are "not supported." The FAC specifically alleges many details such as the dates of events, exact quotations from relevant actors, and even photographs of posters and social media posts, and either inserts into the FAC or attaches such documents as exhibits. For purposes of Haverford's motion, those allegations must be accepted as true—which, in fact, they are. *Id.*

## THE CASE HAVERFORD IGNORES BUT THAT THE COMPLAINT ACTUALLY PLEADS

Turning the focus to where it belongs on a Motion to Dismiss—the allegations in the pleading being attacked—let us begin by asking: What does it mean for an "environment" to be "hostile?"

The dictionary defines an "environment" as "the circumstances, objects, or conditions by which one is surrounded: the factors and influences that affect the growth, health, progress, functioning, etc., of someone or something." https://www.merriam-webster.com/dictionary/environment.

And what is "hostile?" The dictionary's answer is:

a) of or relating to an enemy;

b) marked by malevolence: having or showing unfriendly feelings

_____

1549, 1553 (11th Cir 1994) (stating that the effect of judicially noticing a fact is to preclude the opposing party from introducing contrary evidence and essentially direct a verdict against him as to the noticed fact)."

c)   openly opposed or resisting

d)   (1) not hospitable: plants growing in a hostile environment

(2) having an intimidating, antagonistic, or offensive nature:  a hostile workplace.

https://www.merriam-webster.com/dictionary/hostile.

The law, which uses these words, further requires that for an "educational environment" to be "hostile," the acts at issue must "alter the conditions of * * * the victim's educational environment," making them different from and worse than they are for others.  *Kade v Workie,* 238 F. Supp. 3d 625 (D. Del. 2017).  The hostility must detract materially from the student's educational experience. *See Castleberry v. STI Grp.*, 863 F.3d 259, 264 (3d Cir. 2017) ("Whether an environment is hostile requires looking at the totality of the circumstances, including: the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with [students' educational] performance."); *L. L. v. Evesham Twp. Bd. of Educ.*, 710 F. App'x 545, 549 (3d Cir. 2017).

The Complaint's 403 factual allegations provide a detailed, factual picture of the "circumstances, objects and conditions by which [the Plaintiffs] are surrounded."  These circumstances, objects and conditions "affect the growth, health, progress and functioning" of the Plaintiffs, and their effort to acquire a college education on Haverford's campus.

The FAC's detailed picture makes it clear that the "environment" on Haverford's campus is indeed a severely and pervasively "hostile" one, as the dictionary defines those terms.  If they reveal their identities and religious commitments, the Plaintiffs are identified as "an enemy" by their fellow students, by the organs of student government, and even by some of their very vocal (and foul-mouthed) teachers. *See J.G. on behalf of K.C. v. Hackettstown Pub. Sch. Dist.*, 2018 WL 3756952, at *5 (D.N.J. Aug. 8, 2018) ("Discrimination under Title VI is not limited to being excluded from, or denied the benefits of, a particular school program; rather, courts have understood Title VI to protect students from an academic environment free from racial hostility.").

The FAC gives a snapshot of this hostility with the experience of a young man who had been admitted to Haverford and initially enrolled.  FAC ¶¶ 362-366. Upon acceptance of Haverford's offer of admission, he joined several chat groups created for incoming first year students.  There he made the error of disclosing that he had attended a Jewish day school.  He was immediately asked if he was a Zionist, and when he said he was, he was blocked by some and grossly insulted by others. Some even told him they were glad he felt uncomfortable with the antisemitism expressed by the other students.  He also saw postings by faculty members of antisemitic books and guides to read over the summer in preparation for perpetuating further antisemitism in the coming academic year.

The experience was so bad that the student reversed his decision to attend Haverford and is now in college elsewhere. FAC ¶363.  Of course this student is not a member of the Plaintiffs' association, because he was so horrified by the hostility at issue in this case that he saved himself from what was revealed to him:  a profoundly hostile campus environment, which was permitted to take root and fester by those who are supposed to be responsible for enforcing the law and campus rules.

The hostility manifest in the Haverford chat groups drove away a student who had wanted to come to Haverford, but ultimately decided not to based on his religious beliefs, ancestral commitments and ethnic identity.  He concluded that he simply could not expose himself to such a hostile environment during his college career.

The FAC's factual allegations describe experience after experience showing "the circumstances, objects, or conditions by which the plaintiffs are surrounded."  They make clear that those surroundings abundantly satisfy the dictionary definition of hostility.

The people whose hostile actions are described in the Complaint freely and indeed proudly say that, as the dictionary requires, they "openly oppose and resist" any action to advance or even express the Plaintiffs' beliefs. Indeed, the Complaint makes clear that these people "openly oppose and resist" even the *presence* on Haverford's campus of any person such as Plaintiffs who holds these commitments, or

7

asserts them publicly.  That is, precisely, the dictionary definition of hostility.  The Complaint cites and quotes specific instances where students have demanded of Haverford's President that the campus not permit the presence of Zionists. ¶¶ 322-324.  The President did nothing to defend that presence, or to explain to the young people who presented this demand why it was wrong.

As the FAC alleges, Haverford was founded by Quakers, yet it is open to all other denominations of Christianity—denominations with whom the Society of Friends obviously has any number of very important disagreements.  Haverford's Honor Code purportedly ensures that no religious commitment, ethnic identity, or ancestral commitment is denounced on Haverford's campus, and no denunciations are permitted on Haverford's campus of the beliefs, commitments, or identities of any group.  Except one.

The Complaint's factual allegations are broken down into 25 sections.   They must be read together, because they describe different aspects of the same campus over the same period.  So read, they define the environment at Haverford College—the circumstances, objects, or conditions by which the Plaintiffs are surrounded. They describe events which all students were expected to attend—such as the three Plenaries; they describe campus-wide vigils; they describe events addressed to only anti-Israel students, but which occupied the heart of the campus, such as the Sit-In and the Encampment, and which blocked access to buildings or parts of campus to any person who hadn't joined the events.  They describe hostile posters put up on campus, and those that were put up by Jews and then torn down, and campus-wide messages sent by Haverford's leaders, its teachers, and its students.  They describe Haverford's orientation for new students (Customs), and how even that event is—officially, as a matter of Haverford College policy—tainted by hostility to Plaintiffs' beliefs, commitments and identity.  They describe the policies that govern social life at the school, and the differences in the way those policies are enforced against Jews who are committed to Israel versus everyone else.

The sum of these facts amounts to this: that wherever Plaintiffs turned, whenever they were on campus, they were threatened *not* by others' mere disagreement with them but with students, professors, events, signs, demonstrations, posters, and communications denouncing the Plaintiffs' deeply held beliefs

8

and shared ancestry as evil, demanding their exile from campus, forcing such students to hide those beliefs and commitments as if they were sinful and shameful, and justifying certain professors' open refusal to treat them the same way any other student would be treated.

### A. The Hostility of Haverford's Campus to Plaintiffs' Beliefs, Commitments and Identity

The FAC describes a lengthy series of incidents, occurring throughout the academic year 2023-24 and through the summer preceding the current academic year. The sum of these events meant that, as alleged with respect to each of the individual Plaintiffs, Jews committed to Israel found themselves and their beliefs denounced everywhere they turned, by students, faculty, and senior administration, virtually every single day. Far from "encountering disagreement," these Plaintiffs are surrounded by enmity and contempt.

