**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| ———————————————— | : | |
| ALLY LANDAU, HJSB, HJSC, and JEWS AT HAVERFORD | : | CIVIL ACTION NO. |
| | : | No. 2:24-cv-02044-GAM |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| THE CORPORATION OF HAVERFORD COLLEGE | : | |
| | : | |
| Defendant. | : | |
| ———————————————— | | |

**DEFENDANT THE CORPORATION OF HAVERFORD COLLEGE'S
MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS
PLAINTIFFS' SECOND AMENDED COMPLAINT**

Defendant the Corporation of Haverford College submits this Memorandum of Law in support of its Motion to Dismiss the claims asserted against it in the Second Amended Complaint filed by Plaintiffs Ally Landau, HJSB, HJSC, and "Jews at Haverford" pursuant to Federal Rule of Civil Procedure 12(b)(6).

## TABLE OF CONTENTS

Page(s)

INTRODUCTION ..................................................................................................................1

FACTUAL BACKGROUND ...............................................................................................3

I.      "Jews at Haverford" ....................................................................................................3

II.     The October 7th attacks on Israel by Hamas and initial response on Haverford's
        campus. ........................................................................................................................5

III.    Alleged social media activity by Haverford employees. ............................................7

IV.     Haverford's Plenary. ...................................................................................................9

V.      Allegations involving Landau. ..................................................................................11

VI.     Expressive activity on campus. .................................................................................13

VII.    Additional allegations. ..............................................................................................16

VIII.   College policies. ........................................................................................................18

LEGAL STANDARD .........................................................................................................19

ARGUMENT ......................................................................................................................19

I.      Plaintiffs' Title VI hostile environment claim fails because they do not allege that
        any of the individual plaintiffs or purported member of "Jews at Haverford" were
        subject to discrimination or harassment actionable under Title VI, or that
        Haverford was deliberately indifferent to any alleged harassment of which it had
        knowledge. ................................................................................................................19

        A.      Plaintiffs fail to allege facts that show that Haverford was deliberately
                indifferent to any alleged harassment of which it had actual knowledge. ............20

                1.      Plaintiffs fail to sufficiently allege that Haverford had actual
                        knowledge of alleged harassment against any Plaintiff or alleged
                        member of "Jews at Haverford." ................................................................21

                2.      Even if the SAC alleged actual notice to Haverford, Plaintiffs fail
                        to show that the College's response to any alleged harassment was
                        clearly unreasonable .................................................................................21

        B.      Plaintiffs fail to allege facts supporting aggregation of their claims to
                support the existence of a hostile environment. ......................................................25

C.    Allegations concerning reactions of non-students are immaterial to and cannot support Plaintiffs' Title VI hostile environment claim. ............................26

D.    The SAC fails to allege that any Plaintiff or member of "Jews at Haverford" experienced harassment that was so "severe, pervasive, and objectively offensive" that it deprived them of access to an educational activity or benefit. ................................................................28

1.    The SAC fails to allege that any individual Plaintiff or alleged member of "Jews at Haverford" was deprived of access to an educational activity or benefit. ...................................31

E.    Plaintiffs fail to allege facts that show that any discrimination or harassment was because of their race, color, or national origin. ..........................33

II.    The SAC fails to state a claim for breach of contract because Plaintiffs fail to identify any contractual duty breached by Haverford. .......................................39

III.    Plaintiffs' claims should be dismissed with prejudice. .......................................44

**CONCLUSION** ................................................................................**45**

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**FEDERAL CASES**

*Anspach ex rel. Anspach v. City of Phila., Dep't of Pub. Health*, 503 F.3d 256 (3d Cir. 2007) ..............................................................................................................................................6

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .................................................................................19, 41

*C.M. v. Pemberton Twp. High Sch.*, CV No. 16-9456 (RMB/JS), 2017 WL 384274 (D.N.J. Jan. 27, 2017) ...............................................................................................................................33

*Concerned Jewish Parents & Tchrs. of Los Angeles v. Liberated Ethnic Stud. Model Curriculum Consortium*, No. CV 22-3243 FMO (EX), 2024 WL 5274857 (C.D. Cal. Nov. 30, 2024) ....44

*Cooper v. Samsung Elecs. Am., Inc.*, 374 F. App'x 250 (3d Cir. 2010) ......................................18

*Davis Next Friend La Shonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629 (1999) ..........20, 31

*Dawn L. v. Greater Johnstown Sch. Dist.*, 586 F. Supp. 2d 332 (W.D. Pa. 2008) .......................23

*De Piero v. Pennsylvania State Univ.*, 711 F. Supp. 3d 410 (E.D. Pa. 2024) ..............................28

*Doe v. Abington Friends Sch.*, No. CV 22-0014, 2022 WL 16722322 (E.D. Pa. Nov. 4, 2022) ...............................................................................................................................................37

*Doe v. Brown Univ.*, 166 F. Supp. 3d 177 (D.R.I. 2016)..............................................................43

*Doe v. Galster*, 768 F.3d 611 (7th Cir. 2014) .......................................................................28, 30

*Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274 (1998) .....................................................24

*Hassen v. Gov't of Virgin Islands*, 861 F.3d 108 (3d Cir. 2017) .................................................19

*In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410 (3d Cir.1997) ................................5, 13

*Johnson v. Cmty. Coll. of Allegheny Cnty.*, 566 F. Supp. 2d 405 (W.D. Pa. 2008).....................28

*Lansberry v. Altoona Area Sch. Dist.*, 318 F. Supp. 3d 739 (W.D. Pa. 2018)..............................32

*Lubavitch-Chabad of Illinois, Inc. v. Nw. Univ.*, 6 F. Supp. 3d 806 (N.D. Ill. 2013)...................37

*Mandel v. Bd. of Trustees of California State Univ.*, No. 17-CV-03511, 2018 WL 1242067 (N.D. Cal. Mar. 9, 2018) ......................................................................................................... passim

*Murrell v. Sch. Dist. No. 1, Denver*, 186 F.3d 1238 (10th Cir. 1999) ..........................................29

*Newman v. Point Park Univ.*, No. 2:20-CV-00204, 2022 WL 969601 (W.D. Pa. Mar. 31, 2022) ....................................................................................................................................32

*Nungesser v. Columbia Univ.*, 169 F. Supp. 3d 353 (S.D.N.Y. 2016) ..........................................43

*Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192 (3d Cir. 1993) .............19

*Robinson v. Dalton*, 107 F.3d 1018 (3d Cir. 1997)......................................................................28

*Roe v. Pennsylvania State Univ.*,
      No. CV 18-2142, 2019 WL 652527 (E.D. Pa. Feb. 15, 2019)..........................................31, 32

*Santiago v. Warminster Twp.*, 629 F.3d 121 (3d Cir. 2010)........................................................41

*Schmidt v. Skolas*, 770 F.3d 241 (3d Cir. 2014) .........................................................................19

*Sewell v. Monroe City Sch. Bd.*, 974 F.3d 577 (5th Cir. 2020).....................................................29

*StandWithUs Ctr. for Legal Just. v. Massachusetts Inst. of Tech.*, No. CV 24-10577-RGS, 2024 WL 3596916 (D. Mass. July 30, 2024).......................................................................21, 22, 24

*Students for Just. in Palestine, at Univ. of Houston v. Abbott*, No. 1:24-CV-523-RP, 2024 WL 4631301 (W.D. Tex. Oct. 28, 2024) ..........................................................................35, 36

*T.E. v. Pine Bush Cent. Sch. Dist.*, 58 F. Supp. 3d 332 (S.D.N.Y. 2014)...............................36, 37

*Tannous v. Cabrini Univ.*, 697 F. Supp. 3d 350 (E.D. Pa.) .....................................................27, 38

*Vance v. Spencer Cnty. Pub. Sch. Dist.*, 231 F.3d 253 (6th Cir. 2000) ........................................29

*Weiss v. City Univ. of New York*, No. 17-CV-3557 (VSB), 2019 WL 1244508 (S.D.N.Y. Mar. 18, 2019) ....................................................................................................................................37

*Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655 (2d Cir. 2012) ..............................................28

*Zinman v. Nova Se. Univ., Inc.*, No. 21-CV-60723, 2021 WL 4025722 (S.D. Fla. Aug. 30, 2021) ....................................................................................................................................37

## INTRODUCTION

In this case, Plaintiffs seek to have this Court define specific categories of expressive conduct as categorically unacceptable, bigoted, and punishable on a private College campus and to dictate how the College itself expresses its official position on such matters. Specifically, premised on a small handful of mostly vague allegations about events at Haverford College ("Haverford" or the "College") where almost *no specific students* are referenced, Plaintiffs ask this Court, in their Second Amended Complaint ("SAC") to hold that certain speech, no matter who says it or under what circumstances, equates to unlawful harassment, and further to deem Haverford an unlawfully discriminatory and hostile environment in violation of federal law because Haverford has not censored expression on its campus in such a manner. That is an invitation this Court should decline.

Haverford is staunchly committed to fostering a community where its members engage in critical inquiry and inclusive, intellectual learning, both in and out of the classroom. To that end, free expression and confrontation between community members is a deeply-embedded feature of Haverford's culture and educational environment. Historically, the Haverford College Honor Code has been an integral aspect of a Haverford education, and today defines how students at the College are to engage with each other in terms of peaceful confrontation.[1] This commitment to

---

[1] *See* https://honorcouncil.haverford.edu/the-code/what-is-the-code/; *see also* Richards Decl. Ex. 1, Honor Code at 5-7 (Section 3.06 Confrontation) ("Confrontation, in the Haverford sense, refers to initiating a dialogue with a community member about a potential violation of the Honor Code with the goal of reaching a common understanding. It should be understood that achieving a common understanding does not necessarily mean reaching agreement. . . . This process is a dialogue, in which the confronted party leans into discomfort and actively listens to acknowledge and understand the harm experienced by the confronting party in order to facilitate the restorative process. This process aims to restore any part of the confronting party's trust in, respect for, and inclusion in the community that was lost due to the harm they experienced, as well as restore the confronted party to the community.")

confrontation – a deeply rooted concept familiar to every Haverford community member and enshrined in the College's Honor Code – is designed to foster an atmosphere of trust, concern, and respect, where student community members take ownership of implementing the Honor Code. Allowing for such a high level of agency among a student body representing endlessly diverse backgrounds and personal beliefs admittedly does not yield a neat and tidy process, and there is little doubt that Plaintiffs are highly critical of that atmosphere. The College recognizes that its commitment to free expression, student agency, and confrontation between community members often comes with struggle and strife, but believes strongly that the resulting community is worth such discomfort. There is a difference between conduct that offends and conduct that we litigate, a difference intended by Congress and repeatedly affirmed by the Courts.

As an initial matter, in spite of the case caption and the plaintiff-association's self-styled name, "Jews at Haverford" is very much *not* all Jews at Haverford. This is not a class action; Plaintiffs do not have standing to sue on anyone's behalf except themselves and their alleged members. And even though Plaintiffs only identify a handful of members of "Jews at Haverford," they are only able to speak in generalities about what those individuals allegedly experienced on campus and how it impacted them. Instead, Plaintiffs rely on allegations about correspondence from unnamed alumni, parents, and various "community members" beyond the confines of campus—in short, individuals to whom the College owes no cognizable legal duty.

The SAC also fails to state a claim upon which relief can be granted. Plaintiffs fail to allege conduct that is actionable under Title VI for at least three reasons. *First*, Plaintiffs fail to allege facts that show the College was deliberately indifferent to alleged harassment. *Second*, the conduct alleged, even if true, does not meet the bar of severe, pervasive, and objectively offensive harassment. And *third*, Plaintiffs fail to allege facts that show they were subject to harassment on

the basis of race, color, or national origin, as required to state a claim under Title VI. Finally, the SAC fails to identify any instance in which the College breached any alleged contract with Plaintiffs or the plaintiff-association's members.

