IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JEWS AT HAVERFORD,
ALLY LANDAU,
HJSB and HJSC,                          :
                                        :
            Plaintiffs,                  :        Civil Action No. 2:24-cv-02044 (GAM)
                                        :
      v.                                :
                                        :
THE CORPORATION OF                      :
HAVERFORD COLLEGE,                      :
                                        :
            Defendant.                   :


**BRIEF IN OPPOSITION TO MOTION TO DISMISS SECOND
AMENDED COMPLAINT**

# TABLE OF CONTENTS

I.    Introduction ................................................................................................................. 1

II.   Legal Standard Governing Motions to Dismiss ...................................................... 3

III.  Haverford Raises Disputed Questions of Fact and Relies on Self-Serving Inferences That Cannot Be Resolved in Its Favor at the Pleading Stage .................................................. 5

   A.   Haverford's Rosy Self-Portrait Is Directly at Odds with the SAC ................................... 6

   B.   Haverford Distorts Key Factual Allegations, and Quarrels With Others, Based on Improper, Self-Serving Inferences ................................................................................. 8

   C.   Haverford Improperly Injects Its Own Version of the Facts in Contradiction to the SAC 12

      i.    Haverford's Bias Policy ......................................................................... 13

      ii.   Professor Aougab's Haverford webpage ................................................ 15

      iii.  Cancellation of the Antisemitism Awareness Event .............................. 16

   D.   Haverford Ignores or Downplays the Significance of Key Allegations in the SAC ........ 18

IV.   Haverford's Attack On the SAC Fails Because It Rests On Incorrect Legal Standards ... 22

   A.   The Standard is Severe *or* Pervasive .......................................................... 22

   B.   The Standard Is Equal Access, Not Denial of Any Access ............................... 23

V.    Plaintiffs Have Properly Followed This Court's Instructions To Establish That Haverford Violated Title VI ............................................................................................................ 25

   A.   Aggregation Is Proper When Students All Know About an Incident .............................. 25

   B.   Haverford Is Responsible Because It Had Notice of Each Event .................................... 26

   C.   Haverford Improperly Compartmentalizes the SAC's Allegations ............................... 27

   D.   The Conduct Present At Haverford Has Been Found By The Courts To Violate Title VI 27

      i.    Harassment is shown by blocking access to a part of campus to people who are committed to Israel – *Frankel* and the Haverford Encampment and sit-in ........................... 28

      ii.   Harassment is shown by Riotous behavior – *Cooper Union* and Haverford's ADL Event .......................................................................................................... 29

      iii.  Harassment is shown by tearing down posters ....................................... 33

      iv.   Harassment is shown by barring a podium to Jews committed to Israel ..... 34

      v.    Harassment is shown by chants attacking the Jewish commitment to Israel ............... 37

      vi.   Harassment is shown by discriminatory treatment of faculty, which was made known to students ...................................................................................... 41

      vii.  Harassment is shown by conduct which discriminates against Plaintiffs on the basis of their ethnic identity ............................................................................... 43

   E.   Once On Notice, A College Must Act, Not Just Talk .................................................... 45

VI.   PLAINTIFFS HAVE PROPERLY PLED A BREACH OF CONTRACT ...................... 49

VII.  CONCLUSION ......................................................................................................... 51

i

**Cases**

*Allen v. Ellis,*
  2017 U.S. Dist.LEXIS  120202 (E.D. Pa. July 31, 2017) ......................................... 4
*Asbestos Prod. Liab. Litig. (No. VI),*
  822 F.3d 125 (3d Cir. 2016) .................................................................................... 4
*Berryman v. SuperValu Holdings, Inc.,*
  669 F.3d 714 (6th Cir. 2012) ................................................................................. 25
*Bivines v. Temple Univ. of Commonwealth Sys. of Higher Educ.,*
  284 F. Supp. 3d 587 (E.D. Pa. 2018) ............................................................... 8, 12
*Brandeis Center v. President and Fellows of Harvard College,*
  2024 U.S. Dist. LEXIS 200937 (D. MA Nov. 5, 2024) ........................................ 45
*Bruni v. City of Pittsburgh,*
  824 F.3d 353 (3d Cir. 2016) .................................................................................... 3
*Canaan v. Carnegie Mellon Univ.,*
  2024 U.S.Dist. LEXIS 227575 (W.D. Pa. Dec. 17, 2024) ......................... 4, 22, 44
*Castleberry v. STI Group,*
  863 F.3d 259 (6th Cir. 2017) ................................................................................ 22
Davis *v. Monroe Cty Bd. of Ed.*
  526 U.S. 629 (1999) .............................................................................................. 23
Doe v. E. Haven Bd. of Educ.,
  200 F. App'x 46 (2d Cir. 2006) ............................................................................. 24
*Earley v. JMK Assocs.,*
  2018 U.S. Dist. LEXIS 202916 (E.D. Pa. Sept. 5, 2018) ............................. 3, 5, 12
*Fiss v. California College of the Arts,*
  2025 U.S. Dist. LEXIS 7456 (N.D. CA Jan. 14, 2025) ........................................ 20
*Frankel v. Regents of the University of California,*
  744 F.Supp.3d 1015, 2024 U.S.Dist. LEXIS 146433 (C.D. CA 2024) ............ 28, 44
*Gartenberg v. Cooper Union for the Advancement of Sci. & Ar*
  *2025 U.S.Dist. LEXIS 20844(S.D.N.Y. Feb. 5, 2024)* ................................... passim
Harris v. Forklift Sys., Inc.,
  510 U.S. 17 (1993) ................................................................................................ 22
Hayut v. State University of New York,
  352 F.3d 733  (2d Cir. 2003) ................................................................................ 23
Hedges *v. United States,*
  404 F.3d 744 (3d Cir. 2005). .................................................................................. 3
*Kade v. Workie,*
  238 F. Supp. 3d 625 (D. Del. 2017) ........................................................................ 5
*Kestenbaum v. President & Fellows of Harvard Coll.,*
  743 F. Supp. 3d 297 (D. Mass. 2024) .................................................. 24, 38, 44, 45
*Komis v. Sec'y of the United States Dep't of Labor,*
  918 F.3d 289  (3d Cir. 2019) ................................................................................ 22
*L. L. v. Evesham Twp. Bd. of Educ.,*
  710 F. App'x 545 (3d Cir. 2017)........................................................................... 23
*Landau v. Corp. of Haverford College,*
  2024 U.S. Dist. LEXIS 225714 (E.D. PA Dec. 13, 2024) ........................... 29, 39, 43

*Landau v. Corp. of Haverford College,*
2025 U.S. Dist. LEXIS 1402 (E.D. PA Jan. 6, 2025

*Link v. Trinity Glass Int'l, Inc.,*
    2007 WL 2407101 (E.D. Pa. Aug. 22, 2007) ...................................................................... 5, 27

*Mayer v. Belichick,*
    605 F.3d 223 (3d Cir. 2010) ........................................................................................................ 3

*Pa. State Police v. Suders,*
    542 U.S. 129 (2004) .................................................................................................................... 22

*Reeves v. C.H. Robinson Worldwide, Inc.,*
    594 F.3d 798 (11th Cir. 2010) ................................................................................................ 5, 27

*Resistors Antitrust Litig.,*
    2017 WL 3895706 (N.D. Cal. Sept. 5, 2017) ......................................................................... 5, 27

*Sharp v. Activewear, L.L.C.*
    69 F.4th 974 (9th Cir 2023) .................................................................................................. 5, 27

*StandWithUs v. Massachusetts Institute of Technology,*
    742 F.Supp.3d 133 (D. MA 2024) ....................................................................................... 44, 46

<u>*T.E.*</u>*v. Pine Bush Cent. Sch. Dist.,*
    58 F. Supp. 3d 332 (S.D.N.Y. 2014) ...................................................................................... 23

<u>*Zeno*</u> *v. Pine Plains Cent. Sch. Dist.,*
    702 F.3d 655 (2d Cir. 2012) .................................................................................................... 23

# I.    INTRODUCTION

In its Opinion of January 6, 2025, this Court recognized that Plaintiffs' First Amended Complaint contained factual allegations that are "concerning, and if pled properly, could perhaps support a cognizable legal claim under Title VI." ECF 33 at 3. Following the Court's instructions, Plaintiffs have focused their Second Amended Complaint ("SAC") on these "serious allegations of actionable discrimination" supported by "compelling facts," *id.* at 3-4, and by adding allegations detailing how and when all of the Plaintiffs either experienced the discriminatory acts or learned of them, and how and when Haverford was placed on notice regarding each event. Taking these allegations as true—as the Court is required to do at this stage—the SAC plausibly states viable Title VI and breach of contract claims.

Rather than engage with the Plaintiffs' pleading, Haverford's Motion to Dismiss attacks a strawman of Haverford's own making. Contrary to Haverford's representations, Plaintiffs do not ask this Court to find a hostile environment at Haverford because some people there hold "views about the significance of a 'commitment to Israel' in Judaism [which] diverge from" theirs. Haverford Memorandum in Support of its Motion to Dismiss (hereinafter "Br.") at 4.  Nor do Plaintiffs ask this Court to "deem Haverford an unlawfully discriminatory and hostile environment in violation of federal law because Haverford has not censored expression on its campus" to suit the Plaintiffs, *id*. at 1, or because Plaintiffs have been "hurt by expression of support for Palestinians," *id*. at 20.

Instead, Plaintiffs brought this lawsuit because *they* have been censored at Haverford, and their views silenced, with impunity. As the SAC alleges in detail, Haverford has shown deliberate indifference to the harassment, attacks, vilification and worse from students, faculty

and administration targeting Plaintiffs based on their commitment to Israel. As the SAC alleges, this commitment cannot now be publicly expressed on the Haverford campus without fear of harassment: thus the SAC alleges, at ¶193, that "refuges off campus [] are the only places where it was and remains possible [for Plaintiffs] to expose their true identity, as Jews committed to Israel, without being denounced or shunned."

Contrary to Haverford's suggestion, these attacks are not mere political speech on matters of public concern: they are targeted efforts to silence and exclude Plaintiffs because of their ethnic identity, in violation of Haverford policies, often accompanied by physically intimidating conduct—as this Court has already found in this case, when it evaluated allegations regarding the ADL event on September 30 of this academic year.

Unwilling to face these factual allegations, Haverford moves the goalposts, prematurely introducing its own facts and inferences and asking the Court to resolve the resulting disputes in its favor, all without the benefit of discovery or a hearing, let alone a trial. At bottom, Haverford's Motion presents a radically different story than the SAC—one in which "critical inquiry and inclusive, intellectual learning" are taking place in an "atmosphere of trust, concern, and respect," with "peaceful confrontation" between diverse "student community members" producing a "resulting community." Br. at 1-2. But that is not what Plaintiffs have experienced, nor is it what they have alleged in this lawsuit. Nonetheless, Haverford explicitly demands the right to dispute various fact allegations in the SAC, asking the Court to throw out Plaintiffs' case because (Haverford asserts throughout its brief) Plaintiffs' factual allegations are untrue. This is procedurally improper and itself requires denial of Haverford's Motion—though it is also true, as Plaintiffs show below, that Haverford's factual claims are also incorrect as a matter of fact. Though

no such showing is required at this stage of the case, this Opposition explains why Haverford is wrong on the facts as well as the law.

Finally, Haverford liberally sprinkles the adjectives "conclusory" and "vague" throughout its brief to describe Plaintiffs' actual allegations and claims.[1] But in so doing, Haverford distorts the SAC with selective and misleading paraphrasing. Once again, this is wholly improper at this stage and offers no basis for dismissal of the well-pleaded Complaint. Resolving the multitude of disputed factual issues raised in Haverford's Motion will be the task for the factfinder at trial, not the Court at this juncture. Haverford's Motion must therefore be denied.