These events included:

- Public statements by professors glorying in Hamas's slaughter of Jews on October 7, ¶¶ 169-170, ¶176 (Hamas's attacks were "imprisoned people breaking free from their chains" and that images of the slaughter were "beautiful sights to wake up to this morning")

- The same language repeated verbatim and adopted by Haverford's President, ¶ 206;

- A Haverford professor exhilarated by Hamas's atrocities was also involved in The Mapping Project, an effort to track Jewish organizations that was so clearly antisemitic that it was disavowed even by the Boycott, Divestment and Sanctions movement against Israel, ¶¶ 173-174;

- Haverford's failure to condemn any of these antisemitic statements stands in contrast to its continuing campaign against Professor Barak Mendelsohn, a Jewish and Israeli professor who has been punished because he asked that an anti-Israel student express her disagreement with him respectfully. ¶¶ 179-180. The impact of Haverford's treatment of this professor is all the more important because, in the wake of the immense hostility on Haverford's campus to Jewish students who openly express their commitment to Israel, this professor has been one of the very few teachers providing a refuge and advocacy for those committed to Israel. ¶ 391.

- Haverford students demanded that Haverford's President apologize for inviting Zionists to the campus. Raymond was asked by a Jewish student how she could tolerate such a demand that particular people—those committed to Israel, including the student posing the question to President Raymond—be banned from campus. Raymond said nothing to those who had made this demand, and did not respond to the Jewish student who had asked how such a demand could be tolerated. ¶¶ 322-324.

- The FAC repeatedly identifies a sharp bias in the way Haverford's rules are applied to attacks on the Plaintiffs' beliefs and identity versus the way those rules are applied to any other group or statements about such groups, individual members of any such group, or non-member supporters of such groups. The Complaint alleges that the treatment of those who support the Plaintiffs and their beliefs "is a function of efforts by students and others to suppress any speech on campus in support of Israel and Zionism." ¶ 187. Haverford does *nothing* to prevent such efforts and instead effectively supports them. These disparities include:

  o The treatment of Professor Ha, who obscenely denounced the Plaintiffs and proclaimed that "I know their names and I know their faces. Never forgive. No reconciliation." ¶¶ 186-187. Professor Ha's pronouncements have met with no objection from the College.

  o This refusal to condemn hostility to Plaintiffs and their beliefs stands in the sharpest possible contrast to the College's continuing pursuit of Professor Mendelsohn, the one professor very publicly supportive of Plaintiffs and their beliefs. Though Professor Mendelsohn issued no denunciation, obscenity-laced or otherwise, of any student's views about anything, Mendelsohn has been and remains the object of ongoing disciplinary proceedings because he dared to insist that a student who denounced Plaintiffs' beliefs do so civilly. ¶¶ 140, 180, 190, 317.

o   The FAC alleges in detail how the pursuit of professors who support Plaintiffs' beliefs is part of an intentional campaign not only to silence the people who speak out in such support, but also to frighten anyone else, preventing them from speaking up:

> If there's one professor, like that Shai Davidai guy, how do we get him in trouble? What are the ways in which his professorship is sort of tenuous, or maybe in jeopardy, or at what point will it be in jeopardy? How do we create a situation in which he's in jeopardy? In a particular situation that might have more impact and it might silence—this is what the Zionists do—that might silence 100 other professors. If you're able to take out somebody like that, and make an example of them, it might shut up 100 more…. What's our biggest threat here? What's our biggest opportunity? Which domino, if we knock it over, is going to knock 20 dominoes over?"

FAC ¶ 189.

The FAC further alleges that, in contrast to the College's statements condemning violence against other populations and ethnic groups and specifically decrying those who engage in and glorify such violence, Haverford's President and her administration resolutely and repeatedly refused to condemn calls for violence against the Jewish state or its Jewish inhabitants.  See, *e.g.,* FAC ¶¶ 194-196.

These allegations, and the claims that arise on the basis of these factual claims, do not present any demand that, Haverford must issue pronouncements in agreement with Plaintiffs, about Israel, Judaism, Zionism, or anything else.  These allegations instead reveal the sharp contrast between Haverford's official response to attacks on other ethnic groups, religions, and races, and attacks on Jews.

The FAC alleges that Haverford has similarly refused to have the College devote a single athletic event to opposing antisemitism, *not* on the ground that there was no antisemitism on campus but exactly the reverse:  because they could not ensure the safety of the event.  ¶¶ 271-272.  This amounts to a frank admission that there *is* antisemitism on campus, and that the College would not take steps to curb its expression or insulate Plaintiffs from its impact. The event proposed by Landau had nothing to do with Israel or support for or against any side in the current conflict. Haverford College's senior administrator Dean John McKnight told Plaintiff Ally Landau that merely raising the need for awareness about antisemitism would likely arouse uncontrollable fury among students.  FAC ¶ 271.  If, as Haverford

11

suggests in its brief, the people attacking, shunning and denouncing the Plaintiffs were "only" opposed to Israel, and not to Judaism, Haverford could have had no such concern.  Haverford's response is an admission that its students' true target is Judaism, not merely the desire to engage in "criticism of Israel."

Indeed, Haverford has continued to permit operation of a student group which was originally named "BiCo Students for Peace," but this academic year has rebranded itself as "Students for the Liberation of Palestine." This rebranding is now proudly saying the quiet part out loud, which is that this organization supports "the complete dismantling of the apartheid settler colonial state [*i.e.*, Israel] *by all means necessary*." ¶ 202 (emphasis added).

This is an explicit call for the elimination—including through the murder of Jewish civilians—of the world's only Jewish state, one whose creation was authorized by the United Nations in 1947.  ¶ 203. Haverford has failed to revoke this group's official status as a student organization,  ¶ 204, even when Jewish students sought such protection.  "Calling for the murder of any ethnic religious or national group would, it should be obvious, violated Haverford's own antidiscrimination principles as well as federal law, and presumably also the Quaker commitment to a healthy and mutually respectful community. Calling for the murder of Jews, however, is deemed by Haverford College to be unobjectionable."  *Ibid*.

The FAC shows how the shooting of an Arab student by someone who was shortly thereafter revealed to be anti-Israel himself has been transformed, by the College, speaking officially through its senior administrators, into yet another way to attack Plaintiffs' beliefs.[2]  Indeed, because Plaintiff Ally Landau had spoken publicly in support of Israel on Haverford's campus, a "Grievances Document" was circulated on campus asserting "that pro-Israel students and Ally in particular bore personal responsibility for the shooting."  ¶ 213; *see also* ¶ 244.  This accusation was presented by its authors to Haverford's

---

[2] The President's statement is cited in the Complaint, ¶ 207; the statement by Haverford Vice President Nikki Young, at a "vigil" about the shooting, explicitly connected the shooting to the "genocide" being committed by Israel.  ¶ 209. These statements leave no room for doubt as to whom Haverford was blaming for the incident.  Haverford's brief completely ignores the import of these factual allegations, dismissing them with its lawyer's argument that of course shooting someone must be hateful.  Motion at 8.  Haverford's brief is silent on who was doing the hating.  Haverford's student leaders, however, were not silent in this way:  they explicitly blamed the Jewish state and its supporters for the shooting.  Jewish students filed bias reports about Young's statements. Such reports are the ultimate responsibility of Young herself.  The reports were completely ignored. ¶ 210.  They apparently weren't even investigated; they were simply left unaddressed.

President, who failed to do anything effective to defend Ally or the rest of the Jews at Haverford who share her beliefs and commitments.  ¶ 213.  Instead, Haverford has continued to stoke the flames, publicly supporting as fact the claim that the shooting was an exercise in Islamophobia even after the shooter's support of Hamas became public.  ¶ 214.  Indeed, though a threat of this kind to a student from any other minority group would have been met with swift and decisive discipline, Haverford explicitly refused to discipline the authors of the threat against Ally.  ¶ 247. This refusal remained even after "[a]t least one member of the College administration acknowledged that the Grievances Document contained elements . . . reasonably read as antisemitic." *Ibid.*

In fact, rather than condemning the antisemitism in the document, President Raymond thanked its authors for preparing it, and praised it as "dialogue" that was "open, honest, thoughtful and constructive." President Raymond responded carefully and respectfully to each of the substantive points presented in the Grievances Document, offering a series of meetings to address the concerns set forth. *Ibid.*; ¶ 248.