Plaintiffs have had three opportunities to plead their claims, and they have failed each time. As such, Counts I and II should be dismissed, with prejudice, for failure to state a claim.

## **FACTUAL BACKGROUND**

### I.    **"Jews at Haverford"**

"Jews at Haverford" alleges that it is "an unincorporated active membership association" composed of "students, as well as faculty, alumni, and parents of students of Haverford, who are Jewish and who share a commitment to the existence and survival of Israel as a Jewish homeland and safe haven." (ECF 35, "SAC" ¶ 9). Plaintiffs allege that "Jews at Haverford" has "over fifty" members (*id.*), though they only specifically identify five such individuals: Landau, a Haverford graduate (*id.* ¶ 12); two anonymous members, "HJSB" and "HJSC," alleged to be current Haverford students (and named pseudonymously as individual plaintiffs in this litigation) (*id.* ¶ 12-14); Haverford professor Barak Mendelsohn[2] (*id.* ¶ 60); and Haverford professor Richard Freedman. (*Id.* ¶ 83).[3] Plaintiffs allege that unidentified members of "Jews at Haverford" communicated amongst each other about what they perceived as "the hostile environment on campus" and "about communal dinners and other events of mutual interest" in a "WhatsApp group

---

[2] The SAC refers to Mendelsohn as "Plaintiff Barak Mendelsohn." (SAC ¶ 60). But Professor Mendelsohn is not an individual Plaintiff in this case and has not personally asserted any legal claims against the College in this litigation.

[3] The sole allegation concerning Freedman is that he "informed" President Raymond of alleged occurrences at a College-sponsored event hosting the Anti-Defamation League and protests related to same. (SAC ¶ 83). President Raymond was allegedly present for the event. (*Id.*)

named 'Many Jews, Even More Opinions,'" and also at in-person meetings at the home of an unnamed Haverford faculty member. (*Id.* ¶ 10-11).

Allegations specific to HJSB and HJSC appear only in paragraphs 13-15 and 172-174 of the SAC. These paragraphs describe the anonymous members as current or former Haverford students and, while they identify no specific conduct, individuals, settings, or timeframes for their allegations, they generally assert the following as the basis for their involvement in this matter: they have been "affected" by unspecified incidents on campus; they have changed routines to avoid expressive conduct which they deem antisemitic; they have been disappointed by classmates' reactions to events in Israel and Palestine; they have been hesitant to voice sympathy for Israel; they have felt "insulted" by students and faculty whose views about the significance of a "commitment to Israel" in Judaism diverge from their own; and they have lost friends due to such differing opinions. (*Id.*) Nowhere does the SAC allege that either HJSB or HJSC made a report to any Haverford administrator that they were subjected to harassment on campus.

Allegations specific to Mendelsohn are limited to paragraphs 60-73, in which Plaintiffs allege that in response to statements Mendelsohn posted on social media referring to Haverford students as "Hamas apologists" and antisemitic, "a letter from over 600 individuals" including Haverford alumni, students, and parents called for Mendelsohn to be dismissed or sanctioned. (*Id.* ¶¶ 66-67). Plaintiffs also allege that Haverford investigated whether social media posts by Mendelsohn "critical of those who had signed a ceasefire petition" constituted a violation of the College's discrimination and harassment policies and "general expectations of faculty," and found Mendelsohn not responsible for discrimination or harassment but noted that his behavior was

"inconsistent with the College's expectations of its faculty." (*Id.* ¶¶ 68-69).[4] Plaintiffs allege that, since the initial investigation, College faculty have brought "charges" against Mendelsohn accusing him of antisemitism, and that the College has "initiated disciplinary proceedings" against Mendelsohn for his conduct. (*Id.* ¶ 69). Plaintiffs do not define what they mean by "disciplinary proceedings," nor do they allege that such purported "proceedings" have resulted in any sanctions against Mendelsohn.[5]

## II.    The October 7th attacks on Israel by Hamas and initial response on Haverford's campus.

On Saturday, October 7, 2023, a series of Hamas-led violent attacks were perpetrated in Israel in which many Israeli citizens were murdered, injured, or taken hostage. Plaintiffs assert that "Haverford made no public institutional statement focused on the attacks in their immediate aftermath," (SAC ¶ 43), a concerning allegation that is belied in the very next paragraph (and elsewhere in Plaintiffs' pleadings and in the public record), which notes that the College issued a

---

[4] The Court may consider material beyond the allegations in the Complaint without converting the motion to dismiss to one for summary judgment where it is a "document integral to or explicitly relied upon in the complaint," of which the plaintiff has notice. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir.1997) ("Plaintiffs cannot prevent a court from looking at the texts of the documents on which its claim is based by failing to attach or explicitly cite them.") Plaintiffs explicitly rely on the alleged investigation as a purported basis for their claims, and as such, the investigation report is properly before the Court here and belies Plaintiffs' allegations. (*See* Richards Decl. Ex. 2 (to be filed under seal)). Specifically, the investigation report shows that the investigation was not commenced as a result of the single social media post referenced in the SAC (¶¶ 66-68), but instead was initiated in response to complaints by multiple students about Professor Mendelsohn's interactions with specific students, both over social media and email.

[5] Plaintiffs also rely on the alleged contents of a written communication from Dean McKnight stating that a "teach-in" Professor Mendelsohn was planning for October 11, 2023 "needs more diversity." (SAC ¶ 62). That allegation is likewise belied by the plain text of the actual message, which does not include the quoted language. (*See* Richards Decl. Ex. 3). In that message Dean McKnight was responding to a specific concern that a student had communicated to Professor Mendelsohn that holding the event was in "bad taste . . . when there are people who have just died, are still dying, or are missing." (*Id.*) Dean McKnight offered administrative support for the event. (*Id.*) *See Burlington Coat Factory*, 114 F.3d at 1426.

public statement on October 9, 2023 addressing the "outbreak of war" and "escalation of violence in Israel and Gaza." (SAC ¶ 44).

The SAC omits that as a matter of public record, on October 12, 2023 Haverford President Wendy Raymond published a letter to the College community referencing the conflict as "a time of horrific loss," and the College's efforts to mourn "the hundreds of Israeli citizens who were murdered or kidnapped by Hamas beginning on Saturday," at a "peace circle" on campus earlier that week and recognizing that "Haverford's Jewish and Palestinian students, faculty, staff, and alums" were "suffering deeply."[6] President Raymond observed that these efforts were likely only the beginning, referenced "the coming months of international strife" and "challenging campus tensions," and reminded students of resources available to them, including academic and emotional support systems at the College. (*See supra* n.6).

Plaintiffs allege that in the wake of the attack, "Haverford students and student groups began publicly posting harassing and discriminatory content on social media." (SAC ¶ 46). Plaintiffs support this assertion with a single example, an image of a silhouette of a parachuter with a Palestinian flag and the words "freedom has only ever been achieved through resistance. Stand with the Palestinian resistance," which an unidentified Jewish student (not alleged to be a Plaintiff or member of "Jews at Haverford") allegedly saw on Instagram and voiced his disbelief

---

[6]*See* "War in Israel and Gaza," Wendy Raymond, October 12, 2023, https://www.haverford.edu/president/news/war-israel-and-gaza. The Court may take judicial notice of material outside of the pleadings when that material is, among other things, a matter of public record not subject to reasonable dispute by the parties. *See Anspach ex rel. Anspach v. City of Phila., Dep't of Pub. Health*, 503 F.3d 256, 273 n. 11 (3d Cir. 2007). Plaintiffs are aware of this message because it has previously been cited in this litigation. (ECF 17 at 5). Reference to the October 12 message is also included in a "demand letter," authored by Plaintiffs' counsel and attached to the SAC as Exhibit B. Plaintiffs have also previously alleged that Dean McKnight later issued a separate message to an unidentified "Jewish leader" to be shared with other students on campus. (ECF 14, FAC ¶ 119).

concerning same on a "Haverford Political Science Department messaging service." (*Id.*) Plaintiffs allege no facts about who posted the image or when, including whether the poster was a Haverford student or employee. The SAC alleges that "Plaintiffs filed bias reports regarding these posts," without specifying who filed the alleged reports,[7] to whom, when, or the alleged content of "these posts" that were the subject of such reports. (*Id.* ¶ 47).

## III.   Alleged social media activity by Haverford employees.

The SAC selectively quotes from alleged private social media posts by Haverford faculty members voicing support for Palestinians and/or disapproval of the Israeli government and Zionism, which Plaintiffs characterize as antisemitic. (*Id.* ¶¶ 49, 51, 54). Plaintiffs have included more comprehensive images of the alleged posts in their previous pleadings. (*See, e.g.*, ECF 14, "FAC" ¶¶ 141, 169-70, 176, 182-84). The SAC does not allege that any individual Plaintiff or member of "Jews at Haverford" has ever taken a course or sought to do so with any of the professors referenced (or even interacted with them in-person or over social media). Plaintiffs assert in conclusory fashion that such posts "attack[ed] Plaintiffs and any other Jew committed to Israel," (SAC ¶ 54), but the alleged posts, even as selectively quoted in the SAC, contain no reference to any individual Plaintiff, alleged member of "Jews at Haverford," the College, or any of its students or community members. The posts were allegedly published between October 2023 and August of 2024 (*id.* ¶¶ 49, 51, 54), and unidentified "Plaintiffs"[8] allegedly learned of them "no later than May or August of 2024." (*Id.* ¶ 57).

---

[7] Plaintiffs do not specify whether it was an individual Plaintiff or an alleged member of "Jews at Haverford" who allegedly made the report(s), or even whether the unidentified reporter was a student, faculty member, alumnus, or parent, all of which are purportedly included among the members of the Plaintiff association.

[8] Even following the Court's instructions in its dismissal order, allegations throughout the SAC refer generally to "Plaintiffs" without specifying whether such references mean an individual

Plaintiffs allege that Professor Tarik Aougab "issued an announcement on his *official Haverford webpage* that he will not write letters of recommendations for any student who, inter alia, plans to work or study at an Israeli academic or cultural institution." (*Id.* ¶ 57 (citing https://sites.google.com/view/tarikaougab/home/letters-of-recommendation) (emphasis added)). But the webpage cited by Plaintiffs contains no Haverford logo, does not carry a haverford.edu web address, does not link to any haverford.edu webpages, or contain any other indication that it is an "official Haverford webpage," but to the contrary specifically states: "*Disclaimer: the views, thoughts, and opinions expressed on this website belong solely to me and not necessarily to Haverford College.*"[9] The webpage indeed sets forth criteria and a process by which his students may request a letter of recommendation. (*Id.*) The webpage states that Professor Aougab will not write letters of recommendation for opportunities to which he is morally opposed, including opportunities that involve policing, the military, private weapons manufacturing, or intelligence gathering; that Professor Aougab endorses the US Campaign for the Academic Boycott of Israel ("USACBI"); and that due to his personal views he will not write letters of recommendation for opportunities that violate the "USACBI." (*Id.*) The webpage says nothing about recommendations for students who "plan[] to work or study at an Israeli academic or cultural institution." The SAC

---

Plaintiff (and if so, which one) or an alleged member of "Jews at Haverford," which compounds the lack of notice to Haverford of the claims asserted against it, and by whom.

[9] *See* https://sites.google.com/view/tarikaougab/home. The webpage does, however, include a section titled, "Talking across difference re: Palestine," in which Professor Aougab invites students to engage in discussion "about my views on Israel/Palestine -- even and especially if your own views differ greatly from what you think mine are-- I will welcome conversation with you." *See* https://sites.google.com/view/tarikaougab/home/talking-across-difference. It also links to a blog post by Professor Aougab about his views, where he writes, "I am Algerian and Jewish American; one side of my family is Amazigh Indigenous Algerian and Muslim, and the other is Ashkenazi Jewish . . . . I ground my anti-Zionism within-- as opposed to in spite of-- my Jewish culture." *See* https://inclusionexclusion.org/2023/11/28/x-in-the-time-of-genocide/#:~:text=Editorial%20note%20from%20MKL%3A%20The,website%20formerly%20known%20as%20Twitter.

does not allege that any Plaintiff or member of "Jews at Haverford" ever requested a letter of recommendation from Professor Aougab, let alone that such a request was denied on the basis of the student's race, color, or national origin.