## II.    LEGAL STANDARD GOVERNING MOTIONS TO DISMISS

It is well-established black letter law that "[t]o withstand a motion to dismiss ... a plaintiff need only demonstrate that he 'may be entitled to relief under any reasonable reading of the complaint,' and 'the defendant bears the burden of showing that no claim has been presented.'" *Bruni v. City of Pittsburgh*, 824 F.3d 353, 361 n.11 (3d Cir. 2016) (quoting *Mayer v. Belichick*, 605 F.3d 223, 229 (3d Cir. 2010) and *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005). As this Court has previously recognized, a defendant cannot demonstrate that the plaintiff has failed to state a claim as a matter of law by making arguments that "are ***almost entirely premised on Defendant's own version of the facts***," including documents that are "neither relied on in nor attached to the Amended Complaint." *Earley v. JMK Assocs.*, 2018 U.S. Dist. LEXIS 202916, at *1 (E.D. Pa. Sept. 5, 2018) (emphasis added). "At best, these can be construed as legal

---

[1] At Br. n.8 Haverford complains that Plaintiffs have failed to follow this Court's instructions on how plaintiffs should give Haverford "notice" of the claims against it. But the Court's instructions related not to notice to Haverford of the claims against it under Rule 8, but to allegations showing Haverford was put on notice of the discriminatory events taking place on campus, such that it was obligated to address them. See *infra* at 26 and this Court's January 6 opinion in this case, 2024 U.S. Dist. LEXIS 225714 (E.D. PA Dec. 13, 2024).

conclusions that are inconsistent with the allegations in the Amended Complaint, and at worst,

counter-allegations not properly considered under F.R.C.P. 12(b)(6). In either case, dismissal is

unwarranted." *Id* at *2.[2]

The law is equally clear that, in evaluating a motion to dismiss, all reasonable inferences

from the pleading's allegations must be drawn in favor of the plaintiff.  As the court explained in

*Canaan v. Carnegie Mellon Univ.*, 2024 U.S.Dist. LEXIS 227575, at *28-29 (W.D. Pa. Dec. 17,

2024):

> At this stage of the litigation, any reasonable inference that can be drawn from these factual
> allegations must, of course, be drawn in Ms. Canaan's favor. *In re Asbestos Prod. Liab. Litig.*
> *(No. VI)*, 822 F.3d 125, 131 (3d Cir. 2016). It is the Court's determination that Ms. Canaan's
> allegations are sufficient to show that CMU failed to meaningfully react to Professor
> Arscott's offensive and discriminatory interactions with Ms. Canaan. The CMU executives
> responsible for addressing discriminatory mistreatment of a Jewish student, such as Ms.
> Canaan, failed or refused to prevent or sufficiently stop it.

Thus, "[i]t does not matter whether the complaint is as rich with detail as some prefer—the only

question is whether, under any reasonable reading of it, there are sufficient facts to support a

plausible claim." *Allen v. Ellis*, 2017 U.S. Dist.LEXIS  120202, at *3 (E.D. Pa. July 31, 2017).

Particularly with respect to a claim that a defendant's actions have created a hostile

environment, degree of harassment is generally too fact-intensive for a motion to dismiss:

> Making a hostility determination in the educational context, as in the employment
> context, entails examining the totality of the circumstances, including: the frequency
> of the discriminatory conduct; its severity; whether it is physically threatening or
> humiliating, or a mere offensive utterance; and whether it unreasonably interferes with
> the victim's academic performance. * * * no single factor is required. Finding the

---

[2] Thus Haverford argues, Br. at 23, that its administrators are entitled to "deference" in determining how to respond
to "student-on-student" harassment.  The argument misses the mark for two reasons:  first, the SAC is not limited to
harassment of the Plaintiffs by other students, but includes extensive allegations of harassments, denunciations, and
worse by faculty, as well as the explicit Haverford policy, announced by Vice President Young, that Jewish students
*should* feel hostility so long as they refuse to disavow Israel's alleged "genocide."  SAC ¶36.  Equally important,
however, is the fact that, on a motion to dismiss, Haverford's actual entitlement to deference is limited to assessment
of the way the College is alleged, by the Plaintiff, to have responded to incidents of harassment, as alleged by the
Plaintiffs.  Whether Haverford's actions fall within the zone of deference to which college administrators are
accorded is not assessed by reference to Haverford's own account of either its own remedial actions or the acts said
to constitute the harassment at issue.

> harassment pervasive means that the challenged incidents are more than episodic; they must be sufficiently continuous and concerted.  * * * Generally speaking, this analysis is fact-specific and, therefore, as in this case, is best left for trial.

*Kade v. Workie,* 238 F. Supp. 3d 625, 633 (D. Del. 2017) (internal citations omitted).

The law is equally clear that the allegations of a complaint cannot be read as a series of separate and unrelated statements, but must instead be read together.  A hostile environment case, the courts have explained, is not simply a matter of an unrelated number of targeted attacks by one person on another, with the impact measured of each individual attack. Rather, harassment "pollutes the victim's [environment], making it more difficult for her to do her job, to take pride in her work, and to desire to stay on in her position." *Sharp v. Activewear, L.L.C.* 69 F.4th 974, 978 (9th Cir. 2023) (internal citations omitted).  Assertedly harassing "conduct is to be viewed cumulatively and contextually, rather than in isolation." *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 807 (11th Cir. 2010) (*en banc*).  Thus "[t]he Supreme Court has held that the question of whether a work environment is abusive is defined not by a bright-line rule, but by the totality of the circumstances." *Link v. Trinity Glass Int'l, Inc.*, 2007 WL 2407101, at *4 (E.D. Pa. Aug. 22, 2007). This accords with the law governing motions to dismiss all complaints, not just those alleging that defendants' actions have created a hostile environment. *See In re Resistors Antitrust Litig*., 2017 WL 3895706, at *3 (N.D. Cal. Sept. 5, 2017) (noting in the antitrust context that "complaints are not reviewed in paper thin slices").

### III.    HAVERFORD RAISES DISPUTED QUESTIONS OF FACT AND RELIES ON SELF-SERVING INFERENCES THAT CANNOT BE RESOLVED IN ITS FAVOR AT THE PLEADING STAGE

Haverford's Motion is predicated on an entirely different set of facts than those alleged in the SAC. For that reason alone, "dismissal is unwarranted." *Earley* 2018 U.S.Dist. LEXIS

202916, at *2. The details on the difference between the facts as portrayed by Haverford and the facts as alleged in the SAC are as follows.

### A. Haverford's Rosy Self-Portrait Is Directly at Odds with the SAC

At the outset, Haverford describes itself as "staunchly committed [to] fostering a community where its members engage in critical inquiry and inclusive intellectual learning both in and out of the classroom," such that "free expression and confrontation between community members is a deeply embedded feature of Haverford's culture and educational environment."  Br. at 1.  By contrast, the SAC describes administrators' apathy, indifference, and complicity in the hateful, reflexive, and deliberate exclusion of Plaintiffs from Haverford's campus community. It alleges mobs of protesters occupying common areas on campus in violation of Haverford policies and using bullhorns to amplify the shouting of anti-Israel slogans (such as "From the River to the Sea, Palestine will be free") targeted directly at Plaintiffs because they are students known to be committed to a Jewish state – and the College's leadership praising the conduct and encouraging more. *See, e.g.* SAC ¶¶ 124, 133. It describes the rigging of access to a public podium at Haverford to exclude Jewish students committed to Israel, and the College's leadership praising the process.  SAC at ¶¶90, 95.  It alleges that the College President admitted to a Plaintiff's parent that a demonstration hostile to the Parent's Plaintiff daughter had violated numerous College rules, ¶128 – and it then alleges that the President praised that very demonstration publicly.  SAC ¶¶127.  It describes the College's Dean forthrightly stating that the Haverford student body might well refuse to tolerate an event condemning antisemitism and that students might respond with an uncontrollable mob, and that Haverford would not or could not do anything to prevent such behavior.  SAC ¶159.  It also such describes the College's issuance of an award to a student because he mocked Jewish students' concerns about their posters being torn down.  SAC ¶155.  It describes faculty publicly cursing Plaintiffs and anyone else who

shares their commitment to Israel, ¶51—with no public response even after these posts were brought to administrators' attention, ¶52. Haverford's account flatly contradicts all of this.

Nor can Haverford paper over the SAC's factual allegations by pointing to its supposed goal of promoting "peaceful confrontation" between students. Br. at 1. Haverford assures the Court that its Honor Code encourages conversation across differences, allowing for an "atmosphere of trust, concern, and respect" as the passing "discomfort" of civic "struggle and strife" ultimately result in "community." *Id.* at 1-2. Whatever Haverford claims about what the Honor Code was "designed to foster," *id.* at 2, its *actual* effect has been the harassment and exclusion of Plaintiffs from Haverford's campus. And contrary to Haverford's rosy portrait of the Honor Code as a template for respectful dialogue among equals, the SAC alleges at ¶ 28 that

> [t]he Honor Code itself embeds a facile dichotomy between "marginalized" and "privileged" groups, which anti-Israel students have consistently weaponized to bully and silence Plaintiffs, with the assertion that Jews committed to Israel are necessarily "privileged," while those who reject that commitment are "marginalized."

Nonetheless, Haverford's President and senior administrators repeatedly told members of Jews at Haverford that they should use the futile mechanisms of the Honor Code to protect themselves from the discrimination imposed by the Code itself.  See, *e.g., id.* ¶ 29.

Haverford simply ignores the fundamental nature of the twofold problem on its campus: hateful efforts by anti-Israel students and faculty to harass and exclude Plaintiffs, coupled with no remedy or protections—and sometimes active encouragement from Haverford's administration. Thus the SAC alleges that the remedies offered by the administration send the Plaintiffs for protection to a regime that officially designates them as "privileged" and therefore entitled to fewer rights, SAC ¶¶28, 190; or where the senior Haverford officer in charge of enforcing the disciplinary system has announced that Jewish students are rightly exposed to a hostile campus unless they disavow Israel's "genocide,"  ¶36, and who recklessly accused Israel

of committing a "genocide" in Gaza and to link that accusation to the unrelated shooting of a Palestinian Haverford student in Vermont. SAC ¶ 34. The SAC does *not* allege that these polarizing remarks constituted a standalone violation of the law; instead, it invokes the fact that Vice President Young is in charge of the College's response to discrimination claims, and, at ¶33, expresses Plaintiffs' concern that they could not trust this administrator to objectively and fairly address their concerns about discrimination related to their commitment to Israel. ¶34. That concern is entirely reasonable given Young's decision to use a public gathering having nothing to do with Israel to gratuitously denounce Israel. Haverford makes no attempt to suggest that that conclusion was implausible, let alone incorrect. SAC ¶34.

Resolving the differences between the SAC's allegations and Haverford's story "is obviously an issue of fact, not appropriate for resolution through a motion to dismiss." *Bivines v. Temple Univ. of Commonwealth Sys. of Higher Educ.*, 284 F. Supp. 3d 587, 590 (E.D. Pa. 2018).

### B. Haverford Distorts Key Factual Allegations, and Quarrels With Others, Based on Improper, Self-Serving Inferences

Haverford also seeks to escape Plaintiffs' factual allegations by consistently claiming the SAC says things it *doesn't* say, and doesn't say things it *does* say. Even where Haverford acknowledges the SAC's allegations, it tries to poke holes in Plaintiffs' account by drawing inferences in its favor. Examples abound, and the following are illustrative, not exhaustive.

First, with respect to the allegations about the Sit-In protest occupying Founders Hall, Haverford claims that Plaintiffs "vaguely allege that the College failed to enforce its rules with regard to the protest but fail to allege any specific rules or explain how any conduct violated those rules." Br. at 14. What the SAC actually says is that ***President Raymond herself***, in conversation with Ally Landau's parents, admitted that she had publicly praised the event "even though she acknowledged explicitly to Ally's parents that the Sit-in violated multiple Haverford

rules." SAC ¶ 128. It further alleges Raymond's excuse for overlooking "conduct in clear violation of the College's rules"—namely, "she feared that if she took action to stop it, even worse behavior by the students would result." *Id.*

Second, Haverford misdescribes the SAC as alleging the Encampment blocked access to "unspecified parts of campus."  Br. at 14.  But the blocked-off area isn't "unspecified" at all: SAC ¶ 133 alleges, emphasis added, that the so-called "Liberated Zone," which was inaccessible to anyone who didn't agree with the protesters, "barred access to ***Founders Hall***, which Haverford College describes as '***the centerpiece of its campus***.'" Haverford further claims the SAC fails to allege "any instance in which a Plaintiff or member of 'Jews at Haverford' attempted or was denied access to any space on campus." Br. at 14. But that's directly contradicted by ¶ 133 (emphasis added) as well:

> Haverford's encampment consisted of tents, banners, and the declaration of a "Liberated Zone."  ***No person not in accord with the demands of these protesters was permitted to enter the Liberated Zone; and because the Liberated Zone was at the center of campus, this rendered the heart of the College in accessible to Plaintiffs***. * * * All Plaintiffs either personally experienced this or knew about it from others who had.

Similarly, Haverford claims credit for stopping the sit-in, and occupation of Founders Hall "in response to concerns for community members," Br. at 14 n.16—which is not pled in the SAC.  Haverford cites the First Amended Complaint to support its claim. *Ibid.* But what the First Amended Complaint actually alleged is that the College was *indifferent* to the impact of the event on Jewish students, and that *only when* College staff complained that they couldn't get their work done because of newly installed mock body-bags, the College finally ordered the protestors removed. FAC ¶¶ 264-266.  Thus, rather than showing that Haverford acted out of concern for "community members" including Plaintiffs, these allegations demonstrate how Haverford ignored Plaintiffs' concerns and took action only when its own staff were impacted by the disruptive protest. As the SAC alleges, President Raymond then took the remarkable step of

publicly praising these disruptive tactics as "a recent example of peaceful protest," and assured participants that "no punitive action" would be taken against them, while admitting to Plaintiffs that the protest violated numerous Haverford rules. SAC ¶¶ 127-28.