Importantly, President Raymond offered this response even though the Grievances Document "states explicitly that its authors view *any* speech supporting Israel's right to exist as a Jewish state as an attack on Palestinian students" and that "such speech cannot be tolerated on Haverford's campus."  ¶ 252. Plaintiffs reasonably interpreted President Raymond's solicitous engagement with a document demanding intolerance for speech supporting the right of Israel to exist as an implicit ratification of that demand.

Quite obviously, this document, and Haverford's President's entanglement with it, is the exact opposite of the narrative Haverford presents to this Court in its brief. This is not about Plaintiffs' supposed allergy to encountering disagreement.  It is exactly the reverse: open insistence by Haverford students that *they* encounter no expression on Haverford's campus of Plaintiffs' beliefs, because these students disagree with Plaintiffs—and Haverford College response that this demand constitutes "open, honest, thoughtful and constructive" "dialogue."  What can this possibly mean about the place on Haverford's campus for Plaintiffs' beliefs, commitments, and sense of their own identity?  What can it tell the Plaintiffs about *their* place on Haverford's campus?

The circumstances, objects and conditions surrounding the Plaintiffs at Haverford also include a series of occupations of campus facilities, lasting days or weeks at a time, at which Plaintiffs' commitments were continuously denounced and attacked.  This included a "Sit-in" at Founders Hall, at the center of Haverford's campus, described in FAC ¶¶ 258-266, and "Encampments," described in FAC ¶¶ 325-333.

At both of these events, the mere existence of Israel as a Jewish state—something Haverford claims has nothing to do with Judaism—was denounced by Haverford faculty.  At the Sit-In, Professor Aougab announced that Israel's mere existence in conformity with the UN Resolution creating it "was an exercise in white supremacy."  ¶ 260.  "Because Founders Hall is at the center of campus, Jewish students were forced to listen to declamations such as this, as well as to chants quoting from the Hamas Charter" whenever they walked through campus."  *Ibid.*  As the FAC alleges, this "transformed the educational experience of the Jewish students" who share the Plaintiffs beliefs and commitments, "and made their presence on campus a source of dread, which could be endured only at the price of constant public denunciations of their ethnic, religious and ancestral commitments by students and faculty."  ¶ 261.

As the FAC alleges, the Sit-In violated multiple Haverford College rules governing such events, a fact that Haverford's President explicitly acknowledged.  ¶ 263.  Asked how, if that was so, she could allow the violations to continue, President Raymond answered that "she feared that if she took action" to enforce those rules, "even worse behavior by the students would result."  *Ibid.* From this we know two things:  Haverford's President fears bad behavior animated by extreme hostility towards Jews; and she chose not to ensure that the unacceptable behavior stop, but instead to condone a hostile environment for Plaintiffs.

However, when the students conducting the Sit-In took action which Haverford found created a hostile *work* environment for Haverford employees—stuffing garbage bags to resemble body bags with dead Gazans in them, and placing those mock body bags outside President Wendy Raymond's office—

Haverford immediately took action, and ended the Sit-In.  ¶ 265.  Hostile learning environment for Jewish students?  No action.  Hostile work environment for Haverford employees?  Immediate action.

The Sit-In was in December of 2023.  In the Spring, the campus was occupied again, with "Encampments" that once again blockaded the center of the college.  FAC ¶¶ 325-332.  This event included a "Liberated Zone," and throughout the Encampment's duration those who were not participants in the Encampment could obtain access to Founders Hall, which Haverford describes as "the centerpiece of its campus."  FAC ¶ 329, quoting the Haverford College website. The Encampment featured calls for the destruction of the Jewish state, and for "intifada," *i.e.* violence against Jewish civilians who live in or support the existence of Israel as a Jewish state.  *Id.* ¶ 328.

In a statement released on the web, Haverford's official Student Government organization identified itself and the Haverford encampment as "in solidarity with" a Columbia University encampment demanding that Israel immediately cease its self-defense and hurling abuse at all who might be described as Zionists, at which a series of violent and antisemitic events and actions took place.  ¶ 325 (citing https://docs.google.com/document/d/18JA1Fi7SeVNvjdL2R97miuh-7mhyXNS3C4jLK4HUdJs/edit?tab=t.0).  The Columbia encampment with which Haverford's allied itself including the chanting of phrases such as "Death to the Jews"; "Long live Hamas;" and "Globalize the Intifada"; as well "Yehudim, Yehudim" [Jews, Jews]," "all you do is colonize," "Go back to Poland" and "go back to Europe." https://www.nytimes.com/2024/04/21/nyregion/columbia-protests-antisemitism.html.

In a footnote, Defendant attempts to escape the force of these allegations by saying that because these paragraphs describe events "at an entirely different institution," they are irrelevant here.  Motion at 12 n. 5.  This assertion ignores the fact that, as the FAC alleges, Haverford's encampment leadership announced that its encampment was in "solidarity with" the Columbia action.  The FAC also cited a joint statement issued by the Columbia action and Haverford, along with groups at other colleges and universities, entitled "Joint Statement in Solidarity with the Students at Barnard College, Columbia

University and Colleges across the United States, *In Support of the Barnard Student Government Association (SGA) (2023 – 2024)."*  See FAC ¶325.  This makes clear that what was being said and done at Columbia was officially embraced by, and joined in, by the Haverford action, and therefore that events and statements at Columbia are entirely relevant to this case.

The FAC also devotes many paragraphs to a description of the numerous official Haverford events, some with virtually mandatory attendance, that have been conducted as completely one-sided denunciations of Plaintiffs' beliefs and commitments. ¶¶ 221-237, 278-293, 367-391. These events too constitute the surroundings, objects and conditions that define the environment for Plaintiffs at Haverford College,

The Amended Complaint describes the great importance of Plenary, a gathering which all of the College's students are firmly exhorted to attend so they can discuss a wide range of issues including adoption of any changes to the College's Honor Code. ¶221.  As the FAC explains, "Haverford's public statements about Plenary, such as this one https://www.instagram.com/reel/C5Tz6rYJw_d/?igsh=ZXowMXBrMDJzdmtw portray Plenary as a communal event at which all members of the Haverford community come together respectfully to share ideas and speak convivially with one another."  ¶ 222. As the cited Instagram post explains, Plenary "exposes the entire community to the range of ideas that are around."  As the FAC alleges in ¶¶ 236-37,

> The rules governing Plenary were also violated in that the purpose of Plenary is for students to debate and decide issues relating to how the college is run. It is not designed as a referendum on political issues that have no impact on governance of the College. This is most clear in that Plenary has no jurisdiction for holding referenda on issues bearing on the religious commitments of some Haverford students—and thus becoming a forum for the denunciation of those commitments.
>
> Yet that is exactly what occurred at all three Plenaries during the 2023-2024 academic year.

Thus, notwithstanding Haverford's claimed aspiration to tolerance, the FAC alleges that each of the Plenary events held on Haverford's campus during the 2023-24 academic year were completely dominated by hostile denunciations of Plaintiffs' beliefs and identity, with access to the microphone to

16

express or support such beliefs categorically barred.  At Fall Plenary, when the Jewish students asked to be allowed to speak, they were refused. When they appealed to the College's Dean of Students, his feeble response proved useless.  ¶ 234.  Although Haverford's President Raymond attended the entire event and thus had direct, personal knowledge of what transpired there, she did nothing to provide equal access.  She then enthusiastically praised the result as a tremendous and unadulterated success.  ¶ 235.