## IV.    Haverford's Plenary.

The SAC includes a series of conclusory and factually unsupported allegations characterizing Plenary, a long-held tradition at Haverford by which the student body gathers to discuss timely issues and vote to ratify the College's Honor Code. (SAC ¶¶ 87-88). Plaintiffs take issue with the fact that during the "public comment segment" of the College's Fall Plenary on November 5, 2023, students who had signed up in advance to speak, on balance, allegedly presented pro-Palestinian viewpoints, including advocating for a ceasefire in the Israel-Gaza war.[10] (*Id.* ¶¶ 89-91). Such student speakers allegedly included members of the groups Students for Justice in Palestine and Jewish Voice for Peace. (*Id.*)

The SAC avers that unidentified "Plaintiffs" sought to address the community members gathered at Plenary, but they had not signed up in advance to do so, unlike their peers including members of a self-titled Jewish-identifying organization, and thus there were no unclaimed "speaking slots." (*Id.* ¶ 92). Plaintiffs allege that, at the request of unidentified members of "Jews

---

[10] Beyond conclusory assertions, the SAC alleges no specific facts about the content of the comments shared at the Fall Plenary. Plaintiffs have previously alleged that "anti-Israel, pro-Palestinian" statements shared at Fall Plenary included concerns that the "Israel government" was committing genocide against Gazans and that Israel had imposed an apartheid and occupation upon Palestinians and that students espousing such views explained that their views were focused on disapproval of the actions of the Israel government, not Jewish people or Israelis generally. (*See* FAC ¶ 229 (quoting speakers as stating, "Anti-Zionism is the opposition of an oppressive government that has occupied Palestine for the past 75 years . . . . Being antizionist does not mean that you are anti semitic . . . . people start to think that the linking of Jewish people to a Jewish state means that all Jewish people support Israel. That is not the message we are trying to send as SJP. . . . Opposing an oppressive government is not anti semitic")). Another allegedly stated "When I denounce the Israeli government, I speak only about the people in positions of power…. I will always denounce antisemitism and fascism where I see it." (*Id.*)

at Haverford," Dean McKnight messaged the Students' Council members responsible for leading Plenary to adjust the schedule to allow additional students to speak despite their failure to sign up in advance to do so, but that in the midst of the busy congregation and discussion of several hundred Haverford community members (*id.* ¶ 87), the message did not reach the Students' Council leadership. (*Id.* ¶ 94). Aside from the allegation that "certain of" Plaintiffs were disappointed that they did not claim a speaking slot in advance, and that "some members of Jews at Haverford furiously texted each other," (*id.* ¶¶ 93-94) the SAC does not contain any allegations about the experience of any Plaintiff or member of "Jews at Haverford" at the Fall Plenary.[11]

Plaintiffs allege that between February 29 and March 3, 2024, an "emergency Plenary" was held devoted entirely to efforts to adopt a resolution demanding a ceasefire in the Israel-Palestine conflict and vaguely assert that "Haverford rules governing in-person voting at Plenaries" were violated. (*Id.* ¶¶ 106-107). Plaintiffs fail to attach the "rules governing Plenaries" and instead rely on selective excerpts from the College's Students' Association Constitution (*id.* ¶ 107) and the opinion of an individual (not alleged to be a member of "Jews at Haverford") who graduated from the College more than three decades ago and presumably has not participated in a Haverford Plenary since. (*Id.* ¶ 111, Ex. E). Plaintiffs concede that the ceasefire resolution did not pass, in part because "Jewish students" did not support it. (*Id.* ¶ 110). Plaintiffs do not allege how any of its purported members or any individual Plaintiff were impacted by the emergency Plenary. Indeed, while Plaintiffs vaguely allege that "[a]ll of the Plaintiffs" were aware of "the events taking place during the Emergency Plenary," they concede that not all attended the event. (*Id.* ¶ 113).

---

[11] Plaintiffs allege that nearly two weeks after Plenary, parents of unidentified "Haverford students" wrote a letter to President Raymond referencing a poster that unidentified students "presented" at the event with the words, "From the River to the Sea," which the parents found objectionable. (SAC ¶ 96). Plaintiffs do not allege that the parents or their children are Plaintiffs or members of "Jews at Haverford."

Plaintiffs allege that at the College's regularly-scheduled Spring Plenary, an unidentified student offered attendees a Palestinian flag. (*Id.* ¶ 114). The SAC contains no allegations about the experience of any individual Plaintiff or member of "Jews at Haverford" at the Spring Plenary, or even that any such individuals attended the event.[12]

## V.    Allegations involving Landau.

Plaintiffs do not allege that Landau sought to speak at the Fall Plenary or was prevented from doing so. Nevertheless, Plaintiffs allege that shortly thereafter on November 8, 2024, Dean McKnight assisted Landau in sharing her personal beliefs regarding the Israel-Palestine conflict, "defend[ing] Israel's right to exist and to its self-determination and self-defense," with the "entire Haverford community" using the all-College email system. (*Id.* ¶¶ 97-98). Plaintiffs have previously alleged in this litigation that Dean McKnight was actually the one who "pressed 'send'" on the email amplifying Landau's views to the entire College community. (FAC ¶ 239).[13]

Plaintiffs allege that on or about November 27, 2023, unidentified "students" published a document titled the "Haverford Grievances Document" which included a "baseless attack" that the content of Landau's message "was a cause for" the shooting of Palestinian-American Haverford

---

[12] Plaintiffs allege that "the mother of a Jewish Haverford student" wrote to President Raymond after the event about her second-hand knowledge of her son's experience at Spring Plenary, the presence of Palestinian flags, and support for a ceasefire and Palestinians, which she considered objectionable. (SAC ¶¶ 115). Neither the letter's author nor her son are alleged to be an individual Plaintiff or member of "Jews at Haverford."

[13] This was not the first time that Haverford gave Landau a platform to widely voice her pro-Israel views on campus. Plaintiffs omit from this iteration of their pleading any mention of Landau's presentation to the student body on November 1, 2023 sharing her views on the Israel-Palestine conflict and war in Gaza, to which Plaintiffs devoted several pages of their previous Complaints. (*See* ECF 1 at 42-43; FAC at 62-65). Plaintiffs have previously alleged in this action that the College supported Landau's presentation including express permission for the event directly from President Raymond. (*See, e.g.*, FAC ¶ 197). Reference to the presentation is also included in a "demand letter," authored by Plaintiffs' counsel and attached to the SAC as Exhibit B. The event was also covered by the Bi-College News, the publicly-available student newspaper for Haverford and Bryn Mawr Colleges. *See* https://bicollegenews.com/?p=3772.

student.[14] (SAC ¶¶ 99-101). The Grievances Document, most of which focused on Haverford's response to the conflict in Israel and Gaza, twice referenced Landau's letter sent through the all-College email system, stating a view that the letter "target[ed] members of the student body with false accusations" and that Landaus' use of the term "hijacking" constituted "hostile, charged language." (SAC, Ex. D). Plaintiffs fail to explain how these references constitute an "attack" on Landau but concede that President Raymond agreed to have Landau's name removed from the circulating document and offered Landau supportive services. (*Id.* ¶ 103).

Plaintiffs allege that in November 2023, Landau obtained permission from Vice President Young to dedicate a Haverford women's basketball game to antisemitism awareness, and that the College had dedicated prior athletic events to "a variety of causes." (*Id.* ¶ 158). Landau then allegedly worked with Assistant Director of Athletics Jason Rash to identify February 6, 2024 as an available date for the event. (*Id.*) Plaintiffs do not allege that Landau ever discussed the event with her teammates or coaching staff. They allege that prior to the intended event, Landau attended a meeting with Dean McKnight and Athletic Director Danielle Lynch where Dean McKnight and Director Lynch raised concerns that the intended event "might prove too antagonistic," and that, if protestors interrupted the game, Haverford could be forced to forfeit the game per NCAA rules. (*Id.* ¶ 159). Plaintiffs allege that Landau "agreed to cancel" the antisemitism awareness component of the basketball game. (*Id.*) They do not allege that Dean McKnight, Director Lynch, or any Haverford official directed or even requested Landau to cancel the event. The SAC does allege

---

[14] Plaintiffs allege that in November 2023, at a vigil for a Palestinian-American Haverford student who was shot with his two Palestinian friends in Vermont over Thanksgiving break, Nikki Young, Haverford's Vice President for Institutional Equity and Access, characterized the conflict in Israel and Palestine as "genocide" by Israel against Palestinians. (*Id.* ¶¶ 34, 162). Plaintiffs do not specify to whom Young allegedly made this statement and beyond vaguely asserting that "[a]ll Plaintiffs knew about Young's statement," (*id.* ¶ 163) the SAC does not allege that any individual Plaintiff or member of "Jews at Haverford" heard Young make the statement or was present at the vigil.

that Landau's father stated "it was clear to him" that Dean McKnight pressured Landau to cancel the event, and that Dean McKnight responded by suggesting that Landau may have also faced pressure from her father and "the Chabad Rabbi." (*Id.* ¶ 161).

The SAC alleges that Director Lynch, Dean McKnight, and the College's Chief of Staff maintain that the decision was Landau's alone, and that the College offered its support regardless of her decision. (*Id.* ¶ 160). Plaintiffs allege that this is false, and vaguely assert that the communications between Landau and Dean McKnight concerning the matter, "and the cancellation of the event, were made known to Jews at Haverford, including Plaintiffs, right after they occurred." (*Id.*) In doing so, Plaintiffs explicitly rely on such communications, which are attached here. (*See* Richards Decl. Ex. 4).[15] In those communications, Landau wrote to Dean McKnight and Director Lynch, advising them that she had decided not to move forward with the event and thanking them for "trying to make sure [the event] would have run smoothly." (*Id.*) Landau also wrote, "I have told everyone that this was completely my decision," but that "there might be some backlash about cancelling" directed towards the College. (*Id.*) Director Lynch later communicated with Landau about two potential alternative athletic events for antisemitism awareness efforts, but Landau was not available at those times. (*Id.*)

## VI.    Expressive activity on campus.

Plaintiffs allege that on December 5, 2023, pro-Palestinian students "took over" Founders Hall, "the main administrative office" on Haverford's campus, where they hung banners and

---

[15] The Court may consider material beyond the allegations in the SAC without converting the motion to dismiss to one for summary judgment where it is a "document integral to or explicitly relied upon in the complaint," of which the plaintiff has notice. *Burlington Coat Factory*, 114 F.3d at 1426 ("Plaintiffs cannot prevent a court from looking at the texts of the documents on which its claim is based by failing to attach or explicitly cite them.") If the Court determines that the attached documents are not relied upon in the SAC, it should not consider them in determining this 12(b)(6) motion.

engaged in chants accusing supporters of Israel of being "advocates for genocide" and calling for "Intifadah." (SAC ¶¶ 123-124). Plaintiffs allege that Professor Aougab presented a public talk during the demonstration linking Israel to white supremacy, genocide, and apartheid. (*Id.* ¶ 125). Plaintiffs then vaguely allege that the College failed to enforce its rules with regard to the protest but fail to allege any specific rules or explain how any conduct violated those rules.[16]

Plaintiffs allege that in the spring of 2024, pro-Palestinian protestors allegedly attempted to install an "encampment" on Haverford's campus featuring posters and chants similar to those referenced in relation to the December "sit-in" at Founders Hall. (*Id.* ¶¶ 132-133). Plaintiffs allege that the demonstration blocked unidentified Plaintiffs' access to unspecified parts of campus. (*Id.*) They do not allege any instance in which a Plaintiff or member of "Jews at Haverford" attempted or was denied access to any space on campus. The SAC purports to cite to alleged "demands" made by the protestors, but their sole support for that allegation is a letter "in support of the Barnard Student Government Association" on Student Government of Barnard College letterhead which exclusively discusses events on Columbia University's campus and makes no reference to any Haverford employee, student, or events occurring on Haverford's campus.[17] Despite alleging that Haverford "did absolutely nothing" to limit disruption presented by the encampment, Plaintiffs concede that protest activity was discontinued after only three days. (*Id.* ¶¶ 133-134).