Third, Haverford questions how Plaintiffs could have learned of the events of a "closed door" meeting at which anti-Israel students demanded that President Raymond apologize for inviting Zionists to campus. Br. at 26. But the SAC does not allege that this demand was made behind "closed doors." SAC ¶¶ 129-31. To the contrary, it describes such demands being made publicly at Haverford, including at the ADL event when protesters held signs with slogans including "No Zionists on campus." SAC ¶ 82. President Raymond said nothing about that either. SAC ¶ 85; *see also* SAC ¶¶ 51, 54, 63 (discussing public social media posts from Haverford faculty including "FuckZionism" and "the only way to deal with Zionists is to stop talking to them and refuse to let them waste your time"). In any event, the bottom line is that a self-identified Zionist student asked President Raymond why she did not defend the rights of Zionists to be accepted on Haverford's campus, and President Raymond failed to respond to this question or to deny that this demand had been made. *Id.* ¶¶ 130-31. It is difficult to imagine that Haverford would tolerate students or professors demanding that any other group of students be removed from its campus.

Fourth, Haverford faults Plaintiffs for not signing up to speak up at the 2023 Fall Plenary. Br. at 9. But Haverford ignores the SAC's allegations describing how Plenary's student government leaders, and the proponents of the anti-Israel content, secretly coordinated the event without letting Plaintiffs know this item would be on the agenda. *See* SAC ¶¶ 90-92 (detailing how Plenary's leaders coordinated with proponents to make equipment available for their

presentation, and to enable the proponents' advocates to sign up for all available speaking positions). Haverford's brief says nothing about these allegations.

Haverford also baldly asserts that "SAC does not contain any allegations about the experience of any Plaintiff or member of "Jews at Haverford" at the Fall Plenary. Br. 10. This again is false. Paragraph 92 says exactly what Haverford claims the SAC does not say:

> All Plaintiffs were present at this Plenary and personally witnessed the events described here. Certain of them sought to speak, to articulate their views and their commitments, but were not permitted to do so,

*Ibid.*

Fifth, Haverford says that the SAC "selectively quotes from alleged private[3] social media posts by Haverford faculty members voicing support for Palestinians and/or disapproval of the Israeli government and Zionism, which Plaintiffs characterize as antisemitic." Br. at 7. But the statements at issue from members of Haverford's faculty do not merely express "support for Palestinians" – they express support for Hamas murdering Jews, commit never to forgive anyone—such as Plaintiffs—who is committed to the Jewish state, and use threatening language such as "I know their names and I know their faces." SAC ¶¶ 49, 51, 54-55. Regarding a student social media post glorifying October 7, Haverford claims the SAC alleges only that some "unidentified Jewish student, not alleged to be a plaintiff or member of Jews at Haverford" saw the posts on Instagram and "voiced his disbelief concerning same." Br. at 6-7. Similarly, Haverford claims the SAC "do[es] not specify whether it was an individual plaintiff or an alleged member of Jews at Haverford who allegedly made the reports [calling the administration's attention to these attacks], or even whether the unidentified reporter was a student, faculty

---

[3] By "private" Haverford appears to mean simply that these posts were on the poster's own account. There is no evidence that the posts were private, and in fact, as the SAC alleges, they were publicly visible.

member, alumnus or parent." *Id.* at 7 n.7. This is simply not true. The SAC clearly alleges that "*Plaintiffs* filed bias reports" about the post depicted in ¶ 46 and also says that when the bias reports were ignored, "Plaintiffs *and* community members brought the posts to the attention of Haverford administrators directly," who took no action in response. SAC ¶ 47 (emphasis added).

Sixth, Haverford tells the Court that Plaintiffs' allegations regarding the COVID event contained "no factual allegations about the actual event, [including] what was said there." Br. at 15. Again, this is simply incorrect, and ignores the allegation in the SAC which says exactly what Haverford claims has been omitted. The SAC alleges that the lecture "presented the antisemitic conspiracy theory that the State of Israel has intentionally infected the Palestinian residents of Gaza and the West Bank with Covid," and that "this claim, for which no respectable evidence exists," is equivalent to other blood libels addressed to the Jews such as those holding them responsible for the spread of the bubonic plague or the murder of Christian children. SAC ¶118. The SAC alleges that the accusation was heard and experienced as exactly that blood libel by the Jewish students on campus, by their parents and by the larger Jewish community. SAC ¶119. Haverford does not attempt to argue that this understanding of the event was implausible. For that reason, the SAC alleges, the posting of the title, under the guise of an academic discussion, is deliberately harmful and constitutes harassment.

As these examples illustrate, Haverford's motion improperly attempts to litigate "issue[s] of fact" that are "not appropriate for resolution through a motion to dismiss." *Bivines*, 284 F. Supp. 3d at 590.

### C.  Haverford Improperly Injects Its Own Version of the Facts in Contradiction to the SAC

Haverford's brief also improperly injects numerous "facts" of its own, many of which are based on documents that are "neither relied on in nor attached to the SAC." *Earley*, 2018

U.S.Dist. LEXIS 202916, at *2. These arguments explicitly and improperly—and factually incorrectly—contradict the SAC's allegations regarding the following:

i.    Haverford's Bias Policy

On the basis of nothing more than its counsel's affidavit—rather than a statement by a Haverford official with some personal knowledge of the facts—Haverford insists it currently has no Anti-Discrimination, Harassment, and Bias Policy at all. Br. at 18-19. This claim is belied by the multiple statements on Haverford's website, as well as earlier versions of the relevant pages, showing that Haverford does indeed have such a policy, in force, now, and has had one throughout the last year and a half.  These pages link to the very policy which Plaintiffs invoke, and which explain how that policy operates.  *See* Declaration of Jerome M. Marcus, attached hereto as Exhibit 1.  It is further belied by Plaintiffs' experiences submitting reports under this very policy, as alleged in the SAC.

Below is a screen capture from Haverford's *current* website describing the Bias Policy as "a College-wide policy that affirms Haverford's commitment to cultivate an environment of equity and anti-racism, anti-oppression, and anti-bias":



13

*Id.* (showing https://www.haverford.edu/president/college-policies/anti-discrimination-harassment-and-bias-policy); *see also ibid.* (noting references to "Anti-Discrimination, Harassment, and Bias Policy" and links thereto). This page says that "[t]he Anti-Discrimination, Harassment and Bias Policy *is* a College-wide policy" (emphasis added). It states further that Haverford's "policy establishes"—currently—a " response protocol for reports of discrimination." The "Policy" link appearing on this page takes one to the very policy that Haverford's counsel swears does not exist.

As Mr. Marcus's declaration explains:

4. The Wayback Machine, https://web.archive.org/, is a website that archives versions of webpages existing before the currently accessible version. The current haverford.edu website includes a page entitled Office of the President Anti-Discrimination, Harassment and Bias Policy.
   https://www.haverford.edu/president/college-policies/anti-discrimination-harassment-and-bias-policy. That page is attached hereto as Exhibit A.

5. The current version of that page states (emphasis added) that "The Anti-Discrimination, Harassment, and Bias Policy *is* a College-wide policy that affirms Haverford's commitment to cultivate an environment of equity and anti-racism, anti-oppression, and anti-bias." A link on that page to "Policy" takes one to the policy page which Haverford's counsel claims does not exist. A link immediately below that, entitled File a Complaint, takes one to a page entitled Haverford College Discrimination, Harassment and Bias Incident Report, which is a fillable form at the bottom of which is a live link entitled "Submit."

6. I viewed each of the versions of this page available on the Wayback Machine. They are dated June 24, 2024, July 21, 2024, August 15, 2024, and November 7, 2024. Each has a link for "Policy" which links to the Policy cited in the SAC and which Haverford's counsel claims does not exist. Screen captures of each of these pages are attached hereto as Exhibits B, C, D and E. The version of the page from the first three dates indicates that the policy "is currently in a phase of community consultation" and provided dates and times for "feedback forums" on the policy. Even so, each of those versions allowed a visitor to click on an "Incident Form"—which takes the visitor to page which can be completed so a report could be filed, with the same "Submit" live link at its bottom.

7. The November 7, 2024 version of the page omits any reference to the policy being in a "phase of community consultation" and omits any references to "feedback forums." Further, this version lays out the steps of the "Bias Reporting System Process."

8. The foregoing establishes that the policy invoked by the SAC was in force on June 24, 2024, on July 21, 2024, and on August 15, 2024, though also in a phase of "community consultation." But at some time between August 15, 2024, and November 7, 2024, Haverford decided that the policy was no longer in a "phase of community consultation."

The SAC alleges that students actually filed "bias reports."  See *e.g.,* ¶¶82, 191 (itself

referencing 12 incidents which were the subject of at least one bias report). In addition, at ¶52,

the SAC quotes Jesse Lytle, the Chief of Staff to Haverford's President, who responded to a letter

complaint that "the College has systems and policies in place to safeguard academic freedoms

while addressing related concerns." Given the evidence cited above, Lytle's statement is

reasonably read to reference the policy that Haverford's counsel now claims does not exist.

Haverford's brief supplies no other interpretation of the words in ¶52.

Whatever force is to be attached to the declaration of Haverford's outside counsel, it

should be clear that any question about the existence of the Bias Policy is a factual issue that is

appropriately resolved by a factfinder after discovery.


ii.    Professor Aougab's Haverford webpage

Again relying on its counsel's affidavit, Haverford denies that a Haverford webpage

includes Professor Aougab's policy of refusing to write recommendations for students who want

to study in Israel or work with an Israeli cultural institution.  Haverford both denies that the page

which Plaintiffs have referenced is a Haverford page, and, again through its counsel, claims that

"*The webpage says nothing about recommendations for students who "plan[] to work or study at*

*an Israeli academic or cultural institution."*  The argument Haverford is making is demonstrably

incorrect, as the words on the pages themselves show.

The page cited in the SAC is part of what is identified on Professor Aougab's

haverford.edu page as his "home page:" the haverford.edu webpage directs a student to the page

cited in the SAC to learn Aougab's policies, as a Haverford professor, for the issuance of letters

of recommendation.[4] The page to which students are so directed instructs:

> In general, I am happy to write a letter of recommendation for anyone who has taken a class with me. The purpose of this page is for students to get a feel for the process of asking for one, and to lay out clearly when I will **not** be willing to write a letter so that no one feels blind-sided.

Haverford's categorical claim that the page "says nothing about recommendations for students

who 'plan[] to work or study at an Israeli academic or cultural institution" is also simply false.

The page says (emphasis added):  **As a matter of moral principle, I will not write letters of**

**recommendation for programs or jobs involving * * * ** Opportunities that violate the <u>USACBI</u>

<u>cultural and academic boycott of Israel </u>as I am a signed endorser of that call."  Aougab's home

page links here to the home page of the "US Campaign for the Academic and Cultural Boycott of

Israel."  That page calls for boycotting all Israeli academic institutions, Israeli cultural

institutions, such as the Israeli Philharmonic and Israeli dance troupes.  It is attached as Exhibit F

to the Declaration of Jerome M. Marcus, itself attached hereto as Exhibit 1.[5]

> iii.     Cancellation of the Antisemitism Awareness Event

The SAC alleges that two Haverford administrators coerced Plaintiff Ally Landau to

cancel an Antisemitism Awareness event by summoning her to a meeting less than a week before

the scheduled event and informing her that, if the Antisemitism Awareness component went

forward, it "might prove too antagonistic to the pro-Palestinian students on campus and that the

College might not be able to control the anticipated mob from storming the basketball court and

---

[4] Haverford's argument that Professor Aougab's home page is not a Haverford page asserts that the page does not "link to" a Haverford.edu page.  Br. 8.  Haverford is correct.  It does not "link to" such a page.  But is *linked to* such a page, viz., Professor Aougab's Haverford page.  That Haverford page directs the reader to the home page to learn Professor Aougab's policies as a Haverford professor.  That is what matters for present purposes.