Haverford campus life was again captured by efforts to force students to adopt views hostile to Plaintiffs and their beliefs at an "emergency" Plenary during the early part of Spring semester.  This event was held in flagrant violation of the rules governing Plenary, which require a quorum, in the absence of which the Plenary must be terminated or suspended.  But Student Government leaders wanted to have this Plenary adopt a resolution demanding that Israel cease its self-defense from Hamas and announce a ceasefire. In the service of that goal, the otherwise all-important and binding rules on attendance were jettisoned.  The plenary continued asynchronously for four days, and the voting deadline extended.  The organization's leaders admitted that the rules had been violated.  ¶ 285.  The College's administration paid no attention to the rule violations and instead "praised the efforts of the Students' Council to get the resolution passed." ¶ 289.

The exercise was repeated at Spring Plenary. This time the ceasefire resolution proposed at the Emergency Plenary did pass.  The path to the Spring event, and the people at the entrance, required all attending to either accept or refuse a Palestinian flag as they came in, which actions were observed by all others in the area.  ¶ 292.  Shortly after the event, on April 9, 2024, the President of the College wrote to the community acknowledging that as a result of the way it was conducted, Jewish students "have felt fearful, silenced, or a protective need to self-censor." Indeed, numerous students felt pressured into voting in favor of the ceasefire resolution against their conscience, because votes were required to be public. ¶ 293. Despite President Raymond's acknowledgement of Jewish students' fears and self-censorship arising from the violations of the otherwise ironclad rules with which Plenary is conducted, she did nothing to stop it while it was

17

happening, and did nothing to undo the action to which the violations gave rise: the student body's official endorsement of a resolution condemning Plaintiffs' beliefs and commitments.

The FAC alleges the violation of numerous Haverford College policies to allow actions by those denouncing Plaintiffs' beliefs, while enforcing such policies against those who affirm or support those beliefs.  We have discussed above the contrast between Haverford's treatment of Professor Barak Mendelsohn, who has supported the Plaintiffs, while professors who attack Plaintiffs' beliefs, insult the Plaintiffs, boycott them and announce their categorical refusal to engage with them or even to "forgive" them, are left entirely free to announce and enforce such bigotry.  FAC ¶¶ 30,170, 182-184, 190, 260, 302, 358.   Plaintiff Ally Landau's effort to simply have the College devote a game to opposing antisemitism— just plain old fashioned "antisemitism," without any reference to Israel, Zionism, Hamas, Gaza, or any element of the Middle East conflict—was refused.  ¶¶ 267-74.  Tellingly, the College claimed it could not guarantee the physical safety of the event.  ¶ 271.

## B.  The FAC Clearly Alleges Defendant's Intent to Maintain, and Deliberate Indifference Toward, an Environment Hostile to Plaintiffs

Over and over again, the FAC describes how Plaintiffs, their parents, and others brought the facts at issue in this case directly to the attention of Haverford's President, and how she explicitly refused to take action.  ¶¶ 195-198, 245-51, 263. It describes the College's President being physically present when College rules were violated to suppress speech in support of Jewish belief, her personal awareness and admission that the rules were being so violated, and her decision to do nothing.  Similarly, it alleges that President Raymond explicitly admitted her awareness of rule violations at the Sit-In, and her refusal to do anything about them because "she feared that if she took action" to enforce those rules, "even worse behavior by the students would result."  ¶ 263.

The FAC describes how representatives of the local Jewish community repeatedly met with Haverford administration officials, described this atmosphere, and asked for help.  These pleas

were not answered with any assurance that College leadership believed the campus was safe for
Jews.  On the contrary: they were met with the admission that College leadership *knew* Jews felt
unsafe, yet placed the onus on Plaintiffs to publicly reject their beliefs and commitments because
other minorities had previously experienced similar challenges and it was now Plaintiffs' turn.
The FAC sets out exactly what Haverford leadership said in these meetings: that "historically at
Haverford, members of the LGBT community had to be closeted to be part of the normative
community; members of the Black/Brown community had to be quiet about anti-Black racism to
be part of the normative community, and that now Jewish students need to [adopt the false and
antisemitic charge of] genocide to be part of the normative community."  ¶¶ 22-24.

Similarly, Haverford administrators have unapologetically embraced a double standard in
evaluating campus hostility to Plaintiffs versus hostility to other groups. Thus in March 2024, an
alumnus questioned Dean John McKnight about the abundance of speech on Haverford's campus
that is virulently hostile to Jews and Israel, asking whether Haverford would tolerate such speech
directed at LGBTQ students. Dean McKnight responded that the two groups are "not
comparable." ¶ 29.

### C.  The FAC Allegations Regarding the Plaintiffs

Title VI, and the contractual obligations that Plaintiffs seek to enforce in this action, define their
protections by reference to protected classifications of people, such as race, religion, ethnicity, national
origin or ancestry.  The FAC accordingly defines the Plaintiffs' membership in the protected categories
that create the rights they enforce in this case:  the Plaintiffs' religious beliefs, their ethnic identity, and
the elements of their shared ancestry.

The FAC includes defines the Plaintiffs' religious belief, and the elements of their ethnic identity and
ancestral commitments, relating to the land of Israel.  At ¶¶56-103, it sets out Plaintiffs' beliefs; provides
the background and sources of those beliefs and commitments; and explains how those beliefs and

commitments manifest themselves in the Plaintiffs' lives.  It explains the basis in Jewish texts for the Jewish peoples' commitment to Israel. It does not, *anywhere or ever*, ask the Court or the factfinder to determine that the Plaintiffs' beliefs are *true*.  It simply and only explains that a commitment to Israel as a Jewish nation is a Jewish idea, a source of Jewish ethnic identity and an ancestral commitment that the Plaintiffs share with other Jews—in fact with the vast majority of other Jews in America and around the world.

Haverford simply contradicts these factual allegations when it says that "the 'harassment' alleged was based not [sic] their Jewish identities but instead on world specific political views and positions on world events, namely the Israel-Palestine conflict and the Israeli government's response to the attacks by Hamas on October 7, 2023, and the resultant military operations in Gaza."  Motion at 24.

It is important to understand Haverford's argument. Haverford is saying that the FAC's allegations cited above, which define the Plaintiffs' beliefs, their ethnic identity and ancestral commitments, are not true.  Instead, Haverford informs this Court, on this Motion to Dismiss, that Haverford, rather than the Plaintiffs or their Complaint, shall define the Plaintiffs' Jewish identities. Haverford, rather than the Plaintiffs or their Complaint, will define what place the commitment to Israel really has in Plaintiffs' religious beliefs and in their ethnic identity.

And, Haverford's brief tells this Court, Haverford has determined that the commitment to Israel has nothing to do with Plaintiffs' "Jewish identities" and is instead no more than a matter of "political views" about "world events."  Indeed, Haverford explains itself clearly, explicitly contradicting FAC ¶ 45, explaining that while "Plaintiffs describe themselves as Jews who 'share a commitment to the existence of Israel as a Jewish state,' (FAC ¶ 45). This is a political position . . . [rather than a matter of] religious beliefs."  Motion at 25. But the FAC explicitly alleges that the belief is a component of each Plaintiff's religious belief, shared ancestry and ethnic identity, ¶¶ 56-103.

**ARGUMENT**

Haverford's legal attack on Plaintiffs' Amended Complaint fails in large part because, as shown in the discussion of the facts here at issue, its Motion argues the insufficiency of facts Plaintiffs have not alleged, while ignoring the ones Plaintiffs have pled. But there are dispositive legal errors as well, and we turn to them now.

This discussion shows the following: first, the unincorporated association Jews at Haverford has standing to seek injunctive relief, and individual plaintiffs both current and former students, have standing to seek damages.

Second, Plaintiffs have properly pled that Haverford is discriminating against them on the basis of status protected under Title VI of the Civil Rights Act: race, national ancestry, and ethnicity.

Third, Plaintiffs' detailed Amended Complaint properly alleges that the Plaintiffs have experienced severe, pervasive, and objectively and subjectively offensive harassment.