---

[16] Plaintiffs' have previously alleged that Haverford "put an end to" the protest in response to concerns for community members. (FAC ¶¶ 264-265). They have also previously attached exhibits to their pleadings which include a December 13, 2023 message from President Raymond to the Haverford community clearly stating that the College ended the protest to protect "the abilities of fellow students to pursue their studies and the abilities of staff and faculty to conduct their work." (*Id.* Ex. F at 37).

[17] *See* SAC ¶ 132 (citing https://docs.google.com/document/d/18JA1Fi7SeVNvjdL2R97miuh-7mhyXNS3C4jLK4HUdJs/edit).

Plaintiffs allege that unnamed students planned an event titled "Mass Death on all Fronts: Israel's weaponization of Covid against Palestinians," which Plaintiffs consider to be antisemitic and was the subject of complaints from unidentified "students, alumni, parents, and Jewish community members" (none of whom are alleged to be an individual Plaintiff or member of "Jews at Haverford"). (*Id.* ¶¶ 118-119). Plaintiffs allege that, responding to the "complaints," Dean McKnight worked with the event organizers to change the name, though the new name was also unacceptable to Plaintiffs. (*Id.* ¶ 119). Beyond the event's title, Plaintiffs offer no factual allegations about the actual event, what was said there, by whom, or whether any individual Plaintiffs or members of "Jews at Haverford" attended the event.

Plaintiffs allege that on September 30, 2024, the College hosted an event entitled "Anti-Semitism 101" featuring the Anti-Defamation League ("ADL"). (SAC ¶ 79). Plaintiffs allege that students protested outside the event and engaged in anti-Israel, pro-Palestinian chants, and that some attendees wore t-shirts reading "Not in My Name." (*Id.* ¶¶ 80-81). Plaintiffs also allege that President Raymond, Vice President Young, and Dean McKnight attended the event, that Dean McKnight directed attendees to stop interrupting the presentation, and that Haverford "DEI" staff and security were on hand for the event. (*Id.* ¶¶ 81-82). Plaintiffs take issue with the fact that, to their knowledge, none of the protesters were disciplined, though they do not allege that anyone, including members of "Jews at Haverford," filed any complaints against specific protestors whom they believed to have violated College rules nor do they identify any such specific individuals. (*Id.* ¶ 84). Nor do they allege by what means they could learn confidential information about whether another student was disciplined. The SAC alleges that unidentified members of "Jews at Haverford" were present at the event, but does not allege that any individual Plaintiffs were present (and specifically notes that Landau was not present or even a student at the time). (*Id.* ¶ 86).

**VII.    Additional allegations.**

Plaintiffs' SAC goes on to reference events occurring on and off Haverford's campus with no mention of specific involvement by the individual Plaintiffs or any other alleged member of "Jews at Haverford." Plaintiffs fail to explain how any of these alleged events relate to purported injuries suffered by the plaintiff-association's alleged members but the allegations are nonetheless summarized here for completeness:

- During the 2023-2024 academic year, an unidentified member of "Jews at Haverford" (not alleged to be an individual Plaintiff) attended a meeting where students rejected applications for tour guide positions because the applicants "are Zionists." (*Id.* ¶ 40). The SAC does not allege that the "applicants" identify as Jewish, are individual Plaintiffs, or members of "Jews at Haverford." The SAC also does not allege any details concerning other applicants considered for tour guide positions or the composition of the College's student tour guide staff.

- At a March 31, 2024 Haverford event titled "How Do You Jew?" where Haverford Jewish community members discussed "what being Jewish means to them" and the impact of the October 7th attacks, President Raymond allegedly responded to questions about pro-Palestinian statements which Plaintiffs consider to be wanting and offensive. (*Id.* ¶ 50).

- In response to the alleged removal of posters for the "How Do You Jew" event, the College conducted an investigation and concluded that posters were blown down by the wind. (*Id.* ¶ 154). The SAC does not allege that anyone, including Plaintiffs or any member of "Jews at Haverford" witnessed anyone removing the posters or reported same to the College.

- A student who posted a message stating "i be tearing down chabad posters and eating them like fucking fruit rollups" received an award at the College's 2024 graduation. (*Id.* ¶ 155).[18]

- Students and student organizations have continued to engage in pro-Palestinian advocacy on campus into the 2024-2025 academic year. (*Id.* ¶ 156).[19]

- An unnamed Jewish individual who had accepted an offer of admission to Haverford ultimately decided to matriculate elsewhere due to perceived hostility to his pro-Israel, Zionist views. (*Id.* ¶ 138). The SAC concedes, however, that this individual was reportedly personally called by a Haverford administrator who attempted to address his concerns and collect evidence of any potential wrongdoing. (*Id.* ¶ 139).

- In the fall of 2024, the College facilitated a platform for unidentified Jewish students "committed to Israel" to share their concerns and beliefs about "Israel and Zionism" with student leaders responsible for Customs (Haverford's orientation) programming and be included in developing content for Customs programming, but the student leaders expressed offense at the Jewish students' views.[20] (*Id.* ¶¶ 141-147). None of the students

---

[18] The publicly available program for Haverford's 2024 Commencement lists Landau as graduating with honors and the recipient of the Varsity Cup, "Haverford's highest athletic award, presented annually to the outstanding athlete in the senior class." *See* https://www.haverford.edu/commencement/commencement-program-class-2024.

[19] In conclusory fashion, Plaintiffs assert that the stated commitment to "the liberation of Palestine through the complete dismantling of the apartheid settler colonial state of Israel, by all means necessary" by the student group, Bi-Co Students for the Liberation of Palestine, equates to a "call for the murder of Jews." (SAC ¶ 156). It is Plaintiffs' burden under Rule 12(b)(6) to allege facts demonstrating a plausible right to relief. It is not plausible to infer that merely because a student organization advocates for the "liberation of Palestine" and dismantling the state of Israel they are calling for the "murder of Jews."

[20] Plaintiffs allege that the resulting presentation was not to their liking and not representative of their personal beliefs. (SAC ¶ 149). The resulting presentation was attached to Plaintiffs' prior complaint and was aimed at "combating harmful rhetoric" and addressed issues including antisemitism. (*See* FAC ¶¶ 375-376; Ex. F at 2, 16, 17).

involved are alleged by Plaintiffs to be a member of "Jews at Haverford" or an individual Plaintiff in this matter, nor are any such individuals alleged to have attended Customs programming.

## VIII.  College policies.

As an initial matter, Plaintiffs selectively reference certain of the College's policies but do not attach them in full, instead relying on conclusory allegations and Plaintiffs' own subjective interpretations, which are not entitled to the presumption of truth on consideration of a motion to dismiss.[21] The Court may consider documents attached to a Rule 12(b)(6) motion as part of the pleadings if they are referenced in Plaintiffs' SAC and are central to their claims. *Cooper v. Samsung Elecs. Am., Inc.*, 374 F. App'x 250, 253 n.3 (3d Cir. 2010) (citing *Pryor v. Nat'l Collegiate Athletic Ass'n*, 288 F.3d 548, 560 (3d Cir. 2002)). As such, the College attaches the following policies, which are discussed more specifically with regard to Plaintiffs' claims below: The Haverford College Honor Code (Richards Decl. Ex. 1), and The Students' Association Constitution (containing rules related to Plenary) (*Id.* Ex. 5). Plaintiffs also reference alleged harassment occurring in the context of expressive activity on campus, social media posts, and posters around campus, but fail to cite or attach Haverford's relevant policies concerning those issues. Those policies are publicly available should the Court find them to be useful references. (*See*, ECF 17, Ex. 2 "Expressive Freedom and Responsibility Policy," Ex. 4 "Social Media Best Practices and Policy," Ex. 5 "Bulletin Boards, Posting Notices, Banners, and Installation Policy.")

The only purported "policy" that Plaintiffs attach in full is draft text of an unadopted policy proposal. (*See* SAC Ex. A). It is clear from that document's face that it is not an official policy of

---

[21] *See* ECF 33 at 16 (rejecting Plaintiffs' conclusory interpretation of Haverford's "Social Media Policy" based on selective excerpts presented in the FAC where the complete text of the Policy as attached to the College's Opposition brief (ECF 17, Ex. 4) did not support Plaintiffs' assertions).

the College or applicable to any Haverford student, faculty, staff, or other College community member. (*Id.*) As a result, the draft policy text appearing in Exhibit A is of no moment. (SAC ¶¶ 17, 21-26, 185-194).

## LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), Plaintiffs' "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In evaluating plausibility, the Court "disregard[s] rote recitals of the elements of a cause of action, legal conclusions, and mere conclusory statements." *Hassen v. Gov't of Virgin Islands*, 861 F.3d 108, 115 (3d Cir. 2017) (citation omitted). (*See also* ECF 33 at 1-2).

In ruling on a Rule 12(b)(6) motion, courts may consider the complaint, exhibits attached to the complaint, matters of public record, and "an[y] undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993); *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014).

## ARGUMENT

I.    **Plaintiffs' Title VI hostile environment claim fails because they do not allege that any of the individual plaintiffs or purported member of "Jews at Haverford" were subject to discrimination or harassment actionable under Title VI, or that Haverford was deliberately indifferent to any alleged harassment of which it had knowledge.**

Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. In the Court's Opinion dismissing Plaintiffs' FAC, the Court stated the applicable pleading standard as follows: To state a Title VI hostile educational environment claim, a plaintiff

must allege facts that show "1) they experienced harassment that was 'so severe, pervasive, and objectively offensive' that it deprived the victim of access to an educational activity or benefit, and 2) that the school was 'deliberately indifferent' to known acts of harassment." (ECF 33 at 8 (quoting *Davis Next Friend La Shonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 633 (1999)). Further, a school's "own deliberate indifference" must "effectively cause the discrimination." *Davis*, 526 U.S. at 642-43, 645 (quotations omitted).

> **A.  Plaintiffs fail to allege facts that show that Haverford was deliberately indifferent to any alleged harassment of which it had actual knowledge.**

To survive a 12(b)(6) motion to dismiss, Plaintiffs must allege facts sufficient to raise a plausible inference that "Haverford both knew about the harassment and acted with deliberate indifference – a critical element of a hostile environment claim." (ECF 33 at 11). "[T]he Supreme Court has made clear school administrators are accorded wide latitude in matters of campus governance." (*Id.* at 13 (citing *Davis*, 526 U.S. at 648 ("[C]ourts should refrain from second-guessing the disciplinary decisions made by school administrators."))). A school cannot be held liable so long as after receiving appropriate notice of the alleged harassment, it conducts itself "in a manner that is not clearly unreasonable." *Davis*, 526 U.S. at 649. That is, "a school can only be liable for harassment where its indifference effectively 'caused' the discrimination." (ECF 33 at 11 (citing *Davis*, 526 U.S at 642)). Although the SAC alleges that Landau and the anonymous members were dissatisfied by the level of support for Israel shown by the College and their classmates or even felt hurt by expression of support for Palestinians in the wake of the October 7th attacks, this Court can and should determine that as a matter of law, Haverford's response was not "clearly unreasonable." *Davis*, 526 U.S. at 649.