[5] Given Professor Aougab's announced refusal to provide letters to students who wish to study or work at a cultural or academic institution in Israel, it is hardly surprising that, as Haverford complains, br. at 9, no Plaintiff has asked him for such a letter.

refusing to leave." SAC ¶ 159. These administrators told Ally that, under these circumstances, her team "would have to forfeit the game, as required by the NCAA rules." *Id.* "Understanding herself to have no choice, Ally agreed to cancel the Antisemitism Awareness component of the basketball game." *Id.*

In moving to dismiss the SAC, Haverford asks this Court to find that this allegation is false, going so far as to produce Ally's email to Dean McKnight and Director Lynch cancelling the event. Br. at 13 & n.15. Haverford relies especially on Ally's statement that "I have told everyone that this was completely my decision." *Id.* But Haverford ignores all the context alleged in the SAC surrounding that email, including Dean McKnight conveying to Ally the theretofore unknown threat of a mob disrupting the game and the College's refusal to take steps to prevent that from causing Ally's team to forfeit the game. Thus, Ally's isolated statement does not definitely answer whether the decision to cancel the Antisemitism Awareness component was in fact her own choice, or whether—as alleged in the SAC—she was pressured by administrators into making that decision (and telling others it had been her decision to make).

In any event, these emails are not "integral to or explicitly relied upon in the complaint," as Haverford apparently recognizes in suggesting that, if so, the Court "should not consider them in determining this 12(b)(6) motion." Br. at 13 n.15. Instead, it is in *discovery* that Plaintiffs will be entitled to obtain this communication and all others surrounding this event which Haverford has *not* elected to share with the Court. And it is in *depositions or at trial* that Ally (and other percipient fact witnesses) will be asked to testify to the full story of what happened and to cross-examine the Haverford administrators involved under oath.[6]

---

[6] At that stage, the nature of the information Dean McKnight transmitted suggesting that an event opposing antisemitism would be disrupted by a mob that Haverford sought to appease will certainly be strong evidence of the presence of an environment at Haverford hostile to Jews—apparently (since the planned event said nothing about Israel) all Jews, whether or not they are committed to Israel. Similarly, any deliberations among administrators about

Haverford claims that it can adduce documents not included in the Complaint on the theory that Plaintiffs' claims arise out of these documents. As shown above, the materials Haverford attaches do not in fact impair the effectiveness of Plaintiffs' claims, and in any event, Plaintiffs' allegations do not incorporate or rely on any of these extrinsic materials. For that reason, Haverford cannot rely on these materials at this stage.

### D. Haverford Ignores or Downplays the Significance of Key Allegations in the SAC

Haverford ignores the significance of other allegations in the SAC, while attacking them as support for claims Plaintiffs do not make. Most notably, Haverford conflates membership in Jews at Haverford with effective notice of the nature of Plaintiffs' claims based on the events at issue in this case.

With respect to twenty-one different incidents, the SAC references notice provided to Haverford. Each of those incidents, and the SAC paragraphs identifying the notice Haverford received about each, is set out in a chart that is appended hereto as Exhibit 2.

In a number of these incidents, notice was provided by someone other than a Plaintiff or other Haverford student. Contrary to Haverford's claim, Br. at 26, the paragraphs identifying these notices make no claim that cognizable injury was incurred by the people who sent these communications, as the SAC makes clear in each instance. Instead, these paragraphs are present to show that, through these communications, Haverford was put on notice about each of the events described in each of these paragraphs. These allegations set forth the content of the notice—i.e., *what* Haverford was put on notice of; *who* sent the notice; *when* it was sent; and *to*

---

what they were prepared to do to prevent such a mob of students from behaving as Dean McKnight suggested they might will also be important evidence. And if no such deliberations took place, that will be strong evidence of the College's indifference to the threat that Dean McKnight communicated to Ally.

*whom* it was sent.  That satisfies the notice requirement, and that is why these allegations are present in the SAC.[7]

Similarly, the treatment of Professor Mendelsohn is *not* invoked because the injury to him is at issue in this case.  It is invoked for the reason clearly stated in ¶72 –another paragraph of the SAC which Haverford completely ignores in its brief. That paragraph explicitly states that Mendelsohn's experience is relevant because of the impact *on Plaintiffs* of the fact that Haverford's treatment of Mendelsohn's speech in *support* of Plaintiffs and their commitments contrasts starkly with the treatment of professors and senior administrators who denounce, attack and swear at the Plaintiffs and their beliefs.  Mendelsohn was criticized by the administration because he conducted public teaching events on campus, which dealt with terrorism, the topic at the center of his field of expertise, on the theory that they did not provide sufficient diversity; but anti-Israel professors conducted entirely one-sided presentations which met with no pushback at all from the same administrators.  Exhibit 2 to Haverford Br.  Similarly, while anti-Israel professors act with impunity, and to denounce and curse at everyone, including Plaintiffs, who disagrees with them, SAC ¶¶69 and 70, Mendelson's disagreements on his private social media page[8] with a student about the events in Israel and Gaza were attacked and have been made the subject of ongoing disciplinary proceedings which appear designed to silence him and anyone who agrees with him, including the Plaintiffs, as the SAC clearly alleges:

Paragraph 72 alleges:

72.  All Plaintiffs, and most other members of Jews at Haverford, are aware of the treatment meted out to Professor Mendelsohn by the College, and of the disparity between

---

[7] One thing that is clearly not required is formal exhaustion of an internal administrative com-plaint procedure—although Haverford seems at times to suggest (without citing any authority for the proposition) that the SAC should be dismissed on the incorrect theory that exhaustion is needed.

[8] The SAC notes, ¶69, that Professor Mendelsohn was subjected to this disciplinary proceeding on the basis of his statement on his own social media page notwithstanding Haverford's claimed policy that "that social media posts on private accounts lie beyond its jurisdiction."

that treatment and the College's failure to do anything about the social media posts by Professors Aougab, Ha and Velasco attacking the Plaintiffs and all other Jews committed to Israel.  Plaintiffs view these facts as yet another manifestation of Haverford's hostility to any expression supportive of the Jewish commitment to Israel and its effective endorsement of attacks on that commitment.

While ignoring this paragraph, which clearly provides *the* reason why the SAC addresses Professor Mendelsohn's experience, Haverford does make one point with which Plaintiffs entirely agree:  Haverford seeks to justify its treatment of Professor Mendelsohn's statements, and its continued attacks on him for making those statements, on the ground that by doing so Haverford is "responding to community concern," Br. 27,  about Professor Mendelsohn and what he has said.[9] Haverford is exactly right that it is enforcing this community standard.  But a discriminatory community standard can hardly be a defense to a case of discrimination.

Haverford also suggests the Court can decide on this Motion to Dismiss the significance of a Haverford College organization's announcement that it supports "liberating Palestine by all means necessary."  Haverford claims, Br. at 17 n.19, that the Court must read these words now, definitively, to mean *not* "*all"* means, but only nonviolent means—so that the phrase cannot possibly constitute a message threatening to the Plaintiffs. That view flies in the face of public statements by Haverford faculty, quoted in the Complaint, glorying in Hamas's atrocities on October 7, 2023. These quotes, and these people, are supporting the murder of Jews.

Yet this Court need not, and indeed cannot, decide that fact-bound issue now, as multiple courts have recognized in adjudicating claims of antisemitism on campuses arising out of speech supporting the murder of Israelis.  Thus in *Fiss v. California College of the Arts*, 2025 U.S. Dist.

---

[9] The inability of the Haverford community (which apparently does not include the Plaintiffs) to tolerate statements like Mendelsohn's is problematic because this same "community" has no difficulty tolerating its professors announcing "F*ck Zionism," SAC ¶ 51, or calling all who support Israel "racist genocidaires," or announcing that they will refuse to speak to anyone—necessarily including all Plaintiffs—who believe in Israel's right to exist as a Jewish state, or who promise "I will never forgive" those of my students who share that commitment.  "I know their names and I know their faces.  Never forgive.  No reconciliation." *Id.* ¶ 54.

LEXIS 7456 (N.D. CA Jan. 14, 2025) the court refused to determine whether a college

department and many of its faculty were, or were not, supporting the murder of Jews when, in

response to Hamas's actions on October 7, they trumpeted on Instagram that "decolonization is

not a dinner party."  Plaintiff there invoked the phrase as evidence that her employer college was

supporting Hamas's violence.

Just as Haverford does here, the college in *Fiss* claimed that the phrase could not possibly

have a hostile meaning:

> Defendant urges, for example, that the Instagram post [stating "decolonization is not a
> dinner party"] "does not address Judaism or Zionism," and that it ultimately removed the
> post permanently. *See id.* But the meaning of the post and whether it actually created a
> hostile work environment is ultimately one for the factfinder, and not properly before the
> Court at this stage. The Court finds that Plaintiff has sufficiently alleged for purposes of
> the motion to dismiss stage that both the timing and actual content of the post, as well as
> the College's response to it, contributed to a hostile work environment.

*Id.*  at *16-*17.

In *Gartenberg v. Cooper Union for the Advancement of Sci. & Art,* Judge Cronan definitively

rejected exactly the argument that Haverford is making here:

> Although the parties offer competing interpretations of these slogans, when uttered just
> two weeks after the deadliest massacre of Jews since the Holocaust in a manner that
> reasonably appears to celebrate and glorify that same violence, the Court agrees that such
> phrases support at least a plausible inference of animus towards Jews. * * *

2025 U.S. Dist. LEXIS  20844, at *45 (S.D.N.Y. Feb. 5, 2025), *reconsideration denied*, 2025

U.S. Dist. LEXIS 33977 (S.D.N.Y. Feb. 25, 2025) (reiterating conclusion that the plaintiff's

complaint "states a plausible claim for a hostile educational environment based on physically

threatening or humiliating harassment and repeated acts of antisemitic vandalism and graffiti").

## IV.    HAVERFORD'S ATTACK ON THE SAC FAILS BECAUSE IT RESTS ON INCORRECT LEGAL STANDARDS

Haverford's Motion is predicated on a series of legal requirements under Title VI that do not in fact exist.  Harassment violates Title VI if it is *either* severe *or* pervasive, not, as Haverford would have it, both at once.  Similarly, a college's response to harassment breaches the law if students are denied *equal* access to educational resources. The harassment need not cut off *all* access.  And, in contrast to Title VII, there is no requirement that a plaintiff exhaust a college's disciplinary procedure before bringing a Title VI claim.

### A.  The Standard is Severe *or* Pervasive

Haverford erroneously attacks the SAC by arguing, incorrectly, that it fails because Plaintiffs have not alleged conduct that is *both* severe *and* pervasive. Br. at 28 (arguing that harassment must be "severe, pervasive and objectively offensive").  The factual reality is that Plaintiffs have indeed alleged both, but the law, as clearly stated by the Third Circuit, is that *either* severe *or* pervasive hostile conduct is sufficient:

> Rather than "severe and pervasive," however, the correct standard would be "severe or pervasive": "'[S]everity' and 'pervasiveness' are alternative possibilities: some harassment may be severe enough to contaminate an environment even if not pervasive; other, less objectionable, conduct will contaminate the workplace only if it is pervasive," Castleberry, 863 F.3d at 264 (internal quotation and citation omitted); see also Jensen, 435 F.3d at 449 n.3. The trial court therefore appropriately instructed the jury to consider whether Komis faced "severe or pervasive" retaliation in the form of a hostile work environment. See App'x 22, Supplemental App'x 868 (emphasis added).

*Komis v. Sec'y of the United States Dep't of Labor,* 918 F.3d 289, 298  (3d Cir. 2019);; *see also*

*Canaan*, 2024 U.S.Dist. LEXIS 227575 at *35 ("The disjunctive standard has since been applied

to address a Title VI hostile educational environment claim pursuant to Castleberry. See *L. L. v.*

*Evesham Twp. Bd. of Educ.*, 710 F. App'x 545 549 (3d Cir. 2017)Therefore, in the Court's

estimation, the disjunctive severe-or-pervasive standard applies to Ms. Canaan's hostile

educational environment claim pursuant to Castleberry and Boyertown."). As the Sixth Circuit

clarified in *Castleberry v. STI Group,* 863 F.3d 259, 264, (6th Cir. 2017) (emphasis added), "The

correct standard is 'severe *or* pervasive.' The Supreme Court has articulated as much on several

occasions. See, e.g.,*Pa State Police v. Suders,* 542 U.S. 129, 133 (2004)*; Harris v. Forklift Sys.*

*Inc.,* 510 U.S. 17, 22 (1993).  Haverford argues that the standard is severe, and pervasive.   Br. at

28-29. As the above authorities make clear, this is simply incorrect.

### B.  The Standard Is Equal Access, Not Denial of Any Access

Haverford erroneously argues that, to establish a violation of Title VI, Plaintiffs must show that

they have been "deprived of access to an educational benefit or activity."  Br. at 28-32. This too

is wrong.  A Plaintiff establishes a violation of Title VI by showing that he or she was

"effectively denied *equal* access to [the] institution's resources and opportunities" by virtue of the

harassment, *Davis v. Monroe Cty Bd. of Ed.* 526 U.S. 629 (1999) (emphasis added).  The issue is

not *access* but *equal* access:

> harassment that "discouraged [the plaintiff] from more active involvement" in
> campus activities or which "simply created a disparately hostile educational
> environment relative to her peers" is properly "construed as depriving [the
> plaintiff] of the benefits and educational opportunities available at [her
> institution]." *Hayut*, 352 F.3d at 750; see also T.E., 58 F. Supp. 3d at 356.