Fourth, Plaintiffs have properly pled Haverford's breach of its own policies, which constitutes a breach of contract.

Fifth, those Plaintiffs who have sought to do so are entitled to proceed anonymously. Finally, should this Court find any of Plaintiffs' claims legally insufficient as now pled, Plaintiffs should be given the right to amend so as to address the Court's concerns.

## I.    PLAINTIFFS HAVE STANDING

As Haverford does not appear to deny, Plaintiff Jews at Haverford has standing to seek injunctive relief so long as at least one of its members has the right to do so. As explained by the first court to address the many claims arising out of the wave of attacks on Jewish students on college campuses around the country within the last year, the court in *Kestenbaum v. President and Fellows of Harvard College* explained:

> An association has standing to sue on its members' behalf when (1) at least one of its members would have standing to sue individually, (2) the interests it seeks to protect are "germane to the organization's purpose," and (3) the claims and types of relief requested do not require individual

participation of the members.  *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 342 (1977).  **\* \* \* Injunctive relief [] has "generally been held particularly suited to group representation."  *Camel Hair & Cashmere Inst. of Am., Inc. v. Assoc. Dry Goods Corp.*, 799 F.2d 6, 12 (1st Cir. 1986).**

2024 WL 3658793, at \*3 (D. Mass. Aug. 6, 2024). As Judge Stearns went on to explain,

> In assessing the third *Hunt* prong in cases seeking injunctive relief, the "nature of the claim" aspect thus plays a distant second fiddle to the type of relief sought.  *See Warth*, 422 U.S. at 515 (the third prong "depends in substantial measure on the nature of the relief sought").

*Ibid.*  The relief sought here, of course, is simply and only an end to the harassment of Jewish students at Haverford College who share the Jewish beliefs, commitments, and identity of the individual Plaintiffs. "Because the requested relief will "inure to the benefit of those members of the association actually injured[,]" *Warth*, 422 U.S. at 515," *id.,* at \*4, the association has standing to seek injunctive relief.

As the same court explained in a related case,

> the Complaint paints a picture of a campus environment that, allegedly to this day, is filled with antisemitic and anti- Israeli rhetoric that Harvard refuses to sanction or even address. This is sufficient to give them standing in an individual capacity to seek prospective injunctive relief.

*Brandeis Center v. President and Fellows of Harvard College*, 2024 WL 4681802, at \*4 (D. Mass. Nov. 5, 2024) .  The instant complaint obviously pleads far more than two discrete instances of discrimination, and similarly describes "a campus environment" that is "filled with antisemitic and anti-Israel rhetoric that [Haverford] refuses to sanction or even address."  *Ibid.*  As it is for Harvard, so it must also be for Haverford "sufficient to give [Jews at Haverford] standing."

Similarly, as Haverford does not deny, both currently enrolled students and those who have graduated have standing to seek damages.  See *Kestenbaum*, 2024 WL 3658793, at \*4 & n.7 (even a student who had already graduated has standing to seek damages under Title VI).  Here too, "because at least one plaintiff has standing to pursue each type of relief, these thorny standing thickets are ultimately no bar to jurisdiction."  *Ibid.*

## II.    PLAINTIFFS HAVE PROPERLY PLED THAT HAVERFORD IS DISCRIMINATING AGAINST THEM ON THE BASIS OF RACE, NATIONAL ANCESTRY AND ETHNICITY

Ignoring the FAC's explicit allegations, Haverford asks this Court to dismiss Plaintiffs' claims because, in Haverford's view, the Plaintiffs have only been discriminated against because of their political opinions.  This argument is wrong for at least three reasons:

First, it flatly contradicts the allegations of the Complaint, which must be taken as true at this stage. Second, it ignores the law governing judicial assessment of a plaintiff's religious beliefs. And third, even though they too are quoted in the FAC, Haverford's argument ignores the pronouncements of the United States Department of Education, which, speaking through its Office of Civil Rights, has made clear that the Jewish commitment to Israel and Zionism is an element of Jews' shared ancestry and ethnic characteristics.

### A.  Haverford's Dismissal of Plaintiffs' Beliefs, Commitments and Identity as Mere Political Opinion Expressly Contradicts the Complaint's Allegations

The FAC explicitly pleads that each Plaintiffs' commitment to Israel and to Zionism is an element of his or her religious belief, shared ancestry and ethnic identity.  These allegations are allegations of fact. All such allegations must be taken as true for purposes of this Motion to Dismiss.

The allegations themselves, summarized in this brief above at 19, are set forth in the FAC at ¶¶ 56-103.  They explain the source of this commitment and describe its expression in the Jewish bible, its prayerbook, its calendar, its customs and even its kitchen.  As should go without saying, these allegations describe only the content of the Plaintiffs' own beliefs, commitments and identity; the presence of these allegations in the FAC does not reflect any demand for Court approval of the Hebrew Bible or Jewish tradition writ large.

It is of course black letter law, with which even Haverford agrees, that the allegations of a complaint must be taken as true for purposes of a motion to dismiss. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  See, *e.g., Petruska v. Gannon Univ.* 448 F.3d 615 (3d Cir. 2006) (reversing dismissal of Title VII claim in light of 12(b)(6) mandate that Plaintiff's allegations be accepted as true, and presence of allegation that defendant, a Catholic university, had no religious rationale for the dismissal and that termination was in fact motivated by Plaintiff's gender).

23

To be sure, the allegations must plausibly articulate a claim for relief, but Haverford has not argued that the 47 paragraphs describing the content and source of Plaintiffs' beliefs, commitments, and ethnic identity are implausible in any sense.  For that reason, these allegations must be taken as true.

Haverford's insistence that only politics is at issue for the Plaintiffs, and not religion, or a commitment arising from shared ancestry, or from ethnic identity, is manifestly and flatly inconsistent with Plaintiffs' allegations. Because Plaintiff's allegations about their commitment to Israel and Zionism must be assumed to be true at this stage, Haverford's contrary characterization of those beliefs offers no basis for dismissal.  According to the Complaint, no mere political disagreement is at stake here for the Plaintiffs.  Instead, the Plaintiffs' religious commitment, shared ancestry, and ethnic identity, are what is constantly being denounced all over the Haverford campus.[3]

## B.   The Case Law Directs Courts to Respect Allegations Regarding A Plaintiff's Sincerely Held Religious Belief

A claim of discrimination against religious belief is evaluated on the basis of the claimant's own sincerely held religious belief. E.g., *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 724 (2014); *Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520 (1993).  The trial court opinion in *Lukumi* reflects an extensive factual record, including oral testimony, describing both the history and substance of the religious beliefs and practices there at issue.  *See* 723 F. Supp. 1467, 1469–74.  The FAC in ¶¶ 56-103 similarly sets forth Plaintiffs' sincerely held religious beliefs.[4]  The respect mandated by this line of cases is consistent with the dictate of the law on adjudication of Rule 12(b)(6) motions, which is that the Plaintiffs' allegations regarding the content of their religious belief, ancestral commitments and ethnic identity must be taken as true, at least at this stage of the case, so long as they are plausible.

---

[3] It is possible that, for those who do not share Plaintiffs' religious beliefs, national ancestry, or ethnic identity, it is true that the existence or non-existence of the Jewish state is, indeed, merely political.  But that is irrelevant for purposes of the pending motion.

[4] The purpose of this section is thus to explain what the sources are of Plaintiffs' beliefs, commitment and identity.  The cited paragraphs provide the basis for Plaintiffs' showing that these are in fact their sincerely held belief—not, it should be clear, because Plaintiffs are asking this Court to determine that Plaintiffs' beliefs are true.