1.    **Plaintiffs fail to sufficiently allege that Haverford had actual knowledge of alleged harassment against any Plaintiff or alleged member of "Jews at Haverford."**

To meet the deliberate indifference standard, Plaintiffs must allege that the College had actual knowledge of the alleged harassment experienced by specific Plaintiffs or members of "Jews at Haverford." (ECF 33 at 12). This requires alleged knowledge of such harassment by a College administrator "in a position to exercise 'substantial control over both the harasser and the context in which the known harassment occurs.'" (*Id.* (quoting *Davis*, 526 U.S. at 645)). In dismissing Plaintiff's FAC, this Court held that allegations such as "a Jewish leader and several Jewish students complained to the Haverford administration and asked that this be investigated," are insufficient without more – at a minimum, it is necessary to allege "when students complained, whether the request to investigate was formal or informal, or which administrator received the complaint(s)." (ECF 33 at 13). Plaintiffs have not abided by the Court's instruction. Throughout the SAC Plaintiffs repeatedly and vaguely assert that unnamed students made "reports," without alleging what information the "reports" included, when they were made, to whom, what policies (if any) they were submitted under, or otherwise providing *any* of the required factual allegations as noted by this Court. (*See, e.g.*, SAC ¶¶ 47, 82, 119, 150, 156, 163). Such allegations cannot buoy Plaintiffs' Title VI claim, which should be dismissed with prejudice.

2.    **Even if the SAC alleged actual notice to Haverford, Plaintiffs fail to show that the College's response to any alleged harassment was clearly unreasonable.**

Federal courts analyzing similar Title VI claims against other schools recognize that deliberate indifference is a "stringent standard of fault" requiring more than allegations "that an institution could or should have done more." *StandWithUs Ctr. for Legal Just. v. Massachusetts Inst. of Tech.*, No. CV 24-10577-RGS, 2024 WL 3596916, at *4 (D. Mass. July 30, 2024) (citations

omitted), *appeal filed* (1st Cir. Sept. 5, 2024). Deliberate indifference "is not to be viewed through the lens of hindsight," and requires a plausible allegation that Haverford affirmatively chose "to do the wrong thing, or doing nothing, despite knowing what the law requires." *Id.* Plaintiffs have not met that standard here.

Plaintiffs' allegations reveal that their concerns were consistently and repeatedly addressed by Haverford's highest-ranking administrators, and that those administrators worked with Plaintiffs, alleged members of "Jews at Haverford," and other Jewish-identifying community members to address the issues and, critically, *help amplify views of Jewish community members*. While Plaintiffs allege dissatisfaction with the timing and content of the College's statements concerning Israel and Palestine, their allegations make clear that College administrators engaged in multiple conversations with Jewish members of the Haverford community and greater Philadelphia area in response to their related concerns. (*See, e.g.*, SAC ¶¶ 35-36).

For example, the College hosted "teach-ins" and several campus events geared towards supporting Jewish students and views that align with Plaintiffs. (*Id.* ¶¶ 62, 79, 152). The College provided Landau and other members of "Jews at Haverford" multiple opportunities and resources to share their views widely on campus. (*Id.* ¶ 97-99). The College coordinated the removal of Landau's name from the "Haverford Grievances Document" at her request. (*Id.* ¶ 103). The College caused a student group to change the name of an event which Plaintiffs consider to be antisemitic. (*Id.* ¶¶ 118-119). The College hosted a screening of a movie about the October 7th attacks at the Nova Festival in Israel. (*Id.* ¶ 129). The College investigated complaints that posters advertising an event for Jewish students were torn down. (*Id.* ¶ 154). The SAC is in fact replete

with examples of College administrators attending events sponsored by Jewish student groups and engaged in dialogue on topics of concern.[22]

The College's efforts in this regard are not negated by Plaintiffs' dissatisfaction with their results. For example, while the SAC alleges that unspecified individuals were "frightened and disturbed" by the interruptions by unidentified protestors at an ADL event on campus (*id.* ¶ 86), more specific factual allegations make clear that (1) the College sponsored the event entirely devoted to antisemitism education (*id.* ¶ 79); (2) top administrators supported and attended the event, including President Raymond (*id.* ¶ 81); (3) Dean McKnight took action to quell interruptions by students attending the event (*id.*); and (4) Haverford had security posted at the event. (*Id.* ¶ 82). These specifics forcefully belie conclusory assertions that the College "demonstrated deliberate indifference" to hostility on campus. (*Id.* ¶ 167).

Courts afford schools "substantial deference in cases of alleged student-on-student harassment; victims of harassment have, for example, no 'right to make particular remedial demands.'" *Dawn L. v. Greater Johnstown Sch. Dist.*, 586 F. Supp. 2d 332, 369 (W.D. Pa. 2008). (quoting *Davis*, 526 U.S. at 648)). To establish deliberate indifference, a plaintiff must show that the school's response to peer harassment amounted to "an official decision . . . not to remedy the violation[s]." *Id.* (quoting *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998)). In *StandWithUs v. M.I.T.*, the plaintiffs asserted that M.I.T.'s response to events on campus following the October 7th attacks on Israel violated Title VI. The court held that the plaintiffs failed to show

---

[22] Plaintiffs have also alleged previously in this litigation that additional efforts were taken by the College in response to Plaintiffs' concerns. (*See, e.g.*, ECF 14, FAC at ¶¶ 195-199 (granting Landau a platform to present her views on the Israel-Palestine conflict to the student body), 265 (ending a pro-Palestinian "sit-in" on campus) 340-344 (removing pro-Palestinian protestors who interrupted the 2024 commencement ceremony)),

deliberate indifference where M.I.T. "**took steps** to contain the escalating on-campus protests" even if such efforts did not decisively end the issue. *StandWithUs*, at *5 (emphasis added).

> The pain and hurt felt by plaintiffs and the Jewish and Israeli students that they seek to represent is genuine and fully understandable. But at bottom, the fault attributed to MIT is its failure to anticipate the bigoted behavior that some demonstrators – however sincere their disagreement with U.S. and Israeli policies – would exhibit as events unfolded. The transgressors were, after all, mostly MIT students whom the school (perhaps naively) thought had internalized the values of tolerance and respect for others – even those with whom one might disagree – that a modern liberal university education seeks to instill. **To fault MIT for what proved to be a failure of clairvoyance and a perhaps too measured response to an outburst of ugliness on its campus would send the unhelpful message that anything less than a faultless response in similar circumstances would earn no positive recognition in the eyes of the law.**

*Id.* (emphasis added). *See also Mandel v. Bd. of Trustees of California State Univ.*, No. 17-CV-03511, 2018 WL 1242067, at *11 (N.D. Cal. Mar. 9, 2018) (plaintiffs failed to allege deliberate indifference where they conceded that the university investigated alleged events of harassment and took broader steps to address the alleged events and antisemitism on campus in general, despite plaintiffs' characterization of such efforts as "disingenuous").

To contend on the well-pleaded allegations in the SAC that Haverford failed to meet this low bar – that it failed completely to "take steps" to address the climate on its campus after October 7 – simply cannot be squared with reality. (*See, e.g.*, SAC ¶¶ 35-36, 62, 79, 97-99, 118-119, 129, 152, 154). Title VI is not a strict liability statute; an event occurring that, if true, would constitute actionable harassment is necessary, but not sufficient, to show that the College acted with deliberate indifference in response. The SAC makes clear that irrespective of whether Plaintiffs are correct that actionable harassment occurred, Haverford's administrators spent much of the last three semesters responding to Plaintiffs' concerns – hardly "an official decision not to remedy the alleged violations." *Gebser*, 524 U.S. at 290. Plaintiffs' Title VI claim must be dismissed with prejudice.

**B.    Plaintiffs fail to allege facts supporting aggregation of their claims to support the existence of a hostile environment.**

Although Courts typically consider the "totality of the circumstances" involving a plaintiff in determining whether alleged conduct is sufficiently severe, pervasive, and objectively offensive to constitute a hostile environment, no Third Circuit authority authorizes "multiple Plaintiffs [to] aggregate individual instances of harassment to establish a hostile environment." (ECF 33 at 9). And even if aggregating alleged instances of harassment involving different individuals were permitted, out-of-circuit courts that have allowed such aggregation have "held that aggregation is only permitted where a plaintiff shows that they were personally aware of the specific instances of harassment alleged by other employees," and further, "courts may not infer collective knowledge where plaintiffs operate in a large space with multiple buildings," such as a college campus. (*Id.* at 10 (citing *Berryman v. SuperValu Holdings, Inc.*, 669 F.3d 714, 719 (6th Cir. 2012)) (emphasis omitted)).

Thus, in response to Plaintiffs' prior attempts in the FAC to aggregate their claims based on Haverford's relatively small size and the intimate nature of its Jewish community, this Court held that such vague, conclusory allegations of Plaintiffs' individual knowledge of conduct which they subjectively assess to be "antisemitic," were "insufficient to show *individual knowledge* on behalf of *each* Plaintiff." (*Id.* (emphases added)). This Court held that to aggregate their hostile environment claim, Plaintiffs must, at the very least, include "clear factual pleadings as to who knew what and when they knew it" to allege "that each Plaintiff was aware of each instance of harassment alleged." (*Id.* at 11). Plaintiffs have failed to do so here.

Contrary to the standard set by this Court, the SAC attempts to aggregate claims by alleging that certain members of "Jews at Haverford" interact with each other "through in-person gatherings and online," including through a "WhatsApp group," (SAC ¶ 10). Plaintiffs repeat those

conclusory assertions mechanically throughout the SAC: "all Plaintiffs," at some unspecified time, were "aware" of or "learned of" certain alleged conduct that they deem to be offensive (often relying on second-hand information). (*See, e.g.*, *id.* ¶¶ 57, 72, 78, 86, 101, 113, 127, 131, 133, 135, 140, 151, 163). Worse, in some instances, Plaintiffs allege that "all Plaintiffs" were aware of private communications or closed door meetings in which no Plaintiffs or members of "Jews at Haverford" were involved. (*See, e.g.*, SAC ¶¶ 131 (alleging global awareness of communications between President Raymond and unnamed protestors). While the SAC also still includes reference to several alleged incidents without any alleged facts suggesting awareness of any Plaintiff or member of "Jews at Haverford," (*see, e.g.*, *id.* ¶¶ 35 (meeting between College officials and unnamed "affiliate advisors of Hillel and Chabad"), 36 (meeting between greater Philadelphia Jewish leaders and Haverford officials), 38-39 (alleged incidents occurring in 2020)), the SAC contains no allegation that any specific incident of alleged harassment was personally experienced by Plaintiffs HJSB or HJSC. In sum, Plaintiffs have failed to allege "who knew what and when they knew it." As such they cannot aggregate their hostile environment claim.

### C. Allegations concerning reactions of non-students are immaterial to and cannot support Plaintiffs' Title VI hostile environment claim.

The SAC remains replete with allegations that certain Haverford alumni, parents of students, employees, and various other non-students voiced disapproval to College officials regarding alleged events on campus (again, that they had mostly heard about second-hand and did not personally experience). (*See, e.g.*, SAC ¶¶ 52-53, 58, 82, 96, 115, 128, 161, 163). The subjective reactions of non-students to alleged events on campus cannot support Plaintiffs' Title VI claims because the SAC contains no factual allegations suggesting that such individuals (most of whom are not alleged to be members of "Jews at Haverford") could possibly "be excluded from participation in, be denied the benefits of, or be subjected to discrimination under" Haverford's

programs receiving federal funding, as is required to state a Title VI claim. As such, these allegations are irrelevant and should be set aside in determining whether Plaintiffs have alleged facts supporting the existence of a hostile environment.