*Gartenberg* at *68.  That decision defines that the kinds of harm a Plaintiff must experience to

show injury for Title VI purposes:

> Gartenberg plausibly alleges that Jewish students at Cooper Union were subject to
> antisemitic harassment that created an objectively hostile educational environment. She
> also alleges that Jewish students suffered emotional distress "including intense anxiety
> and panic attacks"; have "engaged therapists, missed and/or dropped classes, and failed to
> complete and perform on assignments"; and have avoided the Foundation Building's
> library, and that at that least one student delayed completing his or her degree, resulting
> in temporal and financial losses. Compl. ¶ 142. At the very least, these allegations
> plausibly demonstrate that Jewish students at Cooper Union were "deprived of a

> supportive, scholastic environment free of [discrimination] and harassment." Zeno, 702
> F.3d at 667. Accordingly, they are sufficient to plead a deprivation of educational benefits
> or opportunities for purposes of Title VI.

*Id.* at *68-*69.  See *Hayut v. State University of New York*, 352 F.3d 733, 739-42, 748-50 (2d Cir.
*2003)*(explaining that a plaintiff had shown "interference with educational progress" for purposes
of a Section 1983 claim and a deprivation of educational benefits for Title IX purposes based on
allegations of verbal harassment on the basis of sex, "humiliation and emotional distress,"
trouble sleeping, difficulties concentrating on coursework, and poor academic performance); *L.*
*L. v. Evesham Twp. Bd. of Educ.*, 710 F. App'x 545, 548–49 (3d Cir. 2017) (finding prima facie
evidence of a hostile educational environment where, on a single occasion, "a white second-
grader sitting in the desk in front of [African-American plaintiff] KLJR said the word "n*****,
[and] the teacher smiled at the student's comment and walked out of the classroom"). Thus the
Second Circuit upheld a jury verdict has finding harassment based on testimony that the victim
"would be crying and upset" as a result of verbal harassment even though her "grades did not
suffer."  *Doe v. E. Haven Bd. Of Educ.,* 200 F.Appx. 46, 48 (2d Cir. 2006).  Similarly, courts have
found that plaintiffs "plausibly pled" actionable and "objectively offensive harassment" when
campus "protests were, at times, confrontational and physically violent, and plaintiffs
legitimately fear their repetition." *Kestenbaum v. President & Fellows of Harvard Coll.*, 743 F.
Supp. 3d 297, 308–09 (D. Mass. 2024). As Judge Steans explained in that case, such harassment
"impacted plaintiffs' life experience at Harvard" because "they dreaded walking through the
campus, missed classes, and stopped participating in extracurricular events." Contrary to
Haverford's arguments, these effects on Plaintiffs as alleged in SAC ¶¶ 1, 35, 83, 117, 168-74,
suffice to state a Title VI claim.

# V. PLAINTIFFS HAVE PROPERLY FOLLOWED THIS COURT'S INSTRUCTIONS TO ESTABLISH THAT HAVERFORD VIOLATED TITLE VI

This Court's decision on Haverford's previous Motion to Dismiss found that, to establish a violation, Plaintiffs must be able to show that they were aware of harassing incidents they did not themselves experience. To establish Haverford's actionable indifference to such harassment, Plaintiffs had to allege that Haverford had been put on notice about each incident at issue, and that Haverford had failed to respond appropriately when so notified.  In their Second Amended Complaint, Plaintiffs have properly pled both of these elements.

## A.  Aggregation Is Proper When Students All Know About an Incident

This Court's January 6 decision held that, to establish that students were affected by incidents at which they were not physically present, a complaint must allege that the students learned of the events, and when they did so: "who knew what and when they knew it."  2025 U.S. Dist. LEXIS at *14.

The Court's instruction followed the Sixth Circuit's decision in *Berryman v. SuperValu Holdings, Inc.,* 669 F.3d 714 (6th Cir. 2012). That decision was made on summary judgment, not at the threshold of a Motion to Dismiss. It did not require that notice be pled with the particularly required by Federal Rule of Civil Procedure 9(b), but applied the common sense principle that, if an event of discrimination was not experienced by a plaintiff, he or she can only invoke it if it can be alleged that the Plaintiff actually knew about it.  Otherwise, the event could not possibly have affected the Plaintiff.

The SAC provides this information for each incident of harassment described, as shown by Exhibit 2.  That chart identifies each of the events of harassment here at issue and, for each

event, identifies the SAC paragraphs alleging when each Plaintiff learned of each event. When it can do so without compromising the anonymity of those Plaintiffs authorized by this Court to proceed under a pseudonym, the SAC sets forth who was present and, for those who were not present, when they learned of the incident. In each instance, the SAC pleads that all of the incidents at issue in this case were either experienced by each Plaintiff or known to each Plaintiff while they have been a student at Haverford, and how they learned of those incidents, and that the incident therefore affected each Plaintiff's experience on the Haverford campus.

### B.  Haverford Is Responsible Because It Had Notice of Each Event

This Court also directed Plaintiffs to plead that a Haverford employee with authority over the conduct at issue had notice of each incident of harassment: it instructed Plaintiffs to identify "who complained to whom, if so, about what, and when." Plaintiffs have done exactly that in the SAC, as shown by Exhibit 2.

Haverford complains that some of these notifications came from people other than students, but it cites no authority requiring that notice come from an injured student. Plaintiffs are aware of no such authority. The logic of the requirement is that the institution cannot be found to be indifferent about something unless it knows about it. What is required, as this Court has explained, is knowledge of the harassment, conveyed to a person at the institution with authority to address the matter about which notice is provided. *Landau v. Corp. of Haverford College,,* 2025 U.S. Dist. LEXIS 1402 at *15 (E.D. PA Jan. 6, 2025).

The source of the knowledge should be a matter of indifference, so long as it is credible. The sources here, other than students, are parents, alumni, community leaders, and Haverford

faculty. Haverford has not suggested that any of these sources, or the complaints that they filed, were not credible.[10]

The SAC does not identify the complaining student when doing so would have compromised the anonymity of the pseudonymous plaintiffs. This would be so because the events complained about were public—such as the meeting regarding Customs, at which one Plaintiff was present. In any event, Haverford has the written complaints, and can identify the sources for itself.[11]

### C. Haverford Improperly Compartmentalizes the SAC's Allegations

Haverford improperly asks the Court to treat each of the SAC's allegations individually, rather than understanding them in the aggregate. Br. at 25-26. The law commands otherwise, as shown by the authorities gathered above at 4: *Sharp v. Activewear, L.L.C.* 69 F.4th 974, 978 (9th Cir. 2023); *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 807 (11th Cir. 2010) (*en banc*); *Link v. Trinity Glass Int'l, Inc.*, 2007 WL 2407101, at *4 (E.D. Pa. Aug. 22, 2007); *In re Resistors Antitrust Litig.*, 2017 WL 3895706, at *3 (N.D. Cal. Sept. 5, 2017).

### D. The Conduct Present At Haverford Has Been Found By The Courts To Violate Title VI

The cases adjudicating the responses of colleges and universities to Israel/Hamas protests on campuses, all but one of which Haverford ignores, show that what's happening at Haverford

---

[10] As noted above at 18, Haverford also argues that the non-students who submitted these complaints have no Title VI protected interests; Haverford seems to suggest that the complaints are irrelevant for that reason. Plaintiffs agree that parents and community members have no Title VI interest, and the complaints by these people referenced in the SAC were not invoked to assert any such interest. They are described in the SAC because these complaints put Haverford on notice of the incidents they discuss. And if parents, alumni, faculty and community leaders knew of an event that they felt serious enough to warrant their writing to the president of Haverford College, the most likely source of that knowledge were the students themselves who, as described from the onset of this litigation, are frequently too frightened to state their concerns publicly for fear of outing themselves as Zionists.

[11] The Demand Letter sent to Haverford in February of 2024, SAC Exhibit B, at 12, put Haverford on notice of its duty to retain all documents relating to the harassment described therein.

College is actionable harassment.  And even the one case Haverford does cite from among these authorities imposes a standard of conduct by the institution so notified that Haverford clearly does not meet.

> i.  Harassment is shown by blocking access to a part of campus to people who are committed to Israel – *Frankel* and the Haverford Encampment and sit-in

The SAC alleges, at ¶133, (emphasis added) that the protesters established a "Liberated Zone" in the center of Haverford's campus:

> Haverford's encampment consisted of tents, banners and the declaration of a "Liberated Zone." **No person not in accord with the demands of these protesters was permitted to enter the Liberated Zone; and because the "Liberated Zone" was at the center of campus, this rendered the heart of the College inaccessible to Plaintiffs.** The Liberated Zone featured posters quoting Hamas to advocate for the destruction of the Jewish state, and chants such as "long live the Intifadah." * * * Any person who walked past the Encampment and did not express support for this goal was shouted at and insulted while they were concluding their academic semester and preparing for final exams.

*Frankel v. Regents of the University of California,* 744 F.Supp.3d 1015, 2024 U.S.Dist. LEXIS 146433 (C.D. CA 2024), holds that conduct exactly like that described in the SAC at ¶¶132-136 violates Title VI.  There too an "encampment" was set up, and "people who supported the existence of the state of Israel were kept out of the encampment."  2024 U.S. Dist. LEXIS 146433 at *5.  Because, just as at Haverford, this took place in a central campus location, Plaintiffs in *Frankel,* just like those here, altered their movements across campus to avoid the encampment and the harassment they would experience if they approached it.  Frankel himself "stopped using the Royce Quad because he believed that he could not traverse the encampment without disavowing Israel."  Another Plaintiff "canceled plans to meet a friend at Ackerman Union after four protesters stopped him while he walked toward Janss Steps and repeatedly asked him if" he could show that he agreed with their views.  Another plaintiff "could not study

at Powell Library because protesters from the encampment blocked his access to the library."

And a fourth "decided not to traverse Royce Quad because of her knowledge that she would have

to disavow her religious beliefs to do so." *Id.* at *6-*7.

In *Frankel* the university attempted to address the Jewish students' concerns by forcing

removal of the encampment and altering campus rules on protests in ways which, if they were

obeyed, would prevent a recurrence. Here, by contrast, as the SAC alleges at ¶136, Haverford

did absolutely nothing. President Raymond received a written complaint about the encampment

from a student Plaintiff, which read:

> As the same people have done in numerous other instances, they are impeding the
> movement of every Haverford person, student or faculty, who is not already standing
> with them. * * *
> As a Jew I experience this conduct exactly as these people intend for me to experience it:
> as grossly demeaning, insulting and, most important, physically threatening. * * *
>
> You must know that this is the impact of such conduct, because it's already occurred
> numerous times at Haverford since October 7. And I know that I, and many of my
> friends, have repeatedly spoken directly to you about the impact of such conduct on our
> ability to surive as Jews on this campus.
>
> You've done nothing in the past and you're doing nothing now.
>
> Where are you?

Raymond did not respond. If, as *Frankel* recognizes, a college breaches its Title VI duties when

it tries ineffectively to prevent Jews from being excluded from a portion of its campus, then it is

clear that Haverford breached its duty when it refused even to try to protect the Plaintiffs, and

also when it publicly praised the conduct which had excluded the Jewish students from this

portion of the campus.

  ii. Harassment is shown by Riotous behavior – *Cooper Union* and
     Haverford's ADL Event

29

This Court has already considered the behavior of students and faculty at the ADL event at Haverford earlier this academic year.  As this Court has recognized, "the topic of the presentation, antisemitism, was on its face not political, focusing on attitudes towards Jews, not the nation of Israel[, and] the presenter, the Anti-Defamation League, is a respected nonpartisan, nonprofit, with a mission to combat hate and promote tolerance." *Landau v. Corp. of Haverford College,* 2024 U.S. Dist. LEXIS 225714 at *8 (E.D. PA Dec. 13, 2024).

The protest outside the event was *not* a dialogue or respectful conversation with the ADL or anyone associated with it:  rather, as the SAC, alleges, "In the weeks prior to the event, students thrust flyers into the hands of everyone they passed on campus." Claiming that "the ADL is a genocidal, racist, antisemitic organization," the protesters "insisted that the ADL event be canceled so that the ideas and commitments which ADL sought to explain would not be heard on Haverford's campus."  SAC ¶79.  At the event itself protestors carried signs saying "no Zionists on campus" and "by whatever means necessary."  Many, all outdoors, were masked.