**C. The U.S. Department of Education, Office of Civil Rights has determined that the Jewish commitment to Israel and to Zionism is an element of shared Jewish ancestry and ethnic identity.**

In a series of pronouncements, one of which is quoted in the FAC itself, the United States Department of Education, Office of Civil Rights ("OCR") has determined that attacks on Zionism constitute attacks on Jews' shared ancestry and ethnic identity. Thus, for example, when the University of Vermont allowed a teaching assistant to post comments attacking Israel and Zionists, it was "illegally treating individuals differently on the basis of national origin," thus creating "a hostile environment for some Jewish students to persist at the University" in violation of Title VI. See FAC ¶¶ 408-413.

Similarly, OCR determined that Title VI would be violated if organizations at Berkeley Law School did exactly what students at Haverford are trying to do (and succeeding in doing)—namely, excluding Zionists. See Exhibit A hereto. OCR there explained that if "University-recognized student organizations passed a bylaw against inviting speakers who support 'Zionism, the state of Israel, and the occupation of Palestine,'" they would create "a hostile environment at the law school based on [students'] shared Jewish ancestry."[5]

Finally, the true antisemitic nature of the stream of invective on Haverford's campus is recognized by this Court's opinion in *Tannous v. Cabrini University,* 697 F. Supp.3d 350, 360 (E.D. Pa. Oct. 4, 2023), which Haverford itself cites in its brief. Just as Haverford does here, the plaintiff in that case claimed his posts were only about Israel and Zionism, not about Judaism; indeed, Tannous attacked the Jewish Federation of Greater Philadelphia for inappropriately "conflat[ing] the religion of Judaism with the political ideology of Zionism." *Id.* at 356. This Court held it "objectively reasonable for any [university

---

[5] It is well-established that for Title VI purposes, Jewish identity is considered not merely a religion but a race, as Haverford's own authority makes clear. Thus *T.E. v. Pine Bush Central School Dist.,* 58 F.Supp.3d 332, 354–55 (S.D.N.Y 2014), cited in Haverford's brief at 25, explains, "courts have regularly found that anti-Semitic harassment and discrimination amount to racial discrimination." (citing cases). Furthermore, the Office for Civil Rights has made clear that "anti-Semitic harassment can trigger responsibilities under Title VI . . . when the harassment is based on the group's actual or perceived shared ancestry or ethnic characteristics, rather than solely on its members' religious practices." Dear Colleague Letter from Russlynn Ali, Assistant Secretary for Civil Rights, Office for Civil Rights, U.S. Dep't of Education (Oct. 26, 2010); *Cf.* Kenneth L. Marcus, Jurisprudence of the New Anti-Semitism, 44 Wake Forest L. Rev. 371, 388–89 (2009) (chronicling U.S. Department of Education's Office for Civil Rights letters dating back to 2004 that conclude "that Title VI covers harassment of students of Jewish heritage" (internal quotation marks omitted)).

or college] employer to be concerned about" statements by a professor on social media "that Israel should be 'eradicated' and characterizing it as a 'Nazi' state." *Id.* at 360.  And in a later opinion in this case, uncited by Haverford, this Court rejected the professor's claims, noting that "the tone of Mr. Tannous' posts in the period between the two groups' complaints could reasonably be considered extreme." *Tannous v. Cabrini Univ.*, 2024 WL 1998499, at *6 n.4 (E.D. Pa. May 6, 2024).

Professor Tannous's statements stood out on the Cabrini campus, but they are strikingly similar to those of Haverford's professor Ha, cited in the FAC at ¶¶182-184:



**Guangtian Ha** @sula... · 8/19/24     ···
By this point matter is no longer just ceasefire. The state of Israel must be dismantled and the society de-Nazified. Arms embargo, sanction, boycott, attack Zionism on all fronts. Zionism is Nazism, it is fascism. Zionists are racists.

> 🐦 **Hamza Yusuf** @H... · 8/19/24
> A ceasefire was needed in October. When Israel had already made Gaza a place where no human can exist, exactly as promised....

Even the "extreme" statements from Professor Tannous, however, were not also laced with obscenities – obscenities directed specifically at the student like the Plaintiffs:



Neither did Professor Tannous announce that he would never "forgive" or "reconcil[e]" with anyone who shared Plaintiffs' beliefs, commitments or identity:



Who are these people, whom Professor Ha says he will never forgive, and never reconcile with? They are the Plaintiffs, Professor Ha's students—the Jewish students at Haverford who hold the beliefs and espouse the ideas he denounces.  Haverford has refused to do or even say anything about these denunciations and refusals to deal with such students.

### III.   THE PLAINTIFFS HAVE ADEQUATELY PLED INJURY FROM SEVERE, PERVASIVE AND OBJECTIVELY OFFENSIVE HARASSMENT.

Disaggregating those allegations which it does not simply ignore, Haverford asks this Court to find that at this threshold stage of the case Plaintiffs' extensive and detailed allegations just aren't bad enough to warrant the Court's attention.  Much of that argument rests on Haverford's simple contradiction of the Plaintiff's allegations, and its replacement with Haverford's own account of itself, in which a mere "disagreement" is at issue about political matters, and in which the College's leaders are attentive and caring.  It's a convenient story, except that (a) it isn't true, as Plaintiffs will prove when the time comes for that and (b) more importantly now, as shown above, it's completely irrelevant at this stage of the case.

### A. Each Individual Plaintiff or Member of Jews at Haverford Has Been Directly Injured By Identified Acts of Harassment

A good deal of Haverford's argument is wrong because it simply pretends away vast parts of the Complaint. The reality is that the FAC alleges that each Plaintiff has been directly and personally affected by the lengthy stream of hostile events designed, as Haverford students explicitly tell the College's leaders, to get people like the Plaintiffs off the campus, and to make them suffer so long as they are there. And the FAC clearly alleges that each Plaintiff has suffered, and continues to suffer now, because of these hostile acts.

The FAC carefully describes a series of events at which the Plaintiffs' beliefs, commitments and identity are denounced—*not* merely disagreed with in an open dialogue, but presumptively denounced as evil, often with obscenities added for good measure, even by professors. See ¶¶169-184.  It alleges that because of these hostile acts each Plaintiff has suffered.  In the wake of such hostility, one Plaintiff fled campus because it was so bad.  ¶ 47.   All Plaintiffs have been forced to change the way they get from one building to another on campus to avoid encountering a hostile crowd that will either try to force them to publicly disavow their own beliefs or denounce them for espousing those beliefs.  ¶¶46-50.

The FAC describes the takeover of the central green and building on Haverford's campus by a mob of students continuously waving posters quoting Hamas to advocate for the destruction of the Jewish state, and chanting such messages as "long live the Intifada" – *i.e.*, justifying and promoting attacks on Jewish civilians—and demanding that the College and the United States require Israel to relinquish its right to self-defense.

These forms of injury are sufficient to establish injury under Title VI, as Judge Stearns of the District of Massachusetts found in *Kestenbaum.* There, the Court held that injury was shown by, among other things, the fact that as a result of the anti-Israel demonstrations on campus, "[s]ome students felt compelled to doff clothing that might identify them as Jewish and ceased attending Jewish-sponsored events on campus. Still others feared walking about campus, missed classes, and felt isolated from their classmates." *Kestenbaum*, 2024 WL 3658793, at *2; *id.* at *5 ("The SAC vividly limns repeated, fear-inducing conduct that amounted to more than 'off-color banter,' or, in Harvard's words, 'offensive utterances.' The protests were, at times, confrontational and physically violent, and plaintiffs legitimately fear their repetition. The harassment also impacted plaintiffs' life experience at Harvard; they dreaded walking through the campus, missed classes, and stopped participating in extracurricular events.") (internal citations and alterations omitted).

Similarly, Haverford students declared a "Liberated Zone" during their multi-day "encampment" in solidary with the similar event a Columba University. At the encampment itself and in the Liberated Zone, no students who did not share the protestors' agenda were admitted.   FAC ¶ 326.