Allegations about the experiences of Professor Barak Mendelsohn likewise cannot support Plaintiffs' Title VI claim. The SAC contends that the College reacted differently to Professor Mendelsohn's social media activity than it did to various social media posts by colleagues that were supportive of Palestinians or disapproving of Israel. (SAC ¶ 72). But the actual facts alleged in the SAC include that one of Professor Mendelsohn's posts included a direct and explicit reference to Haverford students as "tainted by anti-Semitism," and that his social media activity resulted in a letter signed by 600 individuals demanding that he be dismissed or sanctioned. (*Id.* ¶¶ 66-67). Plaintiffs do not allege similar facts concerning the posts of other, similarly situated colleagues (the SAC similarly lacks any allegation concerning those professors' respective religious identities or whether they identify as Jewish).[23] In any event, even accepting Plaintiffs' allegations as true, the allegation that 600 community members complained about Professor Mendelsohn's posts provides a non-discriminatory reason for the investigation into his conduct— that Haverford was responding to community concern, not Professor Mendelsohn's personal beliefs. *See Tannous v. Cabrini Univ.*, 697 F. Supp. 3d 350, 360 (E.D. Pa.) (holding that allegations of negative public responses to a professor's social media activity "undercut any inference that [defendant university] fired [plaintiff professor] because of his race or ethnicity rather than because of public reaction to his tweets"), *on reconsideration in part,* 702 F. Supp. 3d (E.D. Pa. 2023).

---

[23] The SAC alleges that "[t]o Plaintiffs' knowledge, no other Haverford professors have been disciplined or investigated" for social media posts relating to the Israel-Palestine conflict. (SAC ¶ 70). But the only facts Plaintiffs allege in support of such "knowledge" is that professors who posted pro-Palestinian content which they deem objectionable remain employed by Haverford, a status they share with Prof. Mendelson. (*See id.* ¶¶ 52, 56).

Allegations about Professor Mendelsohn's experiences at Haverford are likewise immaterial to Plaintiffs' Title VI claim because he is a Haverford employee, not a student, and absent allegations "that a primary objective of the federal funding defendant receives is to provide employment," Professor Mendelsohn's alleged experience as an employee provides no basis for Title VI liability against the College. *See De Piero v. Pennsylvania State Univ.*, 711 F. Supp. 3d 410, 425–26 (E.D. Pa. 2024) (granting motion to dismiss professor's Title VI claim against university); *Johnson v. Cmty. Coll. of Allegheny Cnty.*, 566 F. Supp. 2d 405, 458 (W.D. Pa. 2008) ("[B]efore a litigant can invoke the nondiscrimination provision of Title VI against a recipient of federal financial assistance in an employment discrimination context . . . . Plaintiff must show that the primary purpose of the funding was to provide employment.") And even if Plaintiffs had asserted a Title VII employment discrimination claim based on allegations related to Professor Mendelsohn, they fail to allege that they have "exhaust[ed] all required administrative remedies before bringing a claim for judicial relief" as is required to plead a Title VII claim. *Robinson v. Dalton*, 107 F.3d 1018, 1020 (3d Cir. 1997).

As such, even if Plaintiffs' allegations could be considered in the aggregate to meet their pleading standards (they cannot), any allegations about the experiences of Professor Mendelsohn or other non-students are immaterial and do not support Plaintiffs' Title VI claim.

    **D.**    **The SAC fails to allege that any Plaintiff or member of "Jews at Haverford" experienced harassment that was so "severe, pervasive, and objectively offensive" that it deprived them of access to an educational activity or benefit.**

It is "rare" for discrimination or harassment "to be sufficiently severe under Title VI and Title IX" to support a claim for hostile educational environment. *Doe v. Galster*, 768 F.3d 611, 618 (7th Cir. 2014) (finding reasonable jury could find "cumulative effects" of harassment sufficiently severe where plaintiff was subjected to multiple incidents of physical violence requiring police attention and causing family to change school districts); *Zeno v. Pine Plains Cent.*

*Sch. Dist.*, 702 F.3d 655, 659-62, 667 (2d Cir. 2012) (severity requirement satisfied where the victim endured explicit racial slurs and physical attacks that warranted police attention, causing the victim to graduate early with a limited diploma); *Vance v. Spencer Cnty. Pub. Sch. Dist.*, 231 F.3d 253, 259 (6th Cir. 2000) (finding sufficiently severe harassment where the victim's harassers sexually propositioned her, removed her shirt, and stabbed her in the hand, causing her to complete her studies at home); *Murrell v. Sch. Dist. No. 1, Denver*, 186 F.3d 1238, 1248 (10th Cir. 1999) (finding complaint sufficiently alleged severe harassment where victim sexually was assaulted for a month, causing hospitalization and rending the victim homebound); *Sewell v. Monroe City Sch. Bd.*, 974 F.3d 577, 585 (5th Cir. 2020) (finding complaint plausibly alleged severe, pervasive, and offensive harassment where a dean ridiculed plaintiff every other day during school year, discouraged other students from talking to him, and attempted to convince a female student to accuse him of sexually assaulting her).

Plaintiffs here fail to allege whether any specific Plaintiff or member of "Jews at Haverford" were subjected to the alleged incidents, let alone their impact. For example, with regard to alleged protest activity that interrupted the ADL event, the SAC does not allege that any Plaintiff in this litigation was present for that event, only alleging that "several" unidentified student members of "Jews at Haverford" were present and were "frightened and disturbed." (SAC ¶ 86). The SAC contains only a handful of allegations involving a specific Plaintiff or student member of "Jews at Haverford," including (1) that a member of "Jews at Haverford" witnessed unidentified students reject applications for tour guide positions because the unidentified applicants were believed to be Zionists (*id.* ¶ 40); (2) that Landau's repeated opportunities to voice her opinions broadly among the College community were met with opposition by her peers (*see, e.g.*, *id.* ¶¶ 97-99); (2) that Landau cancelled an intended "antisemitism awareness" component of a College

basketball game after consulting with College officials about NCAA rules (*id.* ¶ 159); and (3) that President Raymond did not reply to an email from an unidentified member of "Jews at Haverford" concerning his reaction to protest activity on campus (*id.* ¶ 136-137). None of these events are qualitatively similar to the type of conduct necessary to state a claim.

In *Doe v. Princeton University*, the Third Circuit concluded that a racial epithet was insufficient to meet the requisite standard. *See* 790 F. App'x 379, 384 (3d Cir. 2019) (finding "one instance of being called a slur, while offensive, is neither severe nor pervasive"). The SAC does not allege that anyone used ethnic slurs against Plaintiffs or any "Jews at Haverford" members; only that Plaintiffs have inferred antisemitic intent based on their subjective evaluation that Haverford's administration and certain of its students have been insufficiently supportive of Israel or the Plaintiffs' alleged commitment to Israel in light of significant conflict in Israel and Palestine. Other case law analyzing similar claims is in agreement; allegations of the sort alleged here do not meet the standard for the "rare" case of discrimination that rises to the extraordinary level necessary to demonstrate a hostile educational environment. *Galster*, 768 F.3d at 618-19.

In *Mandel*, the court held that Jewish student plaintiffs failed to meet the "severe, pervasive, and objectively offensive" standard for Title VI hostile environment claims where they alleged that the university required that an event sponsored by Jewish student members of the university's Hillel organization hosting the mayor of Jerusalem be moved to an inconvenient space requiring a fee, and that university administration failed to respond when pro-Palestinian protestors interrupted the event with "'menacing' threats like 'Get the fuck off our campus' and 'Intifada,'" causing the event to end prematurely. 2018 WL 1242067 at *3.

The *Mandel* plaintiffs also alleged that the Hillel Jewish student group was excluded from a campus event designed for "vulnerable populations who may be feeling targeted in the new

political climate," and the exclusion was "sanctioned" by the university and its officials. *Id.* at *4-5. The *Mandel* court further held that allegations that specific plaintiffs were "verbally and physically threatened and targeted" based on their Jewish identities, were forced to miss class, and avoided enrolling in certain courses that filled degree requirements were not sufficient to "show a concrete, negative effect" on their education, as required to state a Title VI hostile environment claim. *Id.* at *20-21. The conduct alleged in the SAC does not rise to the level of severity of that which was deemed insufficient to plead a hostile environment claim in *Princeton* and *Mandel*, nor have Plaintiffs sufficiently alleged facts describing the impact on any individual Plaintiff or member of "Jews at Haverford." Accordingly, Plaintiffs Title VI claim should be dismissed with prejudice.

> **1.    The SAC fails to allege that any individual Plaintiff or alleged member of "Jews at Haverford" was deprived of access to an educational activity or benefit.**

To plead a Title VI claim, Plaintiffs also must allege that they were subject to harassment which "effectively bars the victim's access to an educational opportunity or benefit." *Davis*, 526 U.S. at 633. The Supreme Court in *Davis* noted that the most obvious example of such deprivation of access would involve "the overt, physical deprivation of access to school resources." *Id.* at 650. That is not at issue here. Plaintiffs have offered no specific allegation of an instance where an individual Plaintiff or member of "Jews at Haverford" sought to gain access to a Haverford resource but was physically denied because of the College's deliberate indifference.

Courts in this district have held that, where physical exclusion is lacking, deprivation of access may be satisfied where a plaintiff alleges facts showing that "the harassment 'had a concrete, negative effect' on the plaintiff's 'ability to receive an education.'" *Roe v. Pennsylvania State Univ.*, No. CV 18-2142, 2019 WL 652527, at *5 (E.D. Pa. Feb. 15, 2019) (quoting *Nungesser v. Columbia Univ.*, 244 F. Supp. 3d 345, 367 (S.D.N.Y. 2017)). "Examples of such negative effects

include a drop in grades, missing school, being forced to transfer schools, or mental health issues requiring therapy or medication." *Id. See also id.* at *8 (holding that plaintiff failed to meet the "high bar" for alleging deprivation of access to an education where she alleged that she was forced to miss a week of classes and that her "health, her studies, and her career" were negatively impacted). Similarly here, despite devoting an entire section of the SAC to "Plaintiffs' Injuries," Plaintiffs merely allege that unspecified individuals have felt uncomfortable in class and experienced "fear, anxiety, and self-suppression" (SAC ¶¶ 168-70); that Landau felt "personally affected," changed her routine, was "shunned" by unidentified students, and felt "rebuffed an/or ignored" by the Haverford administration (*id.* ¶ 171); and that HJSB and HJSC have been similarly impacted (*id.* ¶¶ 172-74). Such allegations are insufficient to allege a deprivation of access to educational activities or benefits.

Similarly in *Felber v. Yudof*, the court granted the defendant university's motion to dismiss Title VI claims based on anti-Israel protests and alleged exclusion from campus spaces where plaintiffs alleged that protestors set up check points, at which students dressed as soldiers and carrying realistic-looking simulated assault weapons. 851 F. Supp. 2d 1182, 1184-85, 1189 (N.D. Cal. 2011). There, the Court held that despite the allegation that students were prevented from entering "an important campus thoroughfare and gathering place," plaintiffs failed to allege facts that showed that such conduct "would significantly impede any student's access to the educational services offered by the University, regardless of the nature of those activities." *Id.* at 1188.[24]

---

[24] *See also Newman v. Point Park Univ.*, No. 2:20-CV-00204, 2022 WL 969601, at *24 (W.D. Pa. Mar. 31, 2022) (granting motion to dismiss hostile environment claims by professor who alleged that she was discriminated against due to her pro-Israel views because "[e]ven if Plaintiff had alleged that her work performance suffered when she experienced shunning and evasion, those occurrences do not show that Plaintiff was subjected to a hostile work environment) (internal quotes omitted); *Lansberry v. Altoona Area Sch. Dist.*, 318 F. Supp. 3d 739, 752-53 (W.D. Pa. 2018) (holding that complaint failed to allege severe, pervasive, and objectively offensive conduct

The SAC likewise fails to allege that any specific Plaintiff or member of "Jews at Haverford" has been deprived access to an educational activity or benefit as a result of national origin-based harassment. Indeed, the only individual Plaintiff specifically alleged to be involved in any of the events in the SAC has graduated from the College with honors and awards as a successful athlete. Plaintiffs' allegations do not rise to the level of those in *Mandel* and *Felber*, which were held to be insufficient to survive dismissal on a Rule 12(b)(6) motion to dismiss. Thus, the SAC fails to allege that any Plaintiff or member of "Jews at Haverford" was subject to "severe, pervasive, and objectively offensive" harassment on the basis of their race, color, or national origin such that they were deprived access to an educational activity or benefit, as required to be actionable under Title VI. As such, Count I should be dismissed with prejudice.