To achieve their goal of preventing the ADL from being heard, protesters deployed a variety of tactics:

- They zip-tied open the blinds in the room where the event was to be held, so that the disruptions they had planned immediately outside the room would have maximum effect.  This tactic was defeated because it was noticed before the event began, and the zip-ties removed.  SAC ¶80

- They mobbed the space outside the windows throughout the event, banging on cowbells and pots with spoons and shouting, with the use of a bullhorn. Throughout the event they shouted slogans such as "from Gaza to Lebanon, Israel will soon be gone" and "From the River to the Sea, Palestine will soon be free." *Ibid.*  Audio recordings of these disruptions were submitted to the Court and incorporated into the SAC by reference. *Ibid.*

- Inside the event, multiple protesters, one at a time, interrupted the event to denounce the ADL and Israel.  Although Dean John McKnight, Vice President of Institutional Equity and Access Nikki Young, President of the College Wendy Raymond, (SAC ¶81)--and apparently also the "security" which Haverford brags about in its brief at

15 —were all present, no-one did anything about the first three of these interruptions. When the fourth disrupter stood, Dean McKnight invited all others who wanted to drown out the ADL speakers to join this fourth one, saying it would be the last. That was the extent of the College's intervention in—or, more accurately, its participation in—the disruption of this event.

As the SAC alleges, the ADL speaker and all those attending the event, including several of the Plaintiffs,[12] were "in fear for their physical safety, as Professor Richard Freedman, a faculty member of Jews at Haverford, informed President Raymond after the event." SAC ¶83.

Haverford failed to respond to the complaints filed. No action was taken to prevent a recurrence. No student or faculty member who had participated in the raucous cowbell clanging and shouted promises of Israel's annihilation outside the event were disciplined. No public statement was even made that the conduct of the protestors was unacceptable or outside the norms of conduct Haverford expects of its students. See SAC ¶84. This is so because, it appears, such conduct when directed against Jews simply *isn't* outside the norm, or applicable norms, at Haverford.

As the SAC explains, this was a deliberate choice on Haverford's part. The SAC alleges that Nikki Young, Haverford's Vice President for Institutional Equity and Access, has publicly stated that "historically at Haverford, members of the LGBT community had to be closeted; members of the Black/Brown community had to be quiet about anti-Black racism; and that now Jewish students need[] to condemn 'genocide' rather than reporting antisemitism." SAC ¶36. The conduct of Haverford's leadership in response to the ADL event is the careful and intentional application of the Haverford policy clearly defined by Vice President Young.

---

[12] As the Court is aware, both Plaintiffs in this action other than Ally Landau, and those members of the Jews at Haverford who are not formally plaintiffs but whose experiences are invoked in the SAC, have shielded their identity from the public. For that reason they are not identified as having been in attendance at this event, as such identification would reveal their identities to the public.

The case law governing recent events on American college campuses, which Haverford ignores, makes clear the legal significance of action like this, and of Haverford's non-response to it.  In *Gartenberg v. Cooper Union for the Advancement of Sci. & Art,* 2025 U.S. Dist. LEXIS 20844 (S.D. NY Feb. 5, 2025) the court was faced with a period of just three weeks of protests, rather than the still-continuing 16 month saga at issue in this case.  *Gartenberg* involved one instance where Jewish students were put in fear of their physical safety by a mob of chanting Palestinian protesters.  There "demonstrators surrounded the library and proceeded to bang loudly on the library's doors and on its floor-to-ceiling glass windows, shouting demands to be let in and continuing to direct anti-Israel slogans and waive a Palestinian flag at the Jewish students inside the library." The event lasted only about twenty-minutes, and at Cooper Union as at Haverford, "administrators did nothing to disperse the protestors" and security, which was present, also did nothing.  "None of the protestors subsequently faced any discipline."

*Gartenberg* found Cooper Union's response to this event a breach of its Title VI obligations to its Jewish students.  *Id.* at *63-*64.  And that was so even though, in contrast to Haverford's resolute silence, Cooper Union responded to this event by promising an investigation:

> The school emphasized that it would investigate the October 25 incident. Indeed, as part of a statement issued that same day, President Sparks assured that administrators would "review reports and footage from [that day's] events and initiate any necessary actions consistent with [Cooper Union's] policies." Compl. ¶ 99. President Sparks echoed that promise through a statement addressed to Cooper Union alumni that she issued a few days later. See Dkt. 21, Exh. 3 at 3-4 ("[Cooper Union's] administrative and security team[s] are in the process of a comprehensive review of [October 25's] events and resulting complaints."). Also, on November 3, 2023, President Sparks again warned that Cooper Union takes its Code of Conduct "very seriously" and "acts expeditiously to review potential actions of discrimination," and that "[a]ny member of [Cooper Union's] community who poses a threat to another's safety or engages in hate speech will be held accountable for their actions." Dkt. 21, Exh. 4 at 3-4.

*Id.* at *65-*66.  That court nonetheless held that Cooper Union's statements following the library incident were insufficient to discharge its Title VI obligations, because, in reality Cooper Union "failed to timely investigate the acts of discrimination and harassment on October 25" and because none of the students who engaged in harassing conduct towards Jewish students on that day faced any discipline.

There can be no question that Haverford's tepid or non-response to the threat posed by disruptive and threatening anti-Israel mobs a clear violation of the law.  At least Cooper Union's leadership publicly stated that conduct threatening physical safety is unacceptable. In response to the ADL event, Haverford has not even done that.

   iii. Harassment is shown by tearing down posters

Just as at Haverford, so at Cooper Union, hostility to Jewish students was shown by tearing down posters about Jewish causes. At Cooper Union, the posters torn down related to Jewish hostages taken by Hamas on October 7.  At Haverford, they were completely *a*political— they merely advertised a Chabad event about being Jewish.

As *Gartenberg* explains, one manifestation of the antisemitic behavior at issue in that case was that, "[p]osters hung up by Jewish students with the names and photographs of those whom Hamas had abducted on October 7, meanwhile, were vandalized and torn down." *Id*. at *3."

At both colleges, of course, tearing down posters is against the rules, which was one basis for the court's conclusion in *Gartenberg* that the Jewish students' Title VI rights were violated because Cooper Union did not effectively prevent the conduct.  The SAC alleges that Haverford's purported investigation—the initiation of which Haverford views as a complete vindication—was clearly deficient, because it attributed the posters' disappearance to "the wind" even though many of the allegedly torn down posters had been hung indoors, and in more than

one instance a poster allegedly blown down by the wind was found crumpled up on the floor. SAC ¶154. So the SAC alleges, and the allegation, as noted above, must be taken as true for purposes of this motion.

But its investigation cannot be of any help to Haverford, because the College bestowed an award to the student who, perhaps facetiously, mocked the Plaintiffs' concerns by claiming to have torn the posters down and eaten them. This is, as the SAC alleges, a calculated insult to the Jewish students who put up the posters.[13]

By giving an award to this student Haverford has formally endorsed the insult. No careful evaluation is needed of the quality of Haverford's purported investigation into the winds on its campus (and within its buildings) to determine that Haverford's conduct relating to the removal of Jewish students' posters—conduct that includes the issuance of an award to the student who mocked this concern—are, at least plausibly, a breach of Haverford's Title VI obligations.

    iv.    Harassment is shown by barring a podium to Jews committed to Israel

Presumably even Haverford would acknowledge that an explicit rule barring Jews who are committed to Israel from speaking at a public event would violate Title VI. Haverford ignores, however, that the SAC alleges that indeed such a rule was effectively applied at the first Plenary, in the Fall of 2023, because no student who is committed to Israel was permitted to speak at that event, while every authorized speaker took the opposite position. Haverford attempts to escape the force of these allegations by ignoring the most important parts of them,

---

[13] President Raymond's statement acknowledging that antisemitism would be at work if it were proven that the posters had been torn down, which was referenced by this Court's January 6 opinion, 2025 U.S. Dist. LEXIS 1402 at *17, is effectively rendered a nullity by the issuance of this award, and by the investigation's irrational conclusion.

and suggesting to the Court that the Jewish students were prevented from speaking simply because they didn't sign up in time. Br. 10.  But, as noted above, this argument only works if one ignores SAC ¶¶90-92, which carefully explain that first Plenary's planners worked in secret before the event to define the agenda and then to take all of the speaking slots, so that none would be available for the surprised Jewish students who only learned, once the event commenced, that it would be consumed with denunciations of their ethnic and religious commitments.

None of the anti-Israel protesters at any of the campuses other than Haverford where cases have been brought has tried the tactic of holding an ostensibly public event and then keeping from the podium only those students who are committed to Israel, so there is no exact precedent for this conduct.  But the cases that deal with exclusion from a particular college space of those who are committed to Israel provide the applicable law:  *Frankel* and *Kestenbaum*, both of which involved the exclusion from parts of campus of those Jewish students who are committed to Israel, make clear that it is a violation of the law for a college to tolerate such conduct.

Here the College's most senior leaders, Dean McKnight and President Raymond, were present at the 2023 Fall Plenary.  SAC ¶94.  They saw what was occurring. They were asked in real time by Jewish students to help secure an opportunity to speak. Those Haverford leaders took no effective action.  Dean McKnight's acquiescence in the refusal of Plenary's leadership to allow the Jewish students to speak, to which Haverford (Br. 10) points as proof that it fulfilled its Title VI duties, in fact proves the opposite, because it was totally ineffective.  Plaintiffs remained silenced.  And McKnight saw in real time that the small effort he had made was ineffective. He

could have acted to ensure other perspectives were given the opportunity to speak.  He did not do that.

Worse, when the event ended, President Raymond praised it as "a great success—way to go, Haverford students!"  Because the denunciation of Israel, and the refusal to afford a chance to speak to even a single Jewish student committed to Israel, were among the central events at Fall Plenary, President Raymond's plaudits constituted endorsement of this conduct, "demonstrating not just complete indifference to, but outright support for, the fact that Jewish students committed to Israel had been brutalized and silenced at the event."  SAC ¶95. The "emergency" Plenary was conducted pursuant to what even its leaders admitted was a breach of the rules governing Plenaries, SAC ¶¶107 (rule violations) 109 (admission of rule violations by student council co-presidents).  It was conducted, and the rule violations took place, only to secure a resolution denouncing the plaintiffs' ethnic and religious commitments, including the defense of Jewish lives in Israel.  The College, and President Raymond, were put on notice of the rule violations before they had even taken place. President Raymond and Dean McKnight not only did nothing to prevent the breaches, but also "effusively praised" the effort. SAC ¶112.  Some Plaintiffs were effectively excluded from the event "because they knew it would consist entirely of denunciations of their beliefs and identity."  SAC ¶113.

The SAC thus alleges clear, admitted violations of Haverford College's rules; not only not prevented but even endorsed by the College President and Dean, solely because the conduct was directed at securing campus acclimation of a demand that the State of Israel cease defending Jewish lives on its own territory.  Once again, the policy articulated by Vice President Young is at work:  Jews must denounce "genocide" if they are to be safe on the Haverford campus.  SAC ¶36.  Jewish students who refuse to acquiesce in this are effectively excluded from campus events.

Spring Plenary was the third time during academic year 2023-2024 that Haverford's student government used the official mechanism of Plenary to get the College to adopt a condemnation of the Plaintiffs' ethnic commitments. This time the event was so oppressive that students who share the Plaintiffs' commitments were forced to publicly disavow them, as President Raymond learned from a parent's outraged letter, quoted at SAC ¶115, which explained:

> He 100% does not support a ceasefire but didn't feel comfortable voting honestly. That is so upsetting as a parent for me to hear that my son didn't have the courage to be genuinely himself. Yet, I get it. He feels that after what happened to Ali this fall and with the endlessness of "Free Palestine" on campus and the permissive nature of Haverford's laissez-faire administration, conformity was safer than speaking out. My son's anxiety about this, his sense of isolation, and his feeling of need to vote against himself and his religion was what he considered to be his best choice - his best choice at Haverford - a school we chose for its community!

This discussion also makes clear why the events set out in the Plaintiffs' pleading must be read together, and not as isolated instances. This parent explained to President Raymond that the impact of previous events—and the impact of events directed at Jewish students other than the writer's son—determined the impact of Spring Plenary on the Jewish student whose experience is described here. President Raymond, and Haverford College, were completely indifferent to these events and this impact on Jewish students. As the SAC alleges at ¶116, no substantive response to this letter was received.

> v.    Harassment is shown by chants attacking the Jewish commitment to Israel

The cases adjudicating Title VI claims arising on American campuses over the last eighteen months have dealt with the claim that certain chants attacking Israel are antisemitic. At least two careful opinions have weighed the antisemitic nature of the chants and have balanced the chanters' free speech rights with the duty, under the Civil Rights laws, to bar speech that constitutes harassment.