The same conduct was held by the court in *Frankel v. Regents of Univ. of California*, 2024 WL 3811250 (C.D. Cal. Aug. 13, 2024), to constitute discrimination against Jewish students so severe as to warrant the issuance of a Preliminary Injunction barring the practice. [6]

---

[6] Haverford ignores the above-cited cases though they are, so far as Plaintffs' counsel is aware, the only ones directly on point, ruling as they do on activities that are essentially identical to those occurring on Haverford's campus and at issue in this case. Instead, most of the cases Haverford marshals are so far afield or such weak claims as to be irrelevant. *Zinman v. Nova Southeastern University,* for example, rejected the clain of a *pro se* plaintiff that he could not obey a mask mandate during Covid because doing so would compel him to worship idols. *Lubavitch-Chabad of Illinois, Inc. v. Nw. Univ.*, 6 F. Supp. 3d

**B.  The Complaint's Allegations of Harassing Actions Must Be Assessed as a Whole**

As the cases discussing harassment make clear:

Making a hostility determination in the educational context, as in the employment context, entails examining the totality of the circumstances, including: the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the victim's academic performance. * * * no single factor is required. Finding the harassment pervasive means that the challenged incidents are more than episodic; they must be sufficiently continuous and concerted.  * * * Generally speaking, this analysis is fact-specific and, therefore, as in this case, is best left for trial.

*Kade*, 238 F. Supp. 3d at 633 (internal citations omitted).  Harassment, the courts have explained, is not

simply a matter of targeted attacks by person on another, with its impact measured by the single action

itself.  Rather, harassment

pollutes the victim's [environment], making it more difficult for her to do her job, to take pride in her work, and to desire to stay on in her position. When the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated.

*Sharp v. Activewear, L.L.C.* 69 F.4th 974, 978 (9th Cir. 2023) (internal citations omitted).  Assertedly

harassing "conduct is to be viewed cumulatively and contextually, rather than in isolation." *Reeves v. C.H.*

*Robinson Worldwide, Inc.*, 594 F.3d 798, 807 (11th Cir. 2010) (*en banc*).  Thus

[t]he Supreme Court has held that the question of whether a work environment is abusive is defined not by a bright-line rule, but by the totality of the circumstances.  The Court set forth such factors as the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.

*Link v. Trinity Glass Int'l, Inc.*, 2007 WL 2407101, at *4 (E.D. Pa. Aug. 22, 2007). Thus, "the existence

of a hostile educational environment is a question of fact that must be determined based on the totality of

the circumstances." *L.T. v. Eleanor Murray Fallon Middle Sch.*, 2024 WL 3678014, at *6 (N.D. Cal. Aug.

5, 2024).

---

806, 816 (N.D. Ill. 2013) held that no religious defense could be mounted to a University rule barring the service of alcohol to minors—and even that was on summary judgment, not on a motion to dismiss. *Weiss v. City University of New York* 2019 U.S. Dist. LEXIS 43869 (S.D.N.Y. March 18, 2019) references religious beliefs in a footnote but does not identify them.  The case includes absolutely no discussion of any religious belief, ancestral commitment or ethnic identity in any way analogous to those at issue here.

Because this is the law, Haverford cannot escape the Plaintiffs' claims by arguing that not every individual plaintiff or member of Jews at Haverford was in the room for, or present at, every individual incident of harassment. If an hours-long hatefest is held on campus, attended by hundreds of Haverford students, at which Plaintiffs' beliefs, commitments and identity are denounced, and at which not a single person is allowed to speak in support of beliefs or commitments, and if the College's President then applauds the event as a great success, every one of Haverford's 1400 students will know about it.

That, indeed, is exactly the goal of the people on Haverford's campus attacking Plaintiffs' beliefs, as the FAC explicitly alleges.  See ¶189, quoted above at ___, where FAC explains that the goal of attacking one prominent advocate "might silence 100 other professors. If you're able to take out somebody like that, and make an example of them, it might shut up 100 more."

The obligation to read the FAC's account of harassing incidents at Haverford as a coherent whole, affecting all students who share Plaintiffs' commitments, is particularly clear for purposes of this motion because the FAC explicitly alleges that Jewish students are directly affected even by harassment or attacks directed at other Jews.  See FAC ¶¶46-50.  Haverford is a small and intimate campus, of approximately 1400 students in all years.  The events described in the FAC were known virtually universally, and certainly among the Jewish students at whom they were directed.

Indeed, the cases make clear that the wrong at issue in a hostile environment is the discriminatory environment, not simply the individual acts that, together, create that environment.  That's why people who are *not* members of a protected group have standing to sue under the Civil Rights Act when a hostile environment is created that deprives those people of an integrated environment. That is the holding of *Trafficante v. Metropolitan Life Ins. Co.*, 409 U.S. 205, 209–10 (1972), the seminal associational standing case in the race discrimination context.

> In *Trafficante*, the Supreme Court found that two tenants who alleged a loss of the social and professional benefits of living in an integrated community, due to landlords' alleged discrimination against racial minorities, had standing to sue under Title VIII of the Civil Rights Act of 1968, 42 U.S.C. § 3610(a). Like our analysis in *Hackett*, the *Trafficante* Court's analysis was textual. The Court rejected an interpretation of Title VIII that would limit persons entitled to sue to "objects of discriminatory housing practices" because it found the definition of "person ag-

31

grieved" contained in section 810(a) of Title VIII – "(a)ny person who claims to have been in-
jured by a discriminatory housing practice" -- to be "broad and inclusive." Thus, the Court
concluded, "We can give vitality to [the Act] only by a generous construction which gives
standing to sue to all in the same housing unit who are injured by racial discrimination in the
management of those facilities within the coverage of the statute."

*Anjelino v. New York Times Co.,* 200 F.3d 73, 90 (3d Cir. 1999). See also *Novotny v. Great Am. Fed.*

*Savings & Loan Assn.*, 584 F.2d 1235, 1240–45 (3d Cir. 1978), *rev'd on other grounds,* 442 U.S. 366

(1979), (male plaintiff, who claimed to have been discharged for failing to adhere to a company policy of

sex discrimination against women, could sue under Section 1983).

Each individual before this Court, either as a named plaintiff, an anonymous plaintiff, or as a

member of the unincorporated association Jews at Haverford, has been directly injured by at least one act,

and in fact many acts, of harassment directed at them because of their religious beliefs, ancestry, and

ethnic identity.  But in addition, the cases cited in this discussion make clear that the injury governed by

the Civil Rights Act is the creation and operation of a hostile environment, and that it is that environment,

rather than any individual act of harassment, which bestows a right of action.

## IV.    PLAINTIFFS HAVE CLEARLY ALLEGED HAVERFORD'S DELIBERATE INDIFFERENCE TO, AND INDEED INTENTIONAL SUPPORT OF, THE HARASSMENT HERE AT ISSUE

Here is perhaps the clearest example of Haverford simply pretending away numerous paragraphs

of the FAC explicitly alleging facts that Haverford tells this Court are lacking. Over and over, the FAC

alleges that parents and students, including Plaintiff Ally Landau and Plaintiff HJSC spoke face to face

with Haverford President Wendy Raymond and to Provost Nikki Young and Dean John McKnight, to ask

for their intervention.  Not one of them took meaningful action to stop the harassment.  When Jewish

students were barred from speaking at Plenary in support of their commitment to Israel, Dean McKnight

was there, and was asked for help, and he failed to do anything meaningful.  When Ally asked for a

basketball game to be devoted to antisemitism, McKnight did less than nothing:  he cancelled the game,

yielding to—and admitting the existence of—the threat of violence on Haverford's campus directed

simply and only at promoting Jew-hatred.  When Haverford students asked that the administration not join

in the attribution of blame to Jewish students' support of Israel for the shooting of a Haverford student by a Hamas supporter, the College heard the requests and did nothing.  When students and faculty spread the absurd claim that the Jewish state is intentionally infecting Gazans with diseases, and Jewish students asked that such blood libel be stopped, the College refused.  When students transformed graduation into an extended attack on Israel, Haverford's leaders paused the ceremony over and over so that the attacks could be made effectively, from the stage that Haverford gave to the attackers.  When Jewish students tried to enable Haverford's freshman orientation to include something to counter the virulent attacks on the Jewish state, the reaction among Haverford students was an obscenity-laced demand for an apology for even having to listen to the proposal that such information be provided to new students.  Haverford apologized.  ¶374.