### E. Plaintiffs fail to allege facts that show that any discrimination or harassment was because of their race, color, or national origin.

Plaintiffs base their Title VI claim on the conclusory assertion that Haverford's conduct "created an environment at Haverford hostile to Jewish students committed to Israel." (SAC ¶ 75). As this Court has noted, Title VI applies to harassment, including "antisemitic harassment" in instances where such alleged conduct constitutes harassment on the basis of "race, color, or national origin." (ECF 33 at 6-7). The College agrees with that point of law. But the College does not accept that Plaintiffs' conclusory allegations that certain purported conduct meets their subjective definition of antisemitism must necessarily violate Title VI.

This Court has observed, and Haverford agrees, that the question of the ways in which the concept of Zionism, with its many contested meanings, intersects with the likewise difficult term

---

where claim was based on sporadic instances of bullying); *C.M. v. Pemberton Twp. High Sch.*, CV No. 16-9456 (RMB/JS), 2017 WL 384274, at *6 (D.N.J. Jan. 27, 2017) (dismissing Title IX claim because the complaint only alleged "two seemingly isolated instances" of harassment, "not pervasive conduct").

antisemitism, is ill-suited for short shrift in a legal brief. The College regrets the lack of nuance presented in its prior briefing on that topic. The College should have made its reasoning and its intent in making those arguments clearer, and it will endeavor to do so here.

The International Holocaust Remembrance Alliance defines antisemitism, to include, for instance, comments that refer to the nation of Israel as a "racist endeavor." (SAC ¶ 19). Others might argue that it is entirely possible to hold that view while harboring no antipathy toward individual Jews or Jews as a people, just as some Americans may hold the view that the United States shares that status based on its history of slavery, treatment of native populations, the Japanese internment, and others. But deriding such strongly-held opinions as "anti-American" does not give rise to a Title VI claim. In the same way, finding agreement on endlessly debated topics like what precisely Zionism means, or how to define antisemitism with precision, is neither feasible nor necessary to resolve Plaintiffs' claims, because both "Zionist" and "antisemitic" are adjectives that describe specific, identifiable conduct or expression; they are labels, not legal standards. What is important here isn't whether the parties and the Court can agree whether certain conduct is "antisemitic," *i.e.* whether posting images of Palestinian flags is antisemitic or not; what is important is whether Plaintiffs' allegations show that unlawful harassment was directed at them because of their race, color, or national origin. They do not.

The SAC eschews this uncertainty. It is replete with conclusory assertions that certain conduct is categorically "antisemitic" and by extension *ipso facto* violative of Title VI, including, by way of limited example, expressing the opinion that the Israeli government is engaged in or supporting "genocide," (SAC ¶ 34); protesting against "Israel and Zionists," (*id.* ¶ 42); encouraging others to "stand with Palestinian resistance" through a private social media post, (*id.* ¶ 46); drawing comparisons between the Israeli government and historically fascist regimes on

social media, (*id.* ¶ 54); describing the Anti-Defamation league as a "genocidal, racist, antisemitic organization," (*id.* ¶ 79); "denouncing Israel and the ADL," (*id.* ¶ 81); displaying the words "From the River to the Sea, Palestine Will be Free," (*id.* ¶ 90); offering someone a Palestinian flag, (*id.* ¶ 114); asking the College President to "apologize for inviting Zionists to campus," (*id.* ¶¶ 129-131); presenting, in Plaintiffs' view, an incomplete history of the Israel-Palestine conflict, (*id.* ¶ 149); and voicing commitment to "the liberation of Palestine through the complete dismantling of the apartheid settler colonial state of Israel, by all means necessary." (*id.* ¶ 156).

The foregoing alleged expressions of community members' opinions are hurtful to those who fervently disagree, and Haverford neither adopts them nor condones those opinions. But to suggest that such conduct warrants intervention by the federal judiciary cannot be correct. A federal court recently considered related questions in determining the constitutionality of a state government mandate which *required* public colleges and universities to adopt anti-discrimination policies that specifically define "antisemitism" to include expressive conduct like "claiming that the existence of a State of Israel is a racist endeavor" or "[d]rawing comparisons of contemporary Israeli policy to that of the Nazis," and making such expressive conduct subject to institutional punishment. *See Students for Just. in Palestine, at Univ. of Houston v. Abbott*, No. 1:24-CV-523-RP, 2024 WL 4631301, at *1, 9-10 (W.D. Tex. Oct. 28, 2024). In *Abbott*, the Court determined that wholesale categorization of such conduct as discriminatory harassment chilled free speech in violation of the First Amendment. *Id.* at *9-10 ("[T]he incorporation of this specific definition of antisemitism is viewpoint discrimination.") The court held that "the characteristic of universities as an environment for vigorous debate is outcome determinative" because "this type of passionate political debate is essential at universities, where students are forming their worldview as adults," and thus prohibiting such language, even in the context of large-scale protests on college

campuses, was "akin to a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." *Id.* at *11 (quoting *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 509 (1969)).

*Abbott* speaks to a key issue in this case. "Resort to such generalities" that certain conduct is categorically antisemitic, or even that alleged harassment on the basis of a personal belief which one considers integral to their religious identity is *de facto* actionable under Title VI is "not useful" in applying the law to deeply complex issues like "Zionism" and the "broad diversity of opinion within the Jewish population" concerning same. (*See* ECF 33 at 7). Subjective claims of "antisemitism" relating to specific personal views and conflating the same with Title VI discrimination on the basis of one's race, color, or national origin is a blunt tool unsuitable for pleading such complex claims.

What matters is whether the specific factual allegations show that the alleged conduct was "on the basis of" national origin, and therefore triggers Title VI protection. In cases where alleged discrimination on the basis of a plaintiff's "Jewish ancestry" has been found to trigger Title VI protection, courts have been careful to draw a line between alleged harassment based on "perceived national origin or race rather than just Plaintiffs' faith or religious practices." *See T.E. v. Pine Bush Cent. Sch. Dist.*, 58 F. Supp. 3d 332, 354-55 (S.D.N.Y. 2014) (declining to categorically determine "whether religious bias alone can form the basis of a Title VI claim where it is not deeply intertwined with national origin"). Thus, the question is not whether Jewish people are protected from Title VI discrimination, but whether the specific acts alleged here constitute harassment based on "perceived national origin or race rather than just Plaintiffs' faith or religious practices."

Plaintiffs' factual allegations support the conclusion that their specific personal views, namely, the Israel-Palestine conflict, the Israeli government's response to the attacks by Hamas on

October 7, 2023 and resultant military operations in Gaza are what are at issue in this case. To be sure, Plaintiffs assert that those views are informed by their broader views about Israel and its connection to Judaism (SAC ¶ 9), but Title VI protects individuals from discrimination on the basis of "race, color, or national origin," not political or personal views, even if such views correlate with a plaintiff's religion.

Under similar circumstances, courts have dismissed Title VI claims where plaintiffs fail to sufficiently allege a connection between alleged harassment based on their pro-Israel views and their Jewish identity. *Mandel*, 2018 WL 1242067, at *14. In *Mandel,* the court held that plaintiffs, Jewish students who alleged that their university discriminated against them by failing to shut down anti-Israel protestors, failed to state Title VI and equal protection claims where they failed to allege that the "defendants have acted in similar circumstances to remove student protestors or instructed the police to do so, in order for a plausible inference to arise that the Administrator Defendants acted the way they did *because of* Plaintiffs' Jewish identify." *Id.* [25] Critically here, Plaintiffs fail to allege facts showing that non-Jewish students holding a similar commitment to Israel were treated any differently by the College than Plaintiffs.

---

[25] Courts in this district and beyond generally dismiss Title VI claims when they are premised on a plaintiff's personal beliefs rather than race, color, or national origin. *See, e.g.*, *Doe v. Abington Friends Sch.*, No. CV 22-0014, 2022 WL 16722322, at *6 (E.D. Pa. Nov. 4, 2022); *Zinman v. Nova Se. Univ., Inc.*, No. 21-CV-60723, 2021 WL 4025722, at *8 (S.D. Fla. Aug. 30, 2021) (dismissing Title VI claim where the plaintiff's allegations concentrated on his personal beliefs rather than a characteristic based on race, ethnicity, or shared ancestry), *report & recommendation adopted*, No. 21-CIV-60723-RAR, 2021 WL 4226028 (S.D. Fla. Sept. 15, 2021), *aff'd*, No. 21-13476, 2023 WL 2669904 (11th Cir. Mar. 29, 2023); *Lubavitch-Chabad of Illinois, Inc. v. Nw. Univ.*, 6 F. Supp. 3d 806, 816 (N.D. Ill. 2013) (granting summary judgment to defendant on Title VI claims where plaintiffs alleged that they suffered discrimination solely on the basis of their personal beliefs as opposed to race or ethnicity), *aff'd*, 772 F.3d 443 (7th Cir. 2014); *Weiss v. City Univ. of New York*, No. 17-CV-3557 (VSB), 2019 WL 1244508, at *9 n.11 (S.D.N.Y. Mar. 18, 2019); *T.E. v. Pine Bush Cent. Sch. Dist.*, 58 F. Supp. 3d 332, 355 (S.D.N.Y. 2014).).

Plaintiffs also attempt to rely on allegations that their views have been denounced as racist. (*See, e.g.*, SAC ¶¶ 1, 49, 54, 79, 125, 149). Plaintiffs ask this Court to adopt their view defining all such expressive conduct as "antisemitism" and categorically violative of Title VI. (*Id.* ¶¶ 19-20). But alleged accusations of racism, even where such labels of racism are alleged to have been incorrectly applied, "provide[] a clear, non-race-based motive" for a defendant's conduct. *Tannous v. Cabrini Univ.*, 697 F. Supp. 3d 350, 362 (E.D. Pa.), *on reconsideration in part*, 702 F. Supp. 3d 317 (E.D. Pa. 2023).

In *Tannous*, this Court rejected Title VII discrimination claims brought against a university based on a professor's termination for social media posts deemed to be antisemitic at the motion to dismiss stage. *Id.* at 359-63. The plaintiff alleged that due to his status as a Palestinian-American, his posts were incorrectly presumed to be antisemitic. *Id.* This Court rejected the plaintiff's attempt to equate discrimination based on race/ethnicity to discrimination based on a belief that plaintiff's statements were antisemitic. *Id.* at 360 ("These concepts are distinct. Even if the belief that his statements were antisemitic is unfair or incorrect, courts considering the issue have concluded that such conduct does not give rise to a cognizable claim under Title VII because it is not based on the employee's status as a protected minority.")

The same reasoning applies here. Plaintiffs assert that Haverford has enabled a hostile environment for Jewish students with "a fundamental commitment to Israel." (SAC ¶ 1) But, again, even if Plaintiffs had supported that conclusion with facts, which they haven't, the SAC presents no allegations supporting a conclusion that non-Jewish individuals espousing similar views concerning the Israel-Palestine conflict and actions of the Israeli government would have been treated any differently, or that Jewish students who actively took part in the ceasefire demonstrations were subjected to a hostile environment. (*See* SAC ¶ 90); *accord Tannous*, at 360-

61 (dismissing claims premised on alleged discrimination based on terminated employee's Palestinian-American identity where the plaintiff failed to allege facts suggesting that the defendant would have reacted differently to similar conduct by a similarly situated non-Palestinian-American employee).