These cases recognize that, just as some workplace speech can harass women or people of color, so some campus speech can be antisemitic.  As *Gartenberg* explains:

> there is no question that the elimination of discriminatory harassment in employment and in programs receiving federal funding is a compelling government interest. Saxe, 240 F.3d at 209. And as decades of judicial experience have made all too clear, abusive speech, no less than abusive conduct, can readily slam shut the doors to the workplace or seal the schoolhouse gates.

*Id.* at *29. Some speech, therefore, can be actionable harassment. The U.S. House of Representatives has resolved that the phrase "from the River to the Sea, Palestine will be free" is antisemitic.  H. Res. 883, April 16, 2024.  The ADL agrees.

https://www.adl.org/resources/backgrounder/slogan-river-sea-palestine-will-be-free

The use of bullhorns to shout antisemitic attacks is only a small part of this case, but it is *a* part, and the slogans used at Haverford to attack the Plaintiffs and their commitment to Israel are the same ones that have been used, and condemned in the caselaw, as violations of Title VI when college leadership does nothing to prevent their deployment as harassment of Jewish students.

*Gartenberg*  and *Kestenbaum* both recognize and apply these principles and both find that, on the facts alleged in those cases, it can be a violation of Title VI to chant antisemitic slogans.  *Gartenberg* explains:

> pro-Palestinian students at Cooper Union chanted slogans like "[l]ong live the intifada," "[r]esistance is justified," and "[i]t is right to rebel." Compl. ¶ 77. In addition, demonstrators chanted the phrase "[f]rom the river to the sea, Palestine will be free." Id. Although the parties offer competing interpretations of these slogans, when uttered just two weeks after the deadliest massacre of Jews since the Holocaust in a manner that reasonably appears to celebrate and glorify that same violence, the Court agrees that such phrases support at least a plausible inference of animus towards Jews.

Chanting such slogans is found actionable not only because of their content but also because of the conduct of the people engaged in it. Masking, which prevents students from being

held accountable for any rule violations, is an aggravating factor. *Gartenberg* at *10.[14]  In

*Kestenbaum* the same chants were chanted, *id.* at 302-303; the court held that, in regulating

purportedly protected speech activity, "the record is too thin to determine whether Harvard in

fact acted to protect free speech rights as it contends Title VI required it to do and whether the

protest activity itself comes within the protections of the First Amendment."  742 F. Supp.3d at

309.

   The chants at Haverford are the same as the chants at these other institutions. These

courts have recognized that their use can be, and in the context of demonstrations against Israel

sometimes are, designed to intimidate or silence those who are committed to Israel.

   As *Gartenberg's* careful First Amendment analysis makes clear, these holdings do not

represent a suppression of protected speech.  That is particularly so where, as at Haverford, the

chants were never a part of any student's effort to engage in dialogue of any kind.  Recognizing

that, depending on what conduct accompanies them, there may be a harassing quality to chants

calling for the death of all Jews living in Israel or their ethnic cleansing from that country,

requires no compromise with the First Amendment.

   There is one idea expressed on Haverford's campus which is, even when calmly spoken,

actionable harassment:  the demand that Haverford's campus not allow the presence of Zionists.

This demand was made at the ADL event and after the screening of a film on campus about

Hamas's October 7 attack.  SAC ¶82 (ADL event); 129 (film screening).  The demand that

---

[14] Recognizing that masks can be worn to intimidate, and to secure anonymity to protect the wearer from being
apprehended when engaged in illegal conduct, numerous states bar the wearing of masks under certain
circumstances.  See generally Note, *"Who Goes There.- Proposing a Model Anti-Mask Act,* 61 Fordham L. Rev. 241
(1992).

Zionists be removed from campus is a demand that the Plaintiffs, who are Jews committed to Israel—that is, Zionists—be banned from Haverford College.

If it is true, as this Court has recognized, that "a commitment to the existence of a Jewish state—though notably not a carte blanche endorsement of any activity of the State—is a piece of ethnic identity for many (though not all) Jewish people," *Landau,* 2025 U.S. Dist. LEXIS 1402 at *9, n.8., then a public demand that such people be removed from campus constitutes discrimination on the basis of the "ethnic identity" of the people whose removal is demanded.

Plaintiffs, the SAC clearly alleges, are such people.  For the College to tolerate the repeated, public, repetition of this demand, without even any pushback, is a breach of its duty under Title VI, just as the College's toleration of a demand that any other group of people be removed from its campus would be such a breach.

Finally, even if this Court were to entirely reject the capacity of chants like those here at issue to constitute harassment of any kind, contrary to the rulings of each of the cases cited above, it would remain the case that Haverford has discriminated in its regulation of speech on campus, privileging speech which attacks Plaintiffs' commitments while resisting, or refusing to protect, speech which expresses those commitments.  That is the net result of the College's

- refusal to protect the Antisemitism Awareness event;

- its investigation of Professor Mendelsohn's speech;

- its "apologiz[ing]," SAC ¶148, for subjecting students to the Plaintiffs' views at Customs, and then removing the materials expressing those views from the College's

formal orientation packet, while including a wealth of material attacking Plaintiffs' commitments; SAC ¶149

- its failure to protect the right of Jewish students to speak at Plenary;

- its maintenance of the Honor Code's formal discrimination between the unprotected "privileged" classification of speech supporting the Jewish commitment to Israel, and the protected status of speech by "marginalized" people, which includes the anti-Israel position – as well as Haverford's formal adoption of the Honor Code in its insistence that Jewish students rely exclusively on that Code to remedy harassment against them;

while at the same time Haverford left other professors completely unmolested when they denounce, curse at, and proclaim their refusal to engage in any way with people who, like the Plaintiffs, manifest a commitment to Israel, and leaving unaddressed the demand of students that Haverford's campus be purged of Zionists. A free-speech policy is only defensible if it provides free speech for all sides. See Bernstein, *Freedom of Speech and Campus Antisemitism,*

https://reason.com/volokh/2025/03/08/freedom-of-speech-and-campus-antisemitism/

Haverford, the SAC alleges, refuses adamantly to do any such thing.

  vi. Harassment is shown by discriminatory treatment of faculty, which was made known to students

   Treatment of Professor Barak Mendelsohn as compared with treatment of Professors Aougab, Ha, and Velesco and Vice President Young

The SAC defines the starkly different treatment meted out to Professor Barak Mendelsohn as compared with the treatment of other Haverford professors and administrators who boycott, curse at, and denounce the Plaintiffs' commitments. It describes the impact of this discrimination on Professor Mendelsohn, and it explains *why* the impact on him matters in a case

brought not by him but by Jewish students committed to Israel: because the students knew about this discrimination, and its impact on Professor Mendelsohn, and they viewed the College's treatment of him as discrimination against their commitments and identity.

The difference in treatment could not be more stark: While Professors Aougab, Ha and Velasco, and Vice President Young, all publicly denounced the plaintiffs' commitment to Israel, and/or refuse to speak to, or write letters of recommendation for, students who are committed to Israel, Professor Mendelsohn defended that commitment. Though he is a severe critic of many of Israel's policies, and of its Prime Minister, including specifically their policies relating to the Palestinians, SAC ¶64, Mendelsohn believes in Israel's right to exist as a Jewish state. *Ibid.*

As the SAC alleges, ¶66, Mendelsohn issued a public statement that "Haverford College has a Jewish problem. Its student body is led by Hamas apologists and tainted by anti-Semitism. If I'm a parent of a Jewish student I will not send them to Haverford College."

As a result of this statement—directed to no individual student, containing no obscenities, denouncing no religious or even political belief—Mendelsohn's immediate dismissal from Haverford College was demanded by over 600 people. SAC ¶67. This is the "community" standard that Haverford invokes to defend its investigation of Mendelsohn. Br. 27. Two weeks later, on the basis of other statements similarly devoid of any incivility, the College opened a disciplinary investigation into Mendelsohn's conduct. SAC ¶68.

Professor Mendelsohn has been a source of support for the Plaintiffs and other Jewish students committed to Israel. He has been a sounding board for their reports about hostility on campus, ¶71, receiving reports from students and faculty about "the profound sense of exclusion and extreme hostility from others they are experiencing." With the Haverford Hillel rabbi, Professor Mendelsohn hosted a meeting of Jewish students to discuss these issues—a meeting

whose existence, never mind its location had to be "kept secret due to student concerns about likely retaliation from fellow students if their concerns and views were made public." ¶73. "Since the date of the meeting, Professor Mendelsohn has remained in regular contact with students who attended the meeting, and others, regarding their difficulties as Jews at Haverford." *Ibid.*

Students knew about the College's treatment of Professor Mendelsohn and understood it as an attack not just on Professor Mendelsohn but on them. As SAC ¶72 alleges, students knew about the disparity between the way the College treated public statements hostile to, cursing at, and denouncing their beliefs, by Professors Aougab, Ha and Valasco, and Vice President Young, and Professor Mendelsohn's statements in support of their beliefs. It is this disparity which "[p]laintiffs view * * * as yet another manifestation of Haverford's hostility to any expression supportive of the Jewish commitment to Israel and its effective endorsement of attacks on that commitment." *Ibid.*

Professor Mendelsohn's experience is relevant here because it is the Plaintiffs' experience. Plaintiffs knew about it as it was happening to him; they sought consolation and support from him because of similar treatment directed specifically at them; and they knew that the attack on him was caused by his support for their beliefs and for their right to a campus that did not harass them.

> vii.    Harassment is shown by conduct which discriminates against Plaintiffs on the basis of their ethnic identity

Haverford denies Plaintiffs' right, as Jews committed to Israel, to any protection under Title VI or its antidiscrimination policy, by ignoring both the SAC's allegations on the subject and this Court's prior holding in this case. First, Haverford ignores the SAC's allegation, at ¶18, that "A commitment to Israel is an essential component of Jewish ethnic identity for most Jews,

including each of the Plaintiffs in this case." The allegation, in turn, rests on this Court's holding at *Landau,* 2025 U.S. Dist. LEXIS 1402 at *9, n.8. which Haverford also ignores, that "a commitment to the existence of a Jewish state—though notably not a carte blanche endorsement of any activity of the State—is a piece of ethnic identity for many (though not all) Jewish people." *Ibid.*

Without citing this holding, Haverford insists that Plaintiffs' claim fails, and that there has been no actionable discrimination, because the SAC does not allege action on the basis of the Plaintiffs' "race, color or national origin." Br. at 34. In making this argument Haverford simply ignores the authorities making clear that Title VI reaches discrimination against Jews on the basis of their commitment to Israel. Administrative authorities so holding, from Presidential administrations of both parties reaching back decades, are set forth in the SAC at ¶¶178-179. In addition, every one of the recent cases assessing the response of universities to protests like those at issue here*,* have held that Jewish students, including specifically those who are committed to Israel, are a class protected by Title VI.[15] See *Canaan v. Carnegie Mellon University,* 2024 U.S. Dist. LEXIS 227575 at *23 (Dec. 17, 2024); *Kestenbaum v. President and Fellows of Harvard College,* 743 F.Supp.3d 297, 307 (D. MA 2024); Frankel, 2024 U.S. Dist. LEXIS 146433, at *16-1 (treating discrimination against Jewish students who refused to "disavow[] the state of Israel" as discrimination on the basis of their religion actionable under Title VI); *StandWithUs v. Massachusetts Institute of Technology,* 742 F.Supp.3d 133, 142 (D. MA 2024) (assuming that Jewish and Israeli students are entitled to Title VI protection from the acts at issue, but finding that MIT did enough to carry its burden of providing such protection). Vice President Young's

---

[15] Because ethnic identity is at issue here, Haverford is not helped by authorities which refuse to accord Title VI protection on the basis of religion alone. See Br. at 36.

insistence that Jews will experience a hostile environment at Haverford until they condemn Israel for committing genocide conveys exactly the same message as the disavowal of Israel condemned by the court in *Frankel.*

*In Gartenberg,* the college also argued that Plaintiffs were simply attacking political speech with which they disagreed.  2025 U.S. Dist LEXIS 20844 at *23-*24.  After its careful analysis of First Amendment concerns, the court there recognized that the Plaintiff had standing under Title VI because the speech at issue "went beyond mere criticism of Israeli government policy or of Zionist ideology, and instead sends a message that Jews as a class do not belong in Israel while justifying and encouraging violence against those Jews who do live there."  *Id.* at *42.  That, of course, is exactly what is being shouted at Haverford and posted by students and professors who glorified the atrocities of October 7.

### E.  Once On Notice, A College Must Act, Not Just Talk

Again ignoring most of the cases discussing precisely the kinds of conduct at issue here, as well as the standard imposed by the one relevant case it does cite, Haverford insists that it has responded properly to the incidents of which it was aware, because it has met with the complaining students or, in one or two instances, initiated an investigation.  Haverford is wrong. Talk is not enough.