After the Complaint in this case specifically identified one student and one professor for attacking and mocking the Plaintiffs' beliefs, the President of the College presided over the presentation of awards to these two individuals at graduation, precisely *because* these two people had committed the acts described in the original complaint.  An admitted student who had planned to come to Haverford was attacked in Haverford chat groups created for incoming freshmen, because he revealed that he shares Plaintiffs' commitment to Israel.  The student approached Dean McKnight about the attacks, and McKnight told the student all he could do was complain to the very students who were conducting the attack.  McKnight did nothing to reduce the force of the attacks or to speak to the attackers.

When harassment on Haverford's campus become so offensive that representatives of the Philadelphia Jewish community came to campus to meet with Haverford's senior administrators to discuss the issue, these people were shocked to hear Haverford leaders responded by saying "that historically at Haverford, members of the LGBT community had to be closeted to be part of the normative community; members of the Black/Brown community had to be quiet about anti-Black racism to be part of the normative community, and that now Jewish students need to condemn genocide to be part of the normative community."

Haverford's leaders know, the FAC makes absolutely clear, exactly what is happening on its campus to Jewish students who support Israel. They approve of—they choose not to do anything about—these attacks on the Plaintiffs and their beliefs.   Intent is more than abundantly pled.

### V.   THE FAC PROPERLY ALLEGES HAVERFORD'S BREACH OF ITS CONTRACTUAL OBLIGATIONS TO THE PLAINTIFFS

Haverford's attack on Plaintiffs' contract claims is, yet another river of denial about what is actually in the pleading.  It ignores specific instances in which individual plaintiffs were directly affected by these breaches of duty, and it also ignores the systemic impact of the breaches on the entire Haverford community and therefore on the campus environment.

The FAC charges that Haverford has made and then breached its promise not to discriminate against students on the basis of, among other things, their religion, national origin or ethnicity.

The College's cancellation of the antisemitism awareness event directly injured Plaintiff Ally Landau.  FAC ¶__.  Capitulation to the threat of disruption by students who will not allow Haverford to promote awareness of antisemitism is the clearest possible breach of a policy barring discrimination on the basis of religion, national origin, and ethnicity.  But here yet again, that breach did not only affect Ally:  it affects, and injures, every Jew on campus—certainly it affects every member of the Plaintiff unincorporated association.  Haverford does not argue otherwise; it contents itself merely with denying that the FAC contains any allegations describing any such breach.

Allowing destruction of posters promoting a purely Jewish event is also a breach of the nondiscrimination policy.  So is giving an award to a student who mocks the destruction of the posters. ¶ 353.  Whom did that award injure?  To answer that one need only ask: Whose standing in the community did the award undermine by conferring official praise on a student known to have publicly announced "i be tearing down Chabad posters and eating them like f*ckin fruit rollups"?

The FAC states the obvious – that grant of this award at graduation constituted the College's explicit promotion of this insult to Jewish students and attack on their place in the Haverford community. ¶ 356.  Haverford's defense seems to rest on the contention that the only breach that matters is one that

specifically targets an individual student –so that, for example, the Poster policy can only be enforced by a student who puts up a poster and then complains that *that poster* was torn down.

But this need be no more true for the contract claim than it is for the Civil Rights claims, with respect which the law is explicit that, as noted above, individual targeting is not required.  The promise not to discriminate is a promise that the College's campus will be a place free of discrimination.  The promise that all posters will be treated a certain way is a promise that the College's campus will be governed according to specific rules that apply to everyone, and every poster, equally, so that posters announcing a Jewish event will not be torn down and that tearing down a poster advertising a Jewish event will be investigated with the same rigor as similar treatment of anyone else's poster.  The same law that allows a white person to assert the right to an integrated environment free of discrimination against Black people allows Plaintiffs to enforce Haverford's contracts mandating a set of policies that protect all students.

The same is true for Haverford's media policy.  Private social media posts espousing racist ideas are, the FAC alleges, regulated by Haverford, and that applies not only to those officially authorized to use the College's accounts but to all members of the Haverford community, even students admitted but not yet enrolled.  FAC ¶138.  But private social media posts espousing attacks on Plaintiffs' beliefs are not regulated.  ¶141.  That's a breach of Haverford's policy that hurts the Plaintiffs. That injury is incurred regardless of whether Plaintiff's own media posts are suppressed, because it creates a campus where three professors use private social media accounts to glorify the murder of Jews.

Because Haverford regulates some private social media, and bars members of the Haverford community from using private social media to espouse racist ideas, Haverford breaches its policy by failing to do the same for private social media accounts glorifying in the murder of Jews.

## VI.   PLAINTIFFS' REQUEST FOR ANONYMITY IS NO REASON TO DISMISS THEIR CLAIMS

This case challenges an environment relentlessly hostile to Plainitffs' beliefs, commitments and identity.  The Complaint lays out in elaborate detail all of the ways that hostility manifests itself and the

ways it affects, injures and threatens such people.  Contemporaneously with the filing of this brief, Plaintiffs are submitting a motion for leave to proceed anonymously, and that motion sets forth the need for such treatment.

The Complaint's identification of one student by name does not strip the Plaintiffs of the right to proceed anonymously.  First, even the lawyers' argument which forms the only basis for this contention does not assert that this student's name became public because of the Plaintiff's Complaint.[7]

Second, it is undisputed that this student has incurred absolutely no harm from being exposed, and he appears now to have graduated.  He received an award for the conduct described in the Complaint. This young man was entirely among friends at Haverford.  Caselaw dealing with a student whose exposure in a complaint actually hurt him, thereby diminishing the moral force of a plaintiff's claimed need for anonymity, is entirely irrelevant here.

## IF ANY ASPECT OF HAVERFORD'S MOTION IS GRANTED PLAINTIFFS SHOULD BE GRANTED LEAVE TO AMEND

For two reasons, any grant of Haverford's dismissal request should give Plaintiffs leave to amend. First, this will be the first time the parties have learned from the Court its opinion on what standards actually govern this dispute.

Second, Rule 12 would have entitled Plaintiffs to amend in response to the motion *sub judice*, and the stream of antisemitic attacks at Haverford has continued into the present.  Attached as Exhibit B is letter from Haverford faculty member Richard Friedman to President Raymond describing a very recent presentation on campus by Anti-Defamation League, throughout which students and faculty stood outside shouting into bullhorns, banging on the windows, and denouncing the ADL as racist and antisemitic (!). President Raymond was present throughout this event and did nothing to stop this assault.  If more

---

[7] No actual evidence submitted by Defendant relating to this issue, such as a declaration by the affected student.

horrible conduct is needed to establish the presence of an environment at Haverford hostile to the

Plaintiffs, there is a running river of new material to add.

## CONCLUSION

For the foregoing reasons, the Court should deny Haverford's Motion to Dismiss the Complaint.

DATED: November 08, 2024                                    Respectfully submitted,

Jerome M. Marcus, PA Attorney ID 50708
Lori Lowenthal Marcus, PA Attorney ID 5338
THE DEBORAH PROJECT
P.O. Box 212
Merion Station, PA. 19066
Voice: 610.880.0100
FAX:  610.664.1559

37