Because Plaintiffs fail to allege facts supporting a plausible conclusion that Plaintiffs or the purported members of "Jews at Haverford" were discriminated against *on the basis of their race, color, or national origin*, Title VI is inapplicable here and Count I should be dismissed with prejudice.

## II.    The SAC fails to state a claim for breach of contract because Plaintiffs fail to identify any contractual duty breached by Haverford.

To state a breach of contract claim against Haverford, Plaintiffs' allegations must "relate to a specific and identifiable promise that the school failed to honor. (ECF 33 at 15 (quoting *David v. Neumann Univ.*, 187 F. Supp. 3d 554, 558 (E.D. Pa. 2016)). "When interpreting university policies as contracts, each provision must be read in the context of the larger policy – a plaintiff may not cherry-pick helpful language and disregard the rest." (ECF 33 at 15). Additionally, "a plaintiff may not enforce a policy to which they are merely a third party, such as a promise from the college to some other student, absent a specific intention to grant third party enforcement authority." (*Id.* at 15-16).[26] It is accordingly Plaintiffs' burden to plead that Haverford violated a specific written promise that it made to Plaintiffs. They have again failed to meet that burden.

As the Court has instructed, the specific provisions of the College's policies upon which Plaintiffs base their claim must be read in the context of the larger policy. The alleged policies on

---

[26] The College fully briefed the applicable elements and pleading standards for a breach of contract claim in its Motion to Dismiss Plaintiffs' FAC (*see* ECF 17 at 34-39), but references the standards established by the Court in this litigation here in the interest of brevity.

which Plaintiffs premise their breach of contract claim are again largely irrelevant or fail to otherwise support their claim. (*See id.* at 18-19 (holding that absent allegations of "specific facts surrounding the policy and its alleged violation," the College's non-discrimination statement could not support Plaintiffs' breach of contract claim where "Plaintiffs summarily refer to their multiple allegations of discrimination and deem that sufficient to establish a breach of the antidiscrimination policy")).

Plaintiffs do not address these deficiencies of their breach of contract claim in the SAC. Instead, Plaintiffs now premise their breach of contract claim on a policy that *never existed* and Plaintiffs did not attach or even reference in the combined 219 pages of allegations that comprised their first two Complaints. (*See generally,* ECF 1 and 14). But the "policy" attached to Exhibit A is, on its face, inapplicable because it is clear that the text represents only a proposed draft policy, made available for public comment and response, and which has never been adopted by Haverford nor has the College represented that such a policy was in place. This is evident for several reasons:

- *First*, the "policy" is unmistakably marked as a "**PROPOSAL**" in its title in all capital letters and large font. (SAC Ex. A at 3) (emphasis in original).

- *Second*, the "policy" also notes on its title page that "*[t]his Policy Proposal document and revision copies are confidential between the parties in conversation and for internal use only.*" (*Id.*)

- *Third*, each page of the "policy" bears a watermark reading "Not for use or reproduction without permission of IDEA at Haverford." (*Id.* at 3-16).

- *Fourth*, the "policy" text clearly reflects that it was never approved or effective, leaving the dates meant to reflect such approval and effective dates blank. (*Id.* at 13 ("First approved/Last revised, Month XX, 2023 . . . Effective date, Month XX, 2023."))

Beyond the text of Exhibit A, Haverford's publicly available website confirms that the "policy" was never in place at the College. Indeed, the webpages where actual College policies are posted

make no references of the alleged "policy" and belie Plaintiffs' assertion that it is or ever was enacted:

> Student Complaints Against Faculty, Staff, Or Third Parties: Reports of discrimination or harassment by faculty, staff, or third parties can be made to the Director of Human Resources, or any of the College's EEO Officers. . . Reports of harassment or discrimination by students from other individuals – students, employees, or third parties – will normally be addressed within the student judicial procedures (See the section on Judicial Powers within the Constitution of the Students' Association—accessible through the Documents section of the Students' Council webpage).

Policies for Student Life, *https://www.haverford.edu/student-life/community-guidelines/policies*.

*See also* Human Resources, Handbooks & Policies *https://www.haverford.edu/human-resources/handbooks-policies*.

Despite introducing the alleged "policy" early in the SAC (*see* ¶ 17), Plaintiffs defer any acknowledgment of this problem to a footnote to paragraph 186. Plaintiffs allege faintly "on information and belief" that the draft policy was "in force throughout academic year 2023-2024" and remains "in force" now. (*Id.* ¶ 186 n.9). It was not and it is not. Third Circuit case law is clear that on consideration of a Rule 12(b)(6) motion to dismiss, a plaintiff is only entitled to the presumption of truth "where there are *well-pleaded* factual allegations," in which case, the court then "should assume their veracity and determine whether they plausibly give rise to an entitlement to relief." *Santiago v. Warminster Twp.*, 629 F.3d 121, 130-31 (3d Cir. 2010) (holding that plaintiff's allegations, while factual in nature, were not entitled to the presumption of truth where "fundamentally conclusory" and devoid of factual enhancement) (emphasis added). Further, "determining whether a complaint states a plausible claim is context specific, requiring the reviewing court to draw on its experience and common sense." *Ashcroft*, 556 U.S. at 663–64. As set forth above, on the College's publicly available website, and evident from Plaintiff's own pleading, such policy has never been adopted by Haverford or represented as such, and certainly

was not "in force" at any time relevant to this matter. Plaintiffs' pleading "on information and belief" is not entitled to the presumption of truth based on the face of the document alone. It follows that Plaintiffs' allegations that the College failed to comply with the draft policy in response to unspecified "bias reports" filed by unnamed individuals are immaterial and fatally implausible because, as demonstrated above, the policy in question doesn't exist and thus cannot impose any contractual obligation on Haverford with regard to Plaintiffs.

Even if the referenced policy were real, however, Plaintiffs' claim would still be insufficient. According to Plaintiffs, Haverford has failed to "apply these policies" to protect unidentified individuals with a "commitment to Israel" who have allegedly reported "bias incidents" under the purported "policy." (*See, e.g.*, SAC ¶¶ 186-193; *see also id.* ¶¶ 22 (basing the College's purported obligation to "conduct a thorough inquiry and address all reports of bias incidents" on the text of the irrelevant "policy" attached as Exhibit A), 26 (alleging, in reference to Exhibit A, "Haverford has failed to apply these policies to protect Plaintiffs from discrimination"). But Plaintiffs cannot base their breach of contract claims on the College's failure to "discipline" or apply policies with regard to other students where Plaintiffs have failed to allege (1) that any specific students have violated College policies, and (2) that a Plaintiff or member of "Jews at Haverford" have invoked specific policy procedures by filing a formal complaint against that student. The SAC makes clear that Plaintiffs' breach of contract claim is based on their assertion that, in response to such vague reports purportedly submitted by an unidentified individual, "[i]n no instance was any relief afforded or even addressed the bias manifest in these events in any meaningful way." (SAC ¶¶ 191-92).

Putting aside the fact that Plaintiffs provide *no substantive facts* about the nature of the alleged reports, and that the purported policy they claim was violated was never an actual policy

enacted by the College, Plaintiffs fail to identify any specific procedures that they were entitled to and which Haverford failed to provide. Specifically, Plaintiffs cannot point to a contractual promise by Haverford Plaintiffs that no act of discrimination or harassment would ever occur on its campus – an impossible bar – or any promise that other students or community members would in every case be disciplined in response to conduct which Plaintiffs believe constitutes harassment. *See Nungesser v. Columbia Univ.*, 169 F. Supp. 3d 353, 371 (S.D.N.Y. 2016) (dismissing plaintiff's breach of contract claim based on allegations that university failed to discipline other students where the "policy does not promise students who believe they have been the victim of [] misconduct any specific outcome"); *see also Doe v. Brown Univ.*, 166 F. Supp. 3d 177, 194 (D.R.I. 2016) (granting motion to dismiss student plaintiff's breach of contract claim based on allegation that university defendant failed to enforce its policies against plaintiff's classmate).

This Court has already held that the FAC failed to state a breach of contract claim where Plaintiffs' failed to cite specific provisions of Haverford's policies establishing specific procedures or allege specific instances where a Plaintiff or member of "Jews at Haverford" sought to invoke the policy but the College failed to follow those procedures. Plaintiffs have not cured such deficiencies here. Instead, Plaintiffs assert that unnamed individuals have filed "bias reports," but the SAC fails to link the purported reports to any Haverford policy or procedure under which the College was obliged to respond in a certain way but failed to do so. (*See, e.g.*, *id.* ¶¶ 26, 47, 82, 189, 191). Further, the SAC again vaguely references the College's Honor Code but again fails to attach the Honor Code in full and instead cherry-picks a few single words, removed from the Code's context, and injects those words into Plaintiffs' own conclusory and assertions about the Honor Code's meaning and Plaintiff's subjective belief that the Code is "inadequate." (*Id.* ¶ 28). But Plaintiffs fail to allege facts identifying any specific promises Haverford made to them via the

Honor Code (or otherwise) that the College breached. Further, the SAC fails to cite any instance where a Plaintiff or member of "Jews at Haverford" actually sought to address their concerns under the Honor Code or was punished in violation of the College's Honor Code.

The SAC also asserts that "Haverford rules" were violated in connection with the Emergency Plenary. (*Id.* ¶ 107). But the SAC fails to attach any "Haverford rules" governing the Emergency Plenary and instead relies on purported excerpts from such rules without specifying which College policy they allegedly belong to (*id.*) and the opinion of an alumnus who graduated from the College more than three decades ago and presumably has not participated in a Haverford Plenary since. (*Id.* ¶ 111, Ex. E). Plaintiffs do not allege that any individual Plaintiff or member of "Jews at Haverford" submitted a complaint concerning the purported rule violations. The SAC also fails to allege any specific facts regarding how any Plaintiff or purported member of "Jews at Haverford" were impacted by the emergency Plenary. Thus, the SAC has not and cannot point to a contractual duty owed to Plaintiffs or the alleged members of "Jews at Haverford" that was breached by Haverford with regard to Plenary, let alone any resultant damages.

Because the SAC has failed to identify any specific contractual promise that Haverford failed to honor (or resultant damages) with regard to Plaintiffs or the alleged members of "Jews at Haverford," the breach of contract claim (Count II) should be dismissed with prejudice.

## III.    Plaintiffs' claims should be dismissed with prejudice.

Plaintiffs have twice had the opportunity to review Haverford's arguments in support of dismissal. Plaintiffs have likewise been advised by this Court as to the deficiencies in their pleading. They have failed to address the deficiencies in their claims, so dismissal with prejudice is warranted. *See Concerned Jewish Parents & Tchrs. of Los Angeles v. Liberated Ethnic Stud. Model Curriculum Consortium*, No. CV 22-3243 FMO (EX), 2024 WL 5274857 (C.D. Cal. Nov. 30, 2024) (granting motion to dismiss and finding "no basis" to grant leave to amend where

plaintiffs had multiple opportunities to cure the deficiencies in their pleading), *appeal filed* (9th Cir. Dec. 20, 2024).

<u>**CONCLUSION**</u>

For the foregoing reasons, and any other reasons that may appear to the Court, Haverford College respectfully requests that the Court dismiss Plaintiffs' Second Amended Complaint with prejudice pursuant to Federal Rule of Civil Procedure 12 (b)(6).

Respectfully submitted,

**SAUL EWING LLP**

Date: February 10, 2025

s/ *Joshua W. B. Richards*
Joshua W. B. Richards/204315
Levi R. Schy/329199
Centre Square West
1500 Market Street, 38th Floor
Philadelphia, PA 19102
(215) 972-7737 (Richards)
(215) 972-7803 (Schy)
Joshua.Richards@saul.com
Levi.Schy@saul.com

*Attorneys for Haverford College*