Harvard made the same argument in *Kestenbaum:*

> Harvard is correct that the SAC describes a handful of steps that Harvard took in response to antisemitic incidents. But as pled, Harvard's reaction was, at best, indecisive, vacillating, and at times internally contradictory. For example, the day after Dean Ball emailed all Harvard Law students that Caspersen lounge was limited to "personal or small group study and conversation," demonstrators hosted a "vigil for martyrs" in the lounge without any pushback from law school administrators. SAC ¶¶ 127-128. Rather than call a halt to the vigil, Dean Ball attended it. Id. ¶ 128. In another venue, while Harvard police officers were on

45

> scene at the encampment, when a Jewish student was openly "charged" and "push[ed]," the officers failed to react. See id. ¶ 251

> in many instances, Harvard did not respond at all. To conclude that the SAC has not plausibly alleged deliberate indifference would reward Harvard for virtuous public declarations that for the most part, according to the allegations of the SAC, proved hollow when it came to taking disciplinary measures against offending students and faculty. In other words, the facts as pled show that Harvard failed its Jewish students.

Harvard made the same argument in *Brandeis Center v. President and Fellows of Harvard College,* 2024 U.S. Dist. LEXIS 200937 at *14-*15 (D. MA Nov. 5, 2024) where it was rejected again:

> The alleged unreasonableness in Harvard's response arises from its failure (for more than a year) to take any remedial action based on the results of one investigation[11] and its failure (for months on end) to meaningfully advance the other. To conclude that the mere act of launching an investigation without any further follow-through necessarily defeats a deliberate indifference claim, would be to prioritize form over function.

And the same result was reached in *Gartenberg,* which quoted the words from *Brandeis* above and rejected Cooper Union's claim that it had done enough because it investigated a report of harassing conduct.

Even the one case Haverford relies on which deals with conduct like that at issue here, *StandWithUs v. MIT,* recognizes that a college must take concrete action to fulfill its obligations under Title VI. In that case, the college issued public warnings that harassing conduct violated the school's rules and then actually suspended students who had committed such violations from certain activities. It suspended the student organization that had organized and conducted the challenged conduct.

As Judge Stearns explained in that case:

> MIT took steps to contain the escalating on-campus protests that, in some instances, posed a genuine threat to the welfare and safety of Jewish and Israeli students, who were

at times personally victimized by the hostile demonstrators. MIT began by suspending student protestors from non-academic activities, permitting them only to attend academic classes, while suspending one of the most undisciplined of the pro-Palestine student groups. These measures proved ineffective when, in April of 2024, protestors erected the Kresge lawn encampment. MIT immediately warned students of impending disciplinary action, but its threat went unheeded when student demonstrators "surge[d]" and "breached" the largely evacuated encampment. When MIT's attempt to peacefully clear the encampment proved futile, it suspended and arrested trespassing students.

In hindsight, one might envision things MIT could have done differently. Indeed, some campus administrators elsewhere, as plaintiffs allege, reacted to the protests differently (and with more positive results) than MIT. But that is not the applicable standard. That MIT's evolving and progressively punitive response largely tracked its increasing awareness of the hostility that demonstrators directed at Jewish and Israeli students shows that MIT did not react in a clearly unreasonable manner.

*Id.* at 142.

Haverford can point to absolutely nothing like the steps taken by MIT's leadership.  Most of the talk that Haverford engaged in was not directed at the people committing the harassment, in an effort to get them to stop; it was directed at the Plaintiffs, or it consisted merely in listening to the Plaintiffs describe their experiences and then thanking them for doing so.[16]  Worse, at

---

[16] Haverford trumpets its President's letter of October 12, 2023, Br. at 6, going so far as to ask the Court to take judicial notice of the document.  This letter followed a far weaker communication on October 9 which, without actually mentioning Hamas or its atrocities, compared the October 7 attack to natural disasters for which no person is responsible.  As Haverford's brief mischaracterizes the October 9 letter and the Complaint references it, we attach it for the Court's convenience.  It appears as Exhibit G to the Declaration of Jerome M. Marcus, Exhibit 1 hereto.

The SAC makes clear that Plaintiffs' claims do not arise out of the administration's public letters, SAC ¶45 n. 7, but out of the Defendant's "refus[al] to address the individual incidents [of harassment] in any effective way or to take steps to remedy the hostile environment these incidents have created." SAC ¶3. Nonetheless, the SAC explains that Haverford's public statements provided context for the hostile environment Plaintiffs experienced.  The same phenomenon was identified by the court in *Gartenberg,* which noted that Cooper Union had followed virtually the exact same path as Haverford:

> in the immediate aftermath of the October 7 attacks, Cooper Union mustered only an anemic statement about "the upsetting news of war between Israel and Hamas in the Middle East as well as reports of devastation and aggressions in many other parts of the world" that referred vaguely to "[m]any members of [its] campus community" who might be impacted, while offering no direct statement of support for its Jewish and Israeli students. Dkt. 24, Exh. 1; Compl. ¶ 51. Later, however, Cooper Union did issue a statement that "emphatically denounced" the "October 7 terrorist attacks by Hamas on innocent Israeli civilians." Dkt. 21, Exh. 3 at 2 (alumni letter dated October 31, 2023, which referred to an earlier statement issued on October 11, 2023). Still, Jewish students were troubled by the delay and by the fact that they had to urge the administration to issue a statement. Compl. ¶¶ 49-52.

Haverford, the College's leadership repeatedly *praised* exactly the conduct here at issue, see, *e.g.,* ¶¶95 (Fall Plenary), 104 (Grievances Document which attacked Plaintiff Ally Landau), 112 (Emergency Plenary), 127 (Sit-in), and awarded a prize to a student who either actually tore down posters or mocked the concerns of the students who had put them up.

*MIT* sets an entirely reasonable standard of conduct for a college's leadership when faced with harassing protests; but it is a standard that requires a college to actually try to stop the harassing conduct. Haverford did not do that because Haverford actually believes, as its leadership has actually said, that Jewish students *should* experience a hostile environment unless they submit to the "community" standard and accuse Israel of genocide.  SAC ¶36.  For that reason, Haverford's leadership did precisely none of the things done at MIT.  The case not only is of no help to Haverford:  it condemns Haverford's inaction and its affirmative endorsement of the harassing students' conduct.

---

2025 U.S.Dist. LEXIS 20844 at *7-*8.  The *Gartenberg* court, *id. at *6-*7,* found it relevant that Cooper Union's "anemic" initial statement about Hamas's atrocities stood in contrast to that institution's immediate and clear condemnation of attacks on other groups:

> Although Cooper Union had not been shy to weigh in on hot-button political topics before, it struggled to find its voice in the aftermath of the October 7 attacks, at least initially. In the face of an apparent uptick in violence against Asian Americans in 2021, for instance, Cooper Union forcefully condemned "hateful rhetoric and acts of violence targeting Asian [] American and Pacific Islander (AAPI) communities," and made clear that the institution "stands with [its] Asian and AAPI students, faculty, staff, and alumni." Id. ¶ 47. Similarly, in 2020, President Sparks denounced the police killings of George Floyd, Ahmaud Arbery, Tony McDade, and Breonna Taylor as "outrageous," stressed the need to "eradicate racism at [Cooper Union] and beyond," and invited the Cooper Union community to "join [her] in identifying the concrete steps" that would "make The Cooper Union, New York City and our country safer, kinder, and more loving places for everyone." Id. ¶ 45. And when Russia invaded Ukraine in February 2022, Cooper Union urged its community to "be supportive and show care with specific sensitivity to the needs of our students from Ukraine and Eastern Europe during this particularly difficult time." Id. ¶ 48.

## VI.    PLAINTIFFS HAVE PROPERLY PLED A BREACH OF CONTRACT

Haverford's principal attack on Plaintiffs' contract claim is its assertion, shown above to be incorrect, that in fact the Policy Plaintiffs invoke does not exist.  As Plaintiffs demonstrated above at 13-14, strong evidence exists that the Policy does exist and has existed throughout the pendency of this case.  Certainly at this Motion to Dismiss stage of the case, the say-so of Haverford's counsel that no such policy exists cannot be accepted as true, particularly given the evidence presented here that he is incorrect.

Beyond that, Haverford attacks the breach of contract claim by asserting that Plaintiffs have not identified actions which constitute a breach of the non-discrimination policy, and that it fails to allege that Plaintiffs invoked the procedures of the antidiscrimination policy by filing bias reports.  But the SAC plainly lists a series of actions which constitute bias incidents, and it also alleges over and over again that bias reports were filed in response to these incidents.  SAC ¶¶190-191.  See also Exhibit 2 (identifying each instance in which a bias report was filed). The claim, of course, is not that "no act of discrimination or harassment would ever occur on its campus," Br. at 43; it is that through its antidiscrimination policy, Haverford committed itself to addressing such incidents when they do occur, and that it committed to doing so equally for all persons aggrieved by such incidents.

The SAC alleges not only that numerous bias reports were filed but also that they were routinely ignored. It further alleges that the disciplinary regime was invoked against Professor Mendelsohn, because he supported the plaintiffs' commitment to Israel, while it was not invoked against other professors, who denounced, cursed at and proclaimed boycott of those commitments.  This is a clear breach of the antidiscrimination policy.  It also alleges that the

Honor Code's privileging of speech by other groups, and its concomitant degrading of the Plaintiffs' speech about their commitments, is itself a breach of the antidiscrimination policy. Other than accusing Plaintiffs of "cherry picking" words from the Honor Code, Br. at 43, Haverford has no answer to this claim. Haverford's claim that the SAC did not identify the rules violated by the Emergency Plenary, Br. at 44, ignores the SAC's attachment, as Exhibit E, of a letter which warned President Raymond about precisely which rules were being violated by Emergency Plenary. That five page single spaced letter, to which was appended its own six page single spaced attachment setting forth and quoting the rules being violated, provides all the notice Haverford could possibly be entitled to. The SAC's allegation, ¶109, that a Plenary event's leaders knew they were violating the applicable rules, but that they did so with impunity provides further proof that the rules were indeed violated, as Exhibit E warned President Raymond. Raymond not only did nothing to prevent the rule violations; she once again "effusively praised" the students for committing the acts that constituted the violations. SAC ¶112.

Count II sets forth the Plaintiffs' contract claim, and SAC ¶190 within that Count identifies thirteen categories of bias events. SAC ¶191 alleges that a bias report form was filed for each one of these except the last, which is the College's insistence that the only recourse Plaintiffs could have for discriminatory conduct by their peers was to appeal to the same peers who had discriminated against them, and invoke the Honor Code which authorized the discrimination.

## VII.    CONCLUSION

Plaintiffs' Second Amended Complaint describes a multitude of harassing incidents at Haverford over the last year and a half.  Those incidents have produced a torrent of letters from students, parents, and Jewish community leaders, as well as requests for numerous meetings with College leadership begging these officials to address the hostile environment afflicting Jewish students on campus.  These pleas remain unaddressed.  Instead, the people who have raised these issues, including leaders of the Philadelphia Jewish community who have sought out the College's leadership to ask for change, have been frankly told that Jewish students *should* experience hostility on Haverford's campus unless they affirmatively adopt the College's view that the Jewish state is committing genocide.  SAC ¶36.

Plaintiffs have laid out the details of this problem in a pleading which addresses the concerns identified by this Court in its January 6, 2025 opinion.  The SAC pleads that all Plaintiffs knew about, and were affected by, the incidents of harassment at issue; and it shows that Haverford's President, as well as other, identified, senior administrators, and (when relevant) those responsible for admissions materials and admissions interviewer selection, were all on notice about the events at issue. It shows as well that, apart from talking about these issues, mostly just to the Jewish students themselves or their parents, Haverford has done nothing to solve these problems. Twice Haverford has even publicly awarded the people who attack the Plaintiffs and those who share their commitments, and in many other instances Haverford's leadership has publicly applauded and endorsed the actions of those who have attacked the Plaintiffs.

Plaintiffs submit that the SAC fully addresses the concerns raised by this Court in its January 6 opinion, and that Plaintiffs' pleading provides more detail than any of the complaints that have been sustained by each of the other courts that have addressed problems like those at issue here.  Should the Court still find that Plaintiffs' complaint is lacking in some way, we request the opportunity to address whatever problems remain in a subsequent amendment.

DATED:  March 10, 2025                                    Respectfully submitted,

Jerome M. Marcus, PA Attorney ID 50708
Lori Lowenthal Marcus, PA Attorney ID 5338
THE DEBORAH PROJECT
P.O. Box 212
Merion Station, PA. 19066
Voice: 610.880.0100
FAX: 610.664.1559