**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ALLY LANDAU, HJSB, HJSC, and** | : | |
| **JEWS AT HAVERFORD** | : | |
| | : | **CIVIL ACTION** |
| **v.** | : | **No. 24-2044** |
| | : | |
| **THE CORPORATION OF** | : | |
| **HAVERFORD COLLEGE** | : | |

**McHUGH, J.**                                                                                                    **June 30, 2025**

## MEMORANDUM

As recognized in my first opinion in this action, dismissing Plaintiffs' First Amended Complaint, antisemitism is a serious problem. Where antisemitism results in a deprivation of educational opportunities, federal law provides a remedy. And where the record supports it, some federal courts have permitted parties to proceed with such claims. Here, without minimizing to any degree the extent to which Jewish students in the tumult of the current global and political climate might feel profound discomfort, Plaintiffs' Second Amended Complaint still struggles to meet the threshold of what is required to state a Title VI claim under federal law. While Plaintiffs paint a picture of a stressful campus climate for Jewish students, many of the incidents pled fall within the protection of the First Amendment. In other instances where College officials appear vulnerable to criticism, their response to the situation cannot be deemed deliberate indifference. And the Complaint as a whole fails to plead concrete educational impact. Plaintiffs succeed, however, in stating a cognizable breach of contract claim, albeit one for nominal damages. I will therefore grant Defendant's Motion to Dismiss Plaintiffs' Title VI claim and deny the Motion as to the contract claim.

I.      **Overview**

This action began with an original Complaint, followed by a First Amended Complaint, both unwieldy in length.  In January 2025, I dismissed Plaintiffs' First Amended Complaint in its entirety for failure to state a claim.  Despite an admonition from the Court to proceed with clarity and specificity as to who experienced what and when, Plaintiffs' Second Amended Complaint is riddled with much of the same ambiguity that tarnished their previous attempts.  Haverford College has again moved to dismiss for failure to state a claim.  When it comes to pleading, there is a critical difference between mere insinuations and plausible inferences that would support the claim a plaintiff seeks to assert.  Those continued deficits are fatal to Plaintiffs' civil rights claim, but I will permit the contract claim to proceed to discovery.

II.     **Standard of Review**

Within the Third Circuit, motions to dismiss under Federal Rule of Civil Procedure 12(b)(6) are governed by the well-established standard set forth in *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).

III.    **Discussion**

A.      **Title VI Claim**

Plaintiffs allege that Haverford tolerates and perpetuates a hostile educational environment in violation of Title VI of the 1964 Civil Rights Act.  A plaintiff raising a hostile environment claim must show that 1) the school was "deliberately indifferent" to known acts of harassment that 2) were "so severe, pervasive, and objectively offensive"[1] that they deprived the victim of access

---

[1] In the Third Circuit, conduct need only be severe *or* pervasive, not necessarily both.  *See Castleberry v. STI Grp.*, 863 F.3d 259, 264 (3d Cir. 2017); *see also Yael Canaan v. Carnegie Mellon Univ.*, 760 F.Supp.3d 306, 326 (W.D. Pa. 2024).

to an educational activity or benefit.[2]  *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 633

(1999).  "In determining whether an educational environment is 'hostile', a court must examine

the totality of the circumstances, such as 'the frequency of the discriminatory conduct; its severity;

whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it

unreasonably interferes with a student's performance.'"  *Katchur v. Thomas Jefferson Univ.*, 354

F.Supp.3d 655, 664 (E.D. Pa. 2019) (citing *Ke v. Drexel Univ.*, No. 11-6708, 2015 WL 5316492,

at *32 (E.D. Pa. Sept. 4, 2015)).

In their third bite at the apple, Plaintiffs have again elected to continue litigating their

claims *en mass*, perhaps hoping to prevail on the quantity of allegations rather than quality.  On

top of the sheer breadth of their allegations, except for the admirable and steadfast Ally Landau,

Plaintiffs insist on continuing to litigate in anonymity.  Plaintiffs aver that "Jews at Haverford" is

an unincorporated membership organization, consisting of over fifty Jewish students, as well as

faculty, alumni, and parents of students of Haverford, who are Jewish and share a commitment to

the survival of Israel as a Jewish homeland.  Second Am. Compl. ¶ 9, ECF 35 ("SAC").  This

phantom quasi-class action strategy continues to make it impossible to connect the dots between

Plaintiffs' alleged victims, perpetrators, and related responses.  Critically, Plaintiffs do not

articulate any concrete resultant harm stemming from their allegations, even where those

allegations raise serious concerns about the climate at Haverford.  Plaintiffs' strategy also

distinguishes this case from other recent federal actions challenging antisemitism on college

campuses, where individuals or small groups of individual students brought claims that could

---

[2] This assumes that the plaintiff has already made a showing that they are a member of a protected class
under Title VI and that they were qualified for the relevant educational opportunities.

easily be traced from an incident to its resolution, or lack thereof.  *See, e.g., Gartenberg v. Cooper Union for the Advancement of Sci. & Art*, 765 F.Supp.3d 245 (S.D.N.Y. 2025) (ten individual student plaintiffs); *Felber v. Yudof*, 851 F.Supp.2d 1182 (N.D. Cal. 2011) (two individual student and alumni plaintiffs); *Frankel v. Regents of Univ. of California*, 744 F.Supp.3d 1015 (C.D. Cal. 2024) (three individual plaintiffs); *Yael Canaan v. Carnegie Mellon Univ.*, 760 F.Supp.3d 306 (W.D. Pa. 2024) (one individual student plaintiff); *Canel v. Art Inst. of Chi.*, No. 23-17064, 2025 WL 564504 (N.D. Ill. Feb. 20, 2025) (same).

To establish a Title VI hostile environment claim, a plaintiff must show severe or pervasive harassment, deliberate indifference to that harassment, and a resultant deprivation of educational benefits.  Here, Plaintiffs seek to do that by citing some 25-plus incidents purportedly impacting the collective consciousness of 50-plus mostly unnamed individuals comprising Jews at Haverford.  But such *gestalt* pleading cannot be employed as a strategy to avoid scrutiny by the Court, because discrete legal principles govern what is actionable under Title VI.  I will therefore proceed by identifying a series of core principles both animating and limiting Title VI claims, and consider Plaintiffs' allegations through this matrix.

Plaintiffs' hostile environment claim falls apart as it funnels through the matrix.  First, several of Plaintiffs' allegations involve protected political expression, and cannot be regulated under the guise of nondiscrimination.  Turning to the elements of a Title VI claim, the facts as pleaded do not suffice to establish deliberate indifference.  Finally, even where speech is not necessarily protected or where deliberate indifference could be a closer call, Plaintiffs do not allege any concrete deprivation of educational benefits – either with regard to any of the individual allegations they set forth, or when considering the totality of the circumstances.  As such, Plaintiffs' Title VI claim must be dismissed.

**B.      Title VI Guiding Principles**

  *1.      Public, Political Speech is Protected by the First Amendment.*

  Higher education institutions are prototypical marketplaces of ideas.  College campuses have served as historical sites of foment and the breeding grounds for progress.  In periods of social unrest, emblematic of the American story, "intellectual advancement has traditionally progressed through discord and dissent, as a diversity of views ensures that ideas survive because they are correct, not because they are popular."  *Rodriguez v. Maricopa Cnty. Cmty. Coll. Dist.*, 605 F.3d 703, 708-09 (9th Cir. 2010).

  A court enforcing a federal statute must do so in a way that comports with the Constitution. Although both important, Title VI and the First Amendment are naturally in tension.  "A disparaging comment directed at an individual's sex, race, or some other personal characteristic has the potential to create a 'hostile environment' – and thus comes within the ambit of anti-discrimination laws – precisely because of its sensitive subject matter and because of the odious viewpoint it expresses."  *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 206 (3d Cir. 2001).  But "speech on matters of 'public concern' – expression that 'can be fairly considered as relating to any matter of political, social, or other concern to the community' – is entitled to 'special protection' under the First Amendment' and generally 'cannot be restricted simply because it is upsetting or arousing contempt.'"  *Gartenberg*, 765 F.Supp.3d at 262 (quoting *Snyder v. Phelps*, 562 U.S. 443, 453 (2011)).  However noble the objective of nondiscrimination, institutions cannot be threatened with civil liability for declining to censor First Amendment protected speech.  *New York Times Co. v. Sullivan*, 376 U.S. 254, 282 (1965).

  Not all speech is protected by the First Amendment.  But there are no allegations here that constitute true threats, incitement, fighting words, obscenity, or any other category of unprotected

speech. *Gartenberg*, 765 F.Supp.3d at 262. "Speech 'on matters of public concern, directed to the college community' will generally fail to 'constitute unlawful harassment.'" *Id.* at 265 (citing *Rodriguez*, 605 F.3d at 710). A reasonable person should understand that such public speech, "directed to the community at large through generally accepted methods of communication, is very different than targeted, personal harassment, aimed at a particular person." *Id.* Only one allegation here involved speech targeted at a particular Plaintiff.

It would be a dangerous overreach for federal courts to referee the controversies sparked by campus speech. *See Keyishian v. Bd. of Regents of the Univ. of the State of N.Y.*, 385 U.S. 589, 603 (1967) (the First Amendment "does not tolerate laws that cast a pall of orthodoxy over the classroom."); Eugene Volokh, *Freedom of Speech and Workplace Harassment,* 39 U.C.L.A. L. Rev. 1791, 1817 (1992) ("The government cannot escape First Amendment scrutiny for its speech restriction by forcing someone else, on pain of liability, to implement that restriction."). That responsibility instead belongs to college administrators, and perhaps more importantly, to students – who harness the immense power to talk with one another and change minds, even when doing so demands courage. But where Haverford declined to take action to suppress or regulate pure speech on matters of obvious public concern directed at the campus community, civil liability cannot be imposed, for a robust First Amendment remains the bedrock of a democratic society.

Many of Plaintiffs' allegations fall into the category of pure, protected speech. Although Plaintiffs may have found much of this speech reprehensible, there is no legal cause of action for upset feelings. The following incidents fall within this category.

*i.    The "Weaponization of Covid" Lecture*

In March 2024, Haverford students advertised a lecture with the title "Mass Death on all Fronts: Israel's weaponization of Covid against Palestinians." SAC ¶ 118. Plaintiffs allege that

there were "many complaints" from students, alumni, parents, and Jewish community members, who thought this lecture was a dog whistle to the age-old blood libel.[3]  *Id*. ¶ 119.  Haverford did not cancel the event but encouraged the event organizers to change its name.  *Id*.  In response, the event organizers changed its title to "COVID in the time of Genocide: Teach-in on how Israel uses COVID as a tool for settler colonialism in Palestine," which Plaintiffs contend "was even more overtly antisemitic than the old one."  *Id*.

Even if offensive and received by some as antisemitic, the lecture was pure speech criticizing Israel directed at the general public – precisely the type of speech protected by the First Amendment, and therefore legally inactionable.  *See Gartenberg*, 765 F.Supp.3d at 275 (concluding that a controversial talk hosted on campus about the "Uses and Misuses of Holocaust Memory" constituted "pure speech on matters of public concern.").  No one was required to attend the lecture, and those who found it offensive could have simply looked away.  *See Cohen v. California*, 403 U.S. 15, 21 (1971) (suggesting that those exposed to offensive speech can "effectively avoid further bombardment of their sensibilities by simply averting their eyes.").

## ii.     *Flags at the Spring Plenary*

The student Plenary plays a central role in social and academic life at Haverford College. SAC ¶ 87.  At this event, held twice per academic year, the student body gathers as a community to discuss and vote to ratify various policies.  *Id*.  Plaintiffs allege that at the Spring 2024 Plenary, one student handed out Palestinian flags to all entering students.  *Id*. ¶ 114.  Peaceful distribution of political materials is a standard method of political expression directed at the public, whether it

---

[3] The blood libel is an antisemitic trope dating back to the second century BCE that accuses Jewish people of spreading disease and using the blood of Christian children to prepare their Passover matzah.  *See Blood Libel*, U.S. Holocaust Memorial Museum, https://perma.cc/MX8U-SNPE (accessed June 24, 2025).

be leaflets, stickers, or in this case, flags. *See United States v. Grace*, 461 U.S. 171, 176-77 (1983) ("There is no doubt that as a general matter peaceful picketing and leafletting are expressive activities involving 'speech' protected by the First Amendment."). There are no allegations that this student only handed flags to students she thought might be Jewish. Nor is it alleged that any student was forced to take a flag, because peer pressure, however strong, is not the same thing as coercion. Whatever discomfort any Plaintiff (understandably) felt, what the Second Amended Complaint describes is another instance of purely political expression protected by the First Amendment. *See Gartenberg*, 765 F.Supp.3d at 270-71 (classifying student distribution of flyers inviting members of the college community "to celebrate the anniversary of the first intifada" as "pure speech on matters of public concern.").

          iii.    *Student Organization Supports the Liberation of Palestine "By All Means Necessary"*

Plaintiffs also take issue with the name and mission of a student organization on campus. What was originally "Bi-Co Students for Peace"[4] changed its name to "Bi-Co Students for the Liberation of Palestine." SAC ¶ 156. At the same time, the organization announced that it supported "the liberation of Palestine through the complete dismantling of the apartheid settler colonial state of Israel, *by all means necessary*." *Id.* (emphasis added). From Plaintiffs' perspective, the phrase "by all means necessary" is an implicit threat of violence and an endorsement of Hamas' October 7th terror tactics. *Id.* Although Plaintiffs may dislike the organization's new expressed mission, the organization's messaging directed at the entire college campus cannot, without more, be construed as a genuine threat targeting Jewish people.

---

[4] "Bi-Co" refers to Bryn Mawr and Haverford Colleges.

By way of contrast, in *Gartenberg*, the plaintiffs' claims based on graffiti reading "from the river to the sea" survived a motion to dismiss in a Title VI action. 765 F.Supp.3d at 273. There, the message was publicly displayed graffiti using an artistic style that employed lettering seen throughout Nazi Germany,[5] evocative of the cover of "Mein Kampf." *Id.* The Court concluded that an act of public vandalism, invoking a phrase which many Jewish people understand to be a call for their annihilation, in a manner that mimicked Nazi Germany could lead a reasonable Jewish person to feel threatened. *Id.*

Here, however, Plaintiffs are confronted with language in a document, albeit one available online and distributed electronically, that can hold many interpretations.[6] Unlike in *Gartenberg*, where the menacing style of the graffiti supported an inference of antisemitic intent, there is no additional context to suggest that the language here was intended to target or instill fear. Absent such secondary messaging, mere use of the phrase "by all means necessary" is protected by the First Amendment.

### iv.    *Social Media Posts on Non-Haverford Accounts*

Plaintiffs raise several concerns about posts made on non-Haverford, private social media accounts. First, Plaintiffs allege that an anonymous member of Jews at Haverford was disappointed by his peers' personal Instagram stories in the wake of October 7th. SAC ¶ 46. This

---

[5] The type-face Fraktur (also known as German Gothic) was associated with the Nazi regime and its ideology.

[6] The phrase "from the river to the sea" also holds different meanings to different people. *See* Laurie Kellman, "*From the river to the sea": Why these 6 words spark fury and passion over the Israel-Hamas war*," The Associated Press, (Nov. 10, 2023) https://perma.cc/3VQV-DMGL; *see also* Amos Goldberg and Alon Confino, "*From the River to the Sea: One Slogan, Many Meanings*," The Review of Democracy, https://perma.cc/6T9X-HKJC (accessed June 18, 2025). But it could certainly be viewed as a threat as presented in *Gartenberg*.

Plaintiff conveyed his reaction to these external posts in the Haverford Political Science messaging system. *Id.* In his reflection, the Plaintiff included a screenshot of a graphic that, he alleges, many students posted immediately following the attacks, promoting Palestinian resistance and depicting the silhouette of a paraglider, reminiscent of the October 7th attackers. *Id.*

Plaintiffs also discuss assorted social media posts made by Haverford Professors Gina Velasco, Guangtian Ha, and Tarik Aougab on their personal social media accounts. *Id.* ¶¶ 49, 51, 54-57. These posts all disparage those who continue to support Israel, but vary in tone, taste, and conviction. *Id.* I begin with the observation the social media posts are leveled at the state of Israel, not people of Jewish descent. Consistent with my earlier opinion here and in *Tannous v. Cabrini*, I reject the proposition that criticism of Isreal is invariably antisemitic. 697 F.Supp.3d 350, 367 n.10 (E.D. Pa. 2023). And although some of the posts could easily be conceived as offensive, none of the posts can be construed as anything other than protected political speech. Beyond that, Plaintiffs do not attempt to explain how Haverford could regulate students' and faculty's private social media content, offering no basis on which it could assert such invasive authority.

In a digital world, social media posting has become another form of speech. Each post broadcasts a message to one's followers and the public, just as one could do with a poster in a public square. Here, the social media posts at issue all direct their generalized messages to their followers at large, without focusing upon any particular Plaintiff. These posts are plainly protected political speech about matters of public concern, albeit offensive to some. But offense does not provide a lawful basis on which to stifle expression. *Bachellar v. Maryland*, 397 U.S. 564, 567 (1970); *Matal v. Tam*, 582 U.S. 218, 244 (2017).

In a similar vein, Plaintiffs aver that Haverford elected to investigate Israeli-Jewish Professor Barack Mendelsohn for his social media posts, but not the other three Professors, and

that this differential treatment reflects discrimination.  SAC ¶ 60.  Such an inference does not readily follow.  What differentiates Professor Mendelsohn's posts and the posts of Professors Velasco, Ha, and Aougab is not only the content of the posts, but the magnitude of community reaction to the posts.  While Plaintiffs assert that unspecified individuals "complained" about the Velasco, Ha, and Aougab posts, they also acknowledge that over 600 people signed a petition raising concerns about Professor Mendelsohn's online presence.  *Id.* ¶¶ 67, 70, 191.

My reasoning in *Tannous v. Cabrini* has relevance here.  In that case, I found that a Palestinian-American plaintiff professor failed to state a claim of national origin discrimination where he was terminated for his anti-Israel tweets.  *Tannous*, 697 F.Supp.3d at 360-61.  That was because the University's intervention was prompted by disruptive public outcry, not his identity and beliefs as a Palestinian-American.  *Id*.  I also noted that there were no facts on the record to show that "the university would have reacted differently to a similarly situated non-Palestinian-American employee."  *Id.*

The same applies here.  A 600-person signed petition provided Haverford a legitimate reason for investigation, distinct from Mendelsohn's Israeli and Jewish identity.  There are no facts pleaded in support of Plaintiffs' contention that Mendelsohn was investigated *because* he was Israeli and/or Jewish, or because the content of his posts generally supported Israel.[7]  Had Plaintiffs organized an equivalent petition criticizing the online behavior of Professors Velasco, Ha, or Aougab, Haverford would be expected to act in a manner consistent with their treatment of

---

[7] The investigation ultimately determined that Professor Mendelsohn did not "engage in discrimination or harassment," but was guilty of behavior "inconsistent with the College's expectations of its faculty."  SAC ¶ 69.  Professor Mendelsohn remains employed by the College.  *Id.* ¶ 60.

Professor Mendelsohn.[8]  But vague allegations of some unspecified number of complaints will not suffice for purposes of meaningful comparison when arrayed against a petition signed by 600 people.

***

Certainly some speech can be proscribed, but such speech is not present in this case.  The Third Circuit has cautioned that "when laws against harassment attempt to regulate oral or written expression . . . however detestable the views may be, we cannot turn a blind eye to the First Amendment implications."  *Saxe*, 240 F.3d at 206.  And as Judge Cronan cogently observed in *Gartenberg*, "[r]egardless of whether this expression is better characterized as righteous protest in support of a noble cause, as the vulgar celebration of terrorism and antisemitism, or as something in-between, it is not a proper basis on which to impose civil liability."  765 F.Supp.3d 271.  The allegations above are not legally actionable under Title VI.

> 2.    *Deliberate Indifference is an Exceedingly High Standard Not Met by the Allegations Here.*

To establish liability for a hostile educational environment, the Third Circuit and many federal courts alike require plaintiffs to show that administrators were deliberately indifferent to alleged harassment.  The test for deliberate indifference is "whether a reasonable fact-finder could conclude that the College's response was 'clearly unreasonable in light of the known circumstances.' In other words, whether, on [the] record, one could find that the College made 'an official decision not to remedy the violation.'"  *Oden v. Northern Marianas Coll.*, 440 F.3d 1085,

---

[8] This section only considers the Title VI claim at issue and is not meant to suggest that a university can in every instance point to audience displeasure as the sole basis on which to restrict pure speech in the First Amendment context.

1089 (9th Cir. 2006) (citing *Davis*, 526 U.S. at 641 and *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998)) (cleaned up).  To reach this conclusion, plaintiffs must also show that administrators with authority to act were put on actual notice of the alleged harassment.  *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 273 (3d Cir. 2014) (citing *Davis*, 526 U.S. at 645-49).  Victims of harassment have no "right to make particular remedial demands."  *Davis*, 526 U.S. at 648.

The First Amendment again counsels in favor of limited judicial intervention when it comes to expressive activity on college campuses, demanding "'substantial deference to a college's decision not to take action against' students who engage in expressive activity on matters of public concern and requir[ing] courts to 'defer to colleges' decisions to err on the side of academic freedom."  *Gartenberg*, 765 F.Supp.3d at 267 (citing *Rodriguez*, 605 F.3d at 708-09).  Institutions are not expected to be perfect or clairvoyant.  *See StandWithUs Ctr. for Legal. Just. v. Mass. Inst. of Tech.*, 742 F.Supp.3d 133, 143 (D. Mass. 2024).  Along these lines, government coercion of speech to adhere to a particular message tampers with First Amendment protections.  *W. Va. State Bd. Of Educ. v. Barnette*, 319 U.S. 624, 642 (1943) (explaining that government compulsion of speech "transcends constitutional limitations" on governmental power "and invades the sphere of intellect and spirit which it is the purpose of the First Amendment to our Constitution to reserve from all official control.").  Courts therefore may not compel administrators to make any specific statement on any particular topic.

The operative question is whether Haverford administrators acted, or failed to act, in a way that was "clearly unreasonable in light of known circumstances," and whether these known circumstances necessarily implicate First Amendment protections.  *Davis,* 526 U.S. at 648.  I conclude that for a vast majority of Plaintiffs' allegations, Haverford acted with sufficient reason

and thought to dispel a finding of threshold deliberate indifference. These allegations are as follows.[9]

### i.    *Haverford's Post-October 7th Statements*

Plaintiffs assert that Haverford's failure to issue an appropriate statement in the immediate aftermath of the October 7th attacks caused "hurt and dismay." SAC ¶¶ 43-44. They further contend that when Haverford *did* issue a responsive statement just two days later, it did not denounce the Hamas attacks as terrorism. *Id.* ¶ 44. But the statement identified the attack as one of "several tragedies across the globe," and however inadequate that may be in the eyes of Plaintiffs, matters of nuance and emphasis in the wording of a statement cannot serve to show deliberate indifference.

Plaintiffs also discuss several comments made by Haverford administrators that they found to be in poor taste. For example, Vice President Nikki Young purportedly spoke at a vigil for the Haverford student tragically shot while in Vermont for Thanksgiving, where she linked the shooting to the "genocide" Israel was committing against Palestinians. *Id.* ¶ 34. Plaintiffs describe this message as "divisive, misleading, and antisemitic," and express that they cannot trust Vice President Young "to take seriously their concerns about antisemitic harassment and discrimination." *Id.* At a meeting with Jewish community leaders to discuss the campus climate, Vice President Young also reportedly said that "Jewish students needed to condemn 'genocide' rather than report[] antisemitism." *Id.* ¶ 36. At a similar meeting with Jewish community leaders, Plaintiffs also aver that Dean McKnight posited that attacks against Jews who are committed to

---

[9] While some of Plaintiffs' allegations are a closer call on the question of deliberate indifference, Plaintiffs still fail to state a Title VI claim because they do not articulate any concrete deprivation of educational benefits. These allegations are discussed below.

Israel are categorically different from attacks against other minorities. *Id.* ¶ 58. Plaintiffs finally contend that at a Chabad-hosted event, President Raymond stated that on October 7th, she saw "peaceful people" breaking free from their chains. *Id.* ¶ 50.

As a preliminary matter, none of these statements embrace Hamas. Plaintiffs can reasonably characterize them as focusing on the suffering of Palestinians without showing similar concern for the losses inflicted by Hamas or for the surge of antisemitic incidents making headlines. As a matter of campus leadership, there may be ample basis for criticism if such statements were made, but the statements remain pure speech about matters of public concern. A court cannot compel administrators' speech, nor insist that administrators should have conveyed a different message. *See Barnette*, 319 U.S. at 642. The choice of message in the face of public controversy remains the province of college administrators, and unless clearly lacking in reason or overtly hostile cannot be deemed deliberate indifference.[10]

### ii.    *The Nova Movie Screening*

In Spring 2024, at the behest of Jewish leadership and faculty members, Haverford played a movie for the campus community about the Nova Festival that was the site of the October 7th Hamas attacks. In reaction to this event, Haverford protestors demanded "an apology from President Raymond for her having the temerity to invite 'Zionists' to campus." SAC ¶ 129. But President Raymond never issued an apology. *Id.* ¶ 130. Remarkably, rather than credit Raymond for rejecting the protestors' demand, Plaintiffs instead argue that President Raymond showed deliberate indifference by not taking the opportunity to chastise the protestors. *Id.* ¶ 131.

---

[10] Though insufficient for Title VI purposes, these statements certainly lend plausibility and force to Plaintiffs' contract claim which is grounded in a purported failure to investigate claims of antisemitism. This is particularly so if Jewish students were in fact discouraged from complaining.

Title VI is not a portal for students to litigate their general dissatisfaction with the conduct of administrators or to advance their view of how contentious issues should be handled on campus. It sets an exacting standard for what constitutes a sufficiently hostile environment to justify imposition of civil liability. There is no basis whatsoever, either under Title VI, nor within the confines of the First Amendment, for a court to hold a college administrator liable for failing to convey a specific message that students would have liked to see. *Barnette*, 319 U.S. at 642 (compelled speech runs afoul of the First Amendment).

### iii.    The Fall Plenary

Plaintiffs allege that at the Fall 2023 Plenary, held just weeks after Hamas' October 7th attack, the entire session was devoted to presentations made by Students for Justice in Palestine ("SJP"), a student organization committed to Palestinian resistance. SAC ¶¶ 89-90. Plaintiffs contend that student council members in charge conspired with SJP, enabling SJP members to fill all available speaking spots in advance and violating plenary rules. *Id.* ¶¶ 90-92. Plaintiffs were upset by the one-sided nature of the event, and those who tried to speak were told that the speaking spots were full. *Id.* ¶ 94. Other Plaintiffs "furiously texted each other wondering what they could do to stop the onslaught, but most simply expressed agony." *Id.* ¶ 93.

Plaintiffs do not allege that Haverford barred their participation. Nor do the facts alleged suggest that the administration acted with deliberate indifference. Plaintiffs plead that they asked Dean McKnight to intervene, and that he obliged, texting the Student Council leadership to suggest that they give the Jewish students a chance to contribute. *Id.* ¶ 94. The Student Council leadership ultimately ignored this request in the heat of the moment, but Plaintiffs can hardly say that Dean McKnight unreasonably failed to act. *Id.*

16

Following Plenary, Dean McKnight then allowed Plaintiff Ally Landau to author and distribute a message on the all-college email server responding to the discussion at Plenary. *Id.* ¶ 97. What Plaintiffs plead is in fact the opposite of deliberate indifference: in response to the stated concerns of Jewish students, Dean McKnight provided Ms. Landau with a campus-wide platform through which to voice concerns on behalf of her community.

<em>iv.    The Grievances Document</em>

Amidst the unrest of the Fall 2023 semester, a group of students circulated a "Haverford Grievances Document," which asked the College to better support members of Haverford's Palestinian and Arab communities. *Id.* ¶ 99; ECF 35-4. The document made the outlandish claim that Ms. Landau's post-Plenary campus-wide email was a contributing factor to the tragic shooting of a Palestinian Haverford student while he was in Vermont for Thanksgiving Break. SAC ¶ 100. The attack on Ms. Landau was outrageous, but once again the administration did not act unreasonably. Once the document was brought to President Raymond's attention, she met with Landau's parents and required that Landau's name be removed, thus remedying the situation and attempting to prevent additional harm. *Id.* ¶ 102. This cannot be deemed deliberate indifference.

<em>v.    Jewish Student Withdraws Haverford Matriculation</em>

Next, Plaintiffs contend that when an incoming first-year student said that he was Jewish and had attended a Jewish day school in a group chat for incoming Haverford students, other incoming students berated him for being a Zionist. *Id.* ¶ 138. The prospective student brought this to the attention of Dean McKnight, explaining that he wanted to change his plans and attend a different college. *Id.* ¶ 139. Although Plaintiffs state that "no further action was taken by Haverford after it learned of this student's decision," the pleadings show otherwise. *Id.* ¶ 140.

17

Dean McKnight personally called the prospective student upon receiving his message and encouraged him to report this conduct to the Honor Council.  *Id.* ¶ 139.  But *the prospective student* ultimately declined the Dean's suggestion, stating that he did not wish to raise his concerns with a committee that shares the same beliefs as those who antagonized him in the group chat.  *Id.*

The facts as pleaded reflect that a Haverford administrator listened and responded to the prospective student's concerns and encouraged him to seek recourse through an established mechanism.  Plaintiffs would have preferred a different response, but once again that does not support deliberate indifference.

<em>vi.    Founders Hall Sit-In</em>

Plaintiffs raise two campus protest events in their Second Amended Complaint.  The first occurred in December 2023, when Haverford students, like students on many other college campuses, hosted a sit-in to protest the war in Gaza.  *Id.* ¶ 123.  The sit-in took place at Founders Hall, the main administrative office at Haverford.  *Id.*  Plaintiffs do not contend that the building hosts any classrooms, nor that any Plaintiffs were unable to get to their classes, nor that any classes were disrupted.  *Cf. Frankel*, 744 F.Supp.3d 1015, 1024 (granting a preliminary injunction where final exams were disrupted and students were evacuated from the building).  For its one-week duration, students "hung banners outside the building, and daily conducted chants" that Plaintiffs purport intimidated Jewish students committed to Israel.  SAC ¶ 123-24.

Plaintiffs also aver that when "a student passed by the sit-in who was identified as supporting Israel's existence, the chants were directed specifically at the student."  *Id.* ¶ 124.  But Plaintiffs do not aver that the protestors singled out students whom they assumed to be Jewish. Rather they targeted *any* student who did not support their mission.  This contrasts with other cases where Jewish students were targeted for being Jewish.  *See Gartenberg*, 765 F.Supp.3d at 255-56

18

(where protestors shoved past security and berated Jewish students locked in a library room for over 20 minutes, while the college president ordered the police to "stand down" as she cowered in her office and escaped through a back exit); *Kestenbaum v. President & Fellows of Harvard Coll.*, 743 F.Supp.3d 297, 304 (D. Mass. 2024) (where protestors blockaded Jewish students in a study room).

Although Plaintiffs report that they felt "dread" when walking by the sit-in, often choosing to take a lengthy detour to avoid the center of campus where the sit-in transpired, Plaintiffs do not aver that these detours exacted any educational penalties, such as being late to or missing class. SAC ¶¶ 124, 126. Some Plaintiffs purportedly chose to forego the announcement of majors ceremony that occurred on Founders Green, *adjacent* to the protest, though it is not alleged that Jewish students who attended the ceremony incurred any harm. *Id.* ¶ 123. Moreover, Plaintiffs do not assert any instance where the sit-in grew violent, isolated or targeted individual Jewish students, or amounted to anything more than a prolonged protest. Exposure to a protest, without more, does not amount to harassment. *See Cohen,* 403 U.S. at 22. Indeed, one goal of public protests is to stir strong feelings on the part of passersby seeking to convert them to the protestors' point of view.

When asked about the sit-in, President Raymond praised the "peaceful" nature of the protest, and though she admitted that the protest violated several campus rules, stated that she feared "worse behavior by the students would result" if she took action to stop it. SAC ¶¶ 127-28. Where a college administrator must strike a balance between allowing students broad flexibility to express themselves and avoiding mass disruption of campus activities as a whole, courts must hesitate to second guess such judgments. "To fault [the institution] for what proved to be a failure of clairvoyance and perhaps too measured a response to an outburst of ugliness on its campus

would send the unhelpful message that anything less than a faultless response in similar circumstances would earn no positive recognition in the eyes of the law." *StandWithUs Ctr. for Legal Just.*, 742 F.Supp.3d at 143.

The same applies here: President Raymond had no obligation to be faultless, she just needed to be reasonable. Viewing the circumstances before her, President Raymond decided to let the protest run its course. Plaintiffs do not allege any material harm that stemmed from this choice. As such, the sit-in is not independently actionable because Haverford did not act with deliberate indifference.

*vii.    The Spring 2024 Encampment and "Liberated Zone"*

In Spring 2024, students set up their second encampment on the main college green, barring access to Founders Hall. SAC ¶ 132-133. The encampment consisted of tents, banners, and the declaration of a "Liberated Zone," where only those committed to the protests' objectives were "permitted" to enter. *Id.* Plaintiffs do not indicate how those who supported the protest and those who did not were differentiated, making it unclear why students could not pass through, even if uncomfortably. *Cf. Frankel*, 744 F.Supp.3d at 1021 (only students who voiced support for the protest were issued a wristband and permitted to cross the encampment); *Felber*, 851 F.Supp.2d at 1184 (event organizers set up "check points" where students dressed as soldiers carrying realistic-looking simulated assault weapons demanded passing students to state whether or not they were Jewish).

As with their sit-in allegations, Plaintiffs aver that "*any person* who walked by the Encampment and did not express support for this goal was shouted at and insulted while they were concluding their academic semester and preparing for final exams." SAC ¶ 133 (emphasis added). Plaintiffs do not indicate that Jewish students were singled out or targeted for appearing to be

20

Jewish.  Beyond making studying more difficult in some amorphous way, Plaintiffs do not aver

that these protests had any material impact on their education.  *Cf. Frankel*, 744 F.Supp.3d at 1022

("some students missed finals because they were blocked from entering classrooms, and others

were evacuated in the middle of finals.") (cleaned up).

      The encampment lasted three days, a relatively short period compared to similar

encampment activity on other college campuses.  *See, e.g. StandWithUs Ctr. For Legal Just.*, 742

F.Supp.3d at 139 (encampment lasted over a week); *Frankel*, 744 F.Supp.3d at 1022 (encampment

lasted one week).  There are no allegations that the encampment escalated from chants and posters

to physical aggression, nor are there allegations that Plaintiffs made any reports of serious resultant

harm, beyond frustration with the protest itself and dissatisfaction with the College's response.

      College administrators need not be perfect.  They need not even be good.  They just need

to behave in a way that is not clearly unreasonable in light of the circumstances known at the time.

Here, amidst a period of extreme unrest on college campuses across the country, it was not clearly

unreasonable for administrators to allow protestors to freely express themselves for three days.  It

is also a defensible conclusion that intervention could have triggered an even larger and more

disruptive backlash.  Plaintiffs' dissatisfaction does not state a claim for violation of their civil

rights.

*viii.    Protests at "Anti-Semitism 101"*

      Plaintiffs also describe a protest that transpired at an event hosted on campus by the Anti-

Defamation League ("ADL") entitled "Anti-Semitism 101."  SAC ¶ 79.  Dean McKnight, Vice

President Young, and President Raymond were present.  *Id.* ¶ 81.  Plaintiffs aver that prior to the

event, which took place in a room with windows, Haverford student-protestors zip-tied the blinds

so the windows couldn't be closed.  *Id.* ¶ 80.  These zip-ties were discovered and removed before

21

the event began, but reasonably reflected an intent of the protestors to surround and intimidate those inside the room.  *Id.*  As the event occurred, protestors "mobbed the space outside the windows throughout the event, banging on cowbells and pots with spoons and shouting, with the use of a bull horn."  *Id.*  Inside the room, three separate students interrupted the talk, each ripping off their sweatshirt to reveal a matching protest t-shirt, and denouncing Israel and the ADL.  *Id.* ¶ 81.  When the fourth interrupting student stood to make their statement, Dean McKnight intervened, asking the room whether anyone else planned to interrupt, and requesting that those people come forward to participate in the last interruption.  *Id.*

Haverford again did not act unreasonably.  By way of initial observation, Haverford's leadership was present, which can only be viewed as a recognition of the importance of the event and support for Jewish students.  The zip-ties were found and removed prior to the event, allowing some of the external protest chaos to be shut out.  And in response to four serial interruptions, Dean McKnight intervened, seeking to get the rest of the interruptions over with so that the talk could proceed smoothly.  *Id.*  Dean McKnight's intervention demonstrates a reasonable effort to quell the unrest and allow the event to proceed, undermining Plaintiffs' allegation of deliberate indifference.

### ix.    Cancellation of the Antisemitism Awareness Basketball Game

Plaintiffs allege that it is commonplace at Haverford for sporting events to be dedicated to a cause.  *Id.* ¶ 158.  In November 2023, Plaintiff Ally Landau, a member of the Women's Basketball team, got permission from Vice President Young to dedicate a home intercollegiate basketball game to "Antisemitism Awareness."  *Id.*  This would have involved setting up a table outside the stadium where spectators could pick up literature about antisemitism and "blue square" buttons, which symbolize "eradicating antisemitism."  *Id.*  But less than a week before the game

22

was scheduled to take place, Landau was called into a meeting with Dean McKnight and Athletic Director Danielle Lynch. *Id.* ¶ 159. The administrators expressed their concern that the antisemitism component might draw serious protests to the game. *Id.* If those protests interfered with the players' ability to continue the game, the team would be required to forfeit per NCAA rules. *Id.*

Plaintiffs do not allege that Haverford prohibited the event or was unwilling to schedule it at a different time. But in Plaintiffs' formulation, administrators pressured Landau into cancelling the antisemitism component of the game. *Id.* ¶ 161. It is true that there is an inherent power imbalance between a college Dean and Athletic Director, and a young female student, even though all the pleadings in this case show Ms. Landau to be someone with admirable courage, a laudable advocate for herself and her community. And Plaintiffs further allege that she relented and agreed to postpone.

Regardless, this overture by Haverford administrators is not clearly unreasonable. Whether their judgment was correct or not, the facts suggest that their instincts were to be protective of Ms. Landau. Context here is important. When the event was proposed in November, it was far closer in time to the atrocities perpetrated by Hamas. The game itself was not until February 6, 2024. *Id.* ¶ 158. By that time, Israel's counter-offensive was fully underway, and Hamas' cynical strategy of embedding itself among the populace was beginning to exact an immense toll of innocent civilian casualties, stoking public outcry that was only growing. The potential for disruption was great. Had Ms. Landau been the sponsor of an event that ultimately forced her own team to withdraw from the competition, detrimentally impacting their standing, Landau could have faced severe ostracization and ridicule from her team and community alike, beyond the pressure she was already subject to as a vocal advocate on campus.

23

It also appears that the administrators had legitimate security concerns, given that basketball games have spectators in attendance on all four sides immediately adjacent to the court. At argument, Plaintiffs' counsel cited this security concern as proof that Jewish students were unsafe on campus. But the concern cited by administrators had to do with interference with the game, not physical attacks on Jewish students, and nowhere in this record are there allegations of any student being assaulted or even individually targeted, except for the ill-conceived reference to Ms. Landau in the campus Grievance Document.

Given heated sentiment on campus and beyond, it was not clearly unreasonable for administrators to encourage postponing the event.

***

Taking the facts pleaded as true, Haverford failed to amplify all student voices evenly, took too soft an approach to campus regulation, and failed to communicate as boldly and effectively as Plaintiffs would have liked. The question is not, however, whether Haverford could have handled each situation better. Under Title VI, the question is whether Haverford was so indifferent to known acts of harassment that it caused students to undergo harassment or made them more vulnerable to it, and thereby undermined the students' education. *Davis*, 526 U.S. at 644-45. And even taking all these allegations as a whole, Plaintiffs' pleading does not plausibly support a finding of deliberate indifference, especially where countervailing First Amendment concerns are considered in evaluating the often-fragile balance college administrators must strike.

> 3.  *Failure to Address Alleged Harassment Must Deprive Some Articulable Educational Benefit; Generalized Discomfort is Insufficient.*

Harassment varies in degree. Much expression runs the risk of upsetting someone, and some ultimately does. For purposes of Title VI liability, college administrators must be

24

deliberately indifferent to speech or conduct that creates an environment so hostile that it results in denial of an educational benefit. An actual deprivation of educational experiences is what differentiates expression that evokes strong emotion from expression that amounts to an infringement on civil rights. Title VI does not apply where the primary injury is to one's feelings. Without such requirements, Title VI risks becoming a general civility code, antithetical to robust free speech protections on college campuses.

To satisfy this element, a plaintiff must plead with specificity that the conduct at issue had some "concrete, negative effect" on their education. *Davis*, 526 U.S. at 654. While this element requires a serious showing, that showing can take many forms. For example, courts have found that concrete deprivations existed where plaintiffs alleged that they were forced to change their study habits or change schools, where they had a measurable drop in grades or increase in absenteeism, or where they developed anxiety sufficient to require intervention. *Mandel v. Bd. of Trustees of Cal. State Univ.*, No. 17-03511, 2018 WL 5458739, at *25 (N.D. Cal. Oct. 29, 2018) (citing *Fennell v. Marion Indep. Sch. Dist.*, 804 F.3d 398, 410 (5th Cir. 2015) and *Gabrielle M. v. Park Forest-Chi. Heights, IL. Sch. Dist.*, 315 F.3d 817, 823 (7th Cir. 2003)). In *Gartenberg*, plaintiffs sufficiently plead that they were "deprived of a supportive, scholastic environment free of discrimination and harassment" where they alleged that they suffered emotional distress, "including intense anxiety and panic attacks," "engaged therapists, missed and/or dropped assignments," avoided the campus library, and where at least one student delayed completion of their degree. 765 F.Supp.3d at 278; *see also Canaan*, 760 F.Supp.3d at 331 (plaintiff averred that she missed numerous lectures and many hours of a required studio course, was denied one-on-one meetings with a mentor professor, and avoided community events affiliated with her major); *Frankel*, 744 F.Supp.3d at 1022 (plaintiffs provided sworn declarations that they missed final

exams because they were blocked from entering classrooms, and others were evacuated during final exams due to campus encampments).

Self-censorship does not amount to a concrete deprivation. The "fact that some unidentified students self-censored and did not attend Jewish events or identify as Jewish because of their fear of hostility is not only fatally vague but also questionable as to the impact on their education." *Mandel*, 2018 WL 5458739, at *26 (cleaned up).

Plaintiffs' Second Amended Complaint is likewise fatally vague on the question of educational impact. Even where Plaintiffs' allegations could perhaps be liberally construed to demonstrate deliberate indifference, they do not, in a total of 139 pages of pleading, articulate *any* concrete deprivation of educational benefit. This flaw permeates the entire Second Amended Complaint, both with regard to specific incidents, and when reviewing the totality of the circumstances.

### i. Professor Mendelsohn's Teach-In

Plaintiffs allege that just days after the October 7th attacks, Barack Mendelsohn, an Israeli-Jewish Professor, sought to host a teach-in on security and terrorism in the Middle East, his professional specialty. SAC ¶ 62. In response to a student complaint that it was too soon to host an event on this topic, Dean McKnight relayed the student's concern to Professor Mendelsohn and suggested that the event would benefit from more diversity. Ex. 3, Mot. to Dismiss, ECF 37-5.[11]

_____

[11] The Court may consider material beyond the allegations in the Complaint without converting the motion to dismiss to one for summary judgment where it is a "document integral to or explicitly relied upon in the complaint," of which the plaintiff has notice. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997). Plaintiffs rely upon Dean McKnight's written email exchange to state that he suggested that Professor Mendelsohn add more diversity to his event. I thus look to the full email exchange, which reveals that Dean McKnight's suggestion was in direct response to a student complaint, which was included on the email thread to Professor Mendelsohn.

Professor Mendelsohn disagreed, and the event ultimately occurred as planned, without additional speakers. SAC ¶ 62. Plaintiffs represent that at a later teach-in hosted by Professor Gina Velasco, she was not encouraged to add diversity, evincing disparate treatment. *Id.* ¶ 63. Even if this were true, the facts do not show that Plaintiffs were in any way harmed, let alone deprived an educational benefit, by Dean McKnight's private suggestion to Professor Mendelsohn, who is not a Plaintiff to this action, to add a speaker to his talk. Haverford hosted Mendelsohn's talk just as he planned it, and Haverford students presumably attended. *Id.* ¶ 62. This hardly represents a concrete deprivation of educational benefits.

### ii. *Customs Programming*

Plaintiffs aver that at the request of Jewish students, Haverford administrators allowed a group of Pro-Israel Jewish students to make a presentation to the students tasked with organizing first-year orientation about material that the Jewish students wanted to be included in orientation programming. *Id.* ¶ 143. The Jewish students explained how they "felt about Israel and Zionism, about Israel's war against Hamas, and about the atmosphere at Haverford for people who hold such commitments." SAC ¶ 145. Upon the conclusion of the Jewish students' presentation, the orientation organizers allegedly expressed "anger and disgust," and demanded an apology from Haverford for subjecting them to the presentation. *Id.* ¶¶ 146-47. Haverford inexplicably apologized. *Id.* ¶ 148. According to Plaintiffs, the resulting presentation that the orientation leaders ultimately showed to the incoming students was "entirely hostile to Plaintiffs' beliefs and commitments."[12] *Id.* ¶ 149. Assuming this is true, Plaintiffs do not specify what components of

---

[12] It remains unclear from Plaintiffs' Second Amended Complaint who watched the final presentation and what its contents were.

the presentation they deemed problematic, nor do they allege that any student felt too intimidated or antagonized to attend class as normal or pursue the full range of Haverford's educational offerings. This falls well short of demonstrating any tangible deprivation of educational benefits.

*iii.*     *The Emergency Plenary*

Plaintiffs assert that between February 29 and March 3, 2024, the student body hosted an "emergency" Plenary, devoted "entirely to efforts to adopt a resolution condemning Israel for fighting against Hamas, and demanding that Israel agree to a ceasefire immediately." *Id.* ¶ 106. Plaintiffs purport that this plenary blatantly violated several Haverford rules governing plenaries, such as the need for a required quorum, and the requirement that voting occur in person. *Id.* ¶ 107. Plaintiffs concede, however, that "the resolution did not pass as quorum was not reached, in part because Jewish students refused to participate." *Id.* ¶ 110. Thus, even if Plenary rules were violated, Plaintiffs cannot show any way in which the emergency Plenary impacted their educational experiences, especially where the resolution at issue *did not pass.* If anything, this episode instead highlights an instance where Plaintiffs effectively organized to curb a resolution they found undesirable, not an educational deprivation.

*iv.*     *Posters advertising Jewish events are repeatedly torn down*
          *without serious investigation.*

Plaintiffs aver that throughout the academic year, they and other Jewish students put up posters on Haverford's campus advertising Jewish events. *Id.* ¶ 152. They do not allege that these events had anything to do with Israel, beyond being hosted by Jewish people about Jewish topics. When Plaintiffs tried to advertise for an event entitled "How Do You Jew," posters were repeatedly torn down. *Id.* ¶ 153. Plaintiffs explain that "when they were replaced, they were pulled down again," and that this "occurred repeatedly, at multiple locations throughout campus, including at

28

least one dormitory and public building." *Id.* Plaintiffs maintain that some of the posters were hung indoors and that the posters were found crumpled up on the floor. *Id.* ¶ 154. Plaintiffs aver that the matter "was brought to the attention of President Raymond and other senior administrators," who allegedly investigated the destruction of the posters but concluded that they were "blown down by the wind." *Id.* Administrators announced that "if someone had torn down a poster advertising a Jewish event, the act would be considered antisemitic and constitute a violation of the Honor Code." *Id.*

But Plaintiffs assert that the administration took no steps to stop the destruction from recurring, and question whether Haverford actually investigated the incident, considering that posters allegedly "blown down by the wind" were hung in building interiors and found crumpled up on the ground. *Id.* I agree that Haverford's purported conclusion is suspect considering Plaintiffs' allegations about the placement of posters and where remnants were found. And it is difficult to dispute that if students tore down only posters advertising Jewish events, that would be an act of antisemitism.

Absent, however, are any allegations that this incident resulted in deprivation of educational benefits. Surely Plaintiffs were disappointed and even angry at Haverford's inaction. But there are no allegations that this incident affected Plaintiffs in a way that manifested in any concrete harm, such as a decline in academic performance for any one student or retention of mental health services. For Title VI purposes, these allegations fall short. But as discussed below, they have additional relevance with respect to Plaintiffs' breach of contract claim.

       *v.    Professor Aougab represents that he will not write letters of recommendation.*

Plaintiffs also take issue with Professor Aougab's publicly posted teaching guidelines. Professor Aougab teaches an introductory, required mathematics class.  *Id.* ¶ 49, n.8.  On his personal teaching page, directly linked to his Haverford teaching page, Aougab details the procedure for requesting a letter of recommendation.  Professor Aougab explains that "as a matter of moral principle," he will not write letters of recommendation for programs or jobs involving any of the following: policing, military applications (such as internships at the Department of Defense), private weapons manufacturing, intelligence gathering, or "opportunities that violate the USACBI cultural and academic boycott of Israel."[13]  *Id.* ¶ 57.  The USACBI boycott page[14] explains that this boycott is an academic and cultural boycott of functionally anything with ties to Israel.  Professor Aougab welcomes discussion with students who disagree with his beliefs, but notes that "this policy is non-negotiable."  Several members of Jews at Haverford, including the parent of a current math major, complained to administrators about Aougab's representations, but administrators purportedly took no action.  *Id.* ¶ 49.

I begin with the observation that the professor does not refuse to write letters on behalf of Jewish students, limiting his refusal to positions associated with the state of Israel.  Beyond that, the record is devoid of facts to show that any Plaintiff was deprived of educational benefits.

_____

[13] Professor Aougab's website can be accessed here: https://perma.cc/8EXU-Z3FN.  Plaintiffs cite Haverford's website in their Second Amended Complaint, and it links to his personal website.  I deem the content of both properly considered, and on his personal website Professor Aougab describes his lineage as half-Jewish.

[14] The USACBI boycott webpage linked on Professor Aougab's website can be found here: https://perma.cc/2MRD-L7JC.

Plaintiffs do not aver that any Jewish student sought and was denied a letter of recommendation for an institution unrelated to Israel. If this had occurred and Plaintiffs pleaded it with specificity, Professor Aougab's policy could surely animate allegations of direct antisemitic discrimination. But no such allegations are made. Plaintiffs do not even plead that any student wanted a letter from the Professor but felt that asking was pointless. Whatever the merits of professorial boycotts, no facts are pled demonstrating that any Plaintiff faced a concrete negative educational impact.

vi.     <em>Student Tour Guide Applications Rejected</em>

Finally, Plaintiffs aver that in Fall 2023, students and members of the College admissions team, including a member of Jews at Haverford, met to review student applications for tour guide positions. *Id.* ¶ 40. Students on the committee purportedly rejected several applications because the applicants "are Zionists." *Id.* Two Haverford College administrators were allegedly present but said nothing to challenge these decisions. *Id.*

One can conceive of a version of these facts that could serve as the basis for an actionable direct discrimination claim. But Plaintiffs' vague pleading leaves too many unresolved questions. As a threshold matter, we do not know whether the denied applicants were members of Jews at Haverford. And the observing member of Jews at Haverford does not indicate that they suffered any adverse consequence as a result of watching the denials transpire.

It is also impossible to discern from the facts as pled the basis on which applicants were actually denied. Were the applications denied because they had Jewish-sounding last names, and the student reviewers used "Zionist" as an epithet to discard those applicants based on an invidious inference alone? Did the applicants attend Jewish day schools, leading to a similar sort of inference? Or were the rejected applicants deemed Zionists for expressing views asserting a divine

31

right of West Bank settlers to displace Palestinians?  It is not even clear that the rejected "Zionists" were Jewish.  Plaintiffs do not say, and these nuances matter.

Given that a member of Jews at Haverford is alleged to have been in the room where these decisions were made, Plaintiffs likely could have provided a more complete picture of the incident. But aside from the weakness of any inference that can be drawn, no connection is made to any denial of educational benefit as to the one observing Plaintiff, and let alone with regard to all 50-plus members of Jews at Haverford.

***

Viewing the Second Amended Complaint as a whole, Plaintiffs' allegations on the concrete deprivation of educational benefit element are vague and conclusory, critically lacking in tangible impact as demonstrated by, for example, a drop in grades, increase in absenteeism, or retention of a therapist for serious anxiety.  Plaintiffs instead broadly state that members of Jews at Haverford feared personal shunning, and felt "anxiety, and self-suppression." *Id.* ¶¶ 168-70.  They state that Plaintiff Landau was forced to "change her routine," and was "harassed" and "shunned." *Id.* ¶ 171.  Plaintiff HJSB also purportedly changed her routines, lost friends, felt concerned about her reputation, and ultimately fled to her parents' home, though once again Plaintiffs do not say for how long or how that affected her access to educational opportunities. *Id.* ¶ 172.  I have no doubt that some Plaintiffs were emotionally impacted by the foment on campus.  But self-censorship and purely social and reputational harms do not amount to a concrete deprivation of educational benefits.

As stated in my previous opinion dismissing Plaintiffs' claims, Title VI has a high pleading standard.  In part due to maintaining their insistence on litigating in anonymity, Plaintiffs have failed in their third attempt to articulate with requisite specificity any concrete resultant harm that

has stemmed from their alleged harassment.  Even if the incidents alleged fell outside the realm of

protected speech or demonstrated an instance where Haverford was deliberately indifferent, in a

total of 139 pages of pleading, Plaintiffs do not articulate a single concrete deprivation of

educational benefits.  Plaintiffs must make their case, and they have failed to do so.  Plaintiffs'

Title VI hostile environment claim will be dismissed.

### C.    Breach of Contract

Plaintiffs have also amended their contract claim.  Plaintiffs allege that although they filed

complaints to Haverford about many of the instances detailed above, they did not receive any

response, violating the policies that Haverford represents as active on their website.  The absence

of demonstrable harm does not prohibit this claim, because Pennsylvania law permits contract

claims for nominal damages.  *Thorsen v. Iron & Glass Bank*, 476 A.2d 928, 931 (Pa. Super. 1984).

Plaintiffs allege that Haverford failed to evenhandedly enforce its "Anti-Discrimination,

Harassment, and Bias Policy."  SAC ¶¶ 186-89.  To state a claim for breach of contract, a plaintiff

must "set forth facts regarding (1) the existence of a contract, including its essential terms; (2) a

breach of duty imposed by the contract; and (3) resultant damages*.*"  *Doe v. Haverford Coll*., No.

23-299, 2023 WL 5017964, at *5 (E.D. Pa. Aug. 7, 2023) (McHugh, J.)  (citing *McShea v. City of

Phila.*, 995 A.2d 334, 340 (Pa. 2010)).  Under Pennsylvania law, relationships between private

colleges and their students are contractual in nature.  *Kimberg v. Univ. of Scranton*, No. 06-1209,

2007 WL 405971, at *3 (M.D. Pa. Feb. 2, 2007) (citing *Swartley v. Hoffner*, 734 A.2d 915, 919

(Pa. Super. 1999)).  "Written guidelines, policies, and procedures" distributed to students over the

course of enrollment may constitute the terms of such contracts.  *Id*.

For a college policy to amount to a contract enforceable in federal court, it "must identify

a specific promise or promises on which to base a cause of action, and non-discrimination policies

are often – but not always – too aspirational and general to be actionable." *Canaan*, 760 F.Supp.3d at 335 (citations omitted). Courts "discern whether [the College's] policies contain specific and identifiable promises worthy of contractual enforcement or are more akin to ubiquitous policies in higher education that signal virtuous aspirations but are unworthy of contractual reliance by their students for lacking 'any sort of affirmative, enforceable duty on the part of the institution.'" *Id.* (citing *David v. Neumann Univ.*, 187 F.Supp.3d 554, 560 (E.D. Pa. 2016)).

### 1.    *Existence of a Valid Contract*

Plaintiffs rely on a combination of two Haverford documents as the basis for their claim. They first allege that Haverford has breached its promise set forth in its Non-Discrimination Statement to provide an employment and educational environment free from all forms of unlawful discrimination on the basis of "religion, national origin, ancestry, citizenship . . . or any other characteristic protected by law." SAC ¶ 185. Plaintiffs then allege that this Non-Discrimination policy is enforceable through the College's Anti-Discrimination, Harassment, and Bias Policy ("Bias Policy"), which itself is a binding contract, and details a series of procedures that Haverford has failed to follow. *Id.* ¶¶ 185-86. Plaintiffs attach what they contend is an active and binding version of the Bias Policy that they downloaded from Haverford's website. Pls.' Resp. to Mot. to Dismiss at 17, ECF 44. Plaintiffs also plead that the policy is directly adjacent to the portal where students can, and did, submit "bias incidents."[15] *Id.* at 18.

---

[15] In a sworn declaration, Plaintiffs' counsel also avers that he traced historical versions of the webpage hosting Haverford's Bias Policy, and that the page has been active for longer than Haverford maintains. Plaintiffs note that while at some point in time the document contained language that it was under review, later versions of that document have since removed the language. Adding to their argument that the Policy was in force, Plaintiffs explain that the webpage hosting the Policy uses present tense to discuss the Policy and its operation, supporting an inference that the procedures represented in the Policy were current.

Haverford disputes the validity of the contract, pointing to the fact that the attached PDF of the Bias Policy, the same Bias Policy that was linked on Haverford's website on the date of oral argument, is clearly labeled as a "draft." Mot. to Dismiss at 23-24. Haverford argues that because the Policy was designated as a draft, it was not in force during any of the incidents alleged. *Id.* Notably, Haverford does not provide any alternative policy that *was* in place, further asserting that even if the Court finds that the Bias Policy was operative, Plaintiffs' allegations of breach are too vague to state a contract claim.

As a threshold matter, I take it as highly plausible that *some* bias policy existed at Haverford during the 2023-2024 academic year. Haverford offers no explanation as to why a non-operative Bias Policy would be hosted on Haverford's website, directly adjacent to a live portal to submit bias incidents. At a minimum, students would have reasonably believed that there was a policy under which complaints could be submitted. And surely whatever bias policy existed would allow recourse for instances of antisemitism, unless Haverford would have me infer that it had no concern for its Jewish students. So whatever hard to imagine rationalization Haverford might offer for obscuring the content of its actual bias policy – an artifice reminiscent of Dean Wormer's "double secret probation" – I find the demarcation "draft" to be of no legal import.[16] Moreover, I am obligated at this stage to accept Plaintiffs' allegation that a bias policy was operative (whether the posted draft policy or a different unspecified policy). Dismissal of the contract claim pre-discovery on this ground would be premature.[17]

---

[16] When asked at argument how a student with a bias concern could have proceeded, Haverford's counsel replied that he presumed the student would contact the President's office for guidance.

[17] In the interim period between oral argument and this opinion, Haverford appears to have updated its bias policy and its link on their website, a point of interest, albeit legally irrelevant here.

2.    *Terms of the Contract and its Breach*

Turning to the terms of the contract and its alleged breach, Plaintiffs cannot state a contract claim based on the Non-Discrimination Statement alone, for it is purely aspirational language that lacks the specificity to constitute enforceable promises. *See Canaan*, 760 F.Supp.3d at 335-36 (finding that the College's Statement of Assurance, promising that the school "does not discriminate," was too aspirational and non-specific to support a breach of contract claim).

But Plaintiffs plausibly allege that the Bias Policy contains clear contractual promises that Haverford has breached.  Under the Bias Policy, the College "is required to conduct a thorough inquiry and address all reports of bias incidents of which it becomes aware."  SAC ¶ 22.  Once a complaint is filed, a Bias Reporting Committee ("BRC"), including Vice President Young and Dean McKnight, performs an "initial screening process and determines whether the case will proceed."  *Id.*  If the BRC determines that the incident "does not constitute an act of violation of the policy," the BRC "*will communicate* with the reporting individuals to inform them of the decision."  *Id.* (emphasis added).  If the BRC determines that "there is sufficient information in the report for potential violation of the policy," the matter is escalated to a Bias Incident Response Team ("BIRT"), who then determines whether there is a sufficient basis to launch a formal investigation.  *Id.*  If a formal investigation is found warranted, the BIRT will inform the reporting individual with a written notice.  *Id.*

Plaintiffs contend that they filed reports through Haverford's bias incident portal about many of the instances discussed herein.[18]  *Id.* ¶ 191.  Plaintiffs also contend that they did not

---

[18] In attempting to provide additional clarity about the complaints lodged with Haverford in this action, Plaintiffs have made it apparent that many complaints in this case were raised by parents and community members, not students.  Haverford's internal bias reporting policies specifically recognizes parents as designated parties who may submit complaints through the bias incident portal.  *See* ECF 35-1 at 10.  But

receive any response or observe any remediation regarding any of their reported incidents. *Id.* ¶ 189. This would imply that no incidents were considered at the initial BRC stage, for even if a bias complaint is ultimately terminated at this stage, Haverford is still obligated under the Bias Policy to "communicate with the reporting individuals to inform them of their decision." *Id*. ¶ 22. At the very least, Plaintiffs were due notice that their investigations were terminated upon initial BRC review. But Plaintiffs aver that the complainants here never received such communication.

Discovery will shed light on how many complaints were in fact filed, and what happened to complaints received. If the College never communicated further with each individual complainant here, Plaintiffs cannot know whether their complaints were appropriately investigated, and allegations that complainants did not receive a response would support an inference that their complaints were not investigated. *See Canaan*, 760 F.Supp.3d at 335-36 (where the Court found that the Retaliation Policy was not merely aspirational, and instead promised that violators of the policy would be subject to reasonable disciplinary action). Failure to conduct an initial review and notify Plaintiffs of the outcome of that review would itself constitute a breach of the plain terms of the Bias Policy. Plaintiffs therefore plausibly allege that Haverford failed to honor its Bias Policy, and therein breached their contract.

        3.    *Resultant Harm*

Although Plaintiffs plausibly plead the existence of a contract and breach, none of Plaintiffs' allegations demonstrate resultant harm. To the extent that Plaintiffs seek compensatory damages for a diminution in the value of their education, there are insufficient facts pled to support

---

this additional revelation, that students themselves were not the moving force in many instances, would seem to shed further light on the weakness of the Title VI claims asserted.

such a theory. SAC ¶ 194. But under Pennsylvania law, a plaintiff may recover nominal damages where they have shown a breach of contract, even if they are unable to show damages flowing from the breach. *Thorsen*, 476 A.2d at 931. Plaintiffs' breach of contract claim seeking nominal damages thus survives.[19]  *See Garcia v. Vertical Screen*, 592 F.Supp.3d 409, 428 (E.D. Pa. 2022) ("Because nominal damages are available for breach of contract under Pennsylvania law, courts have refused to grant summary judgment on a breach of contract claim solely because a party has not established damages.").[20]

## IV.    Conclusion

Antisemitism is ugly and persistently stubborn. But while judges may reflect on the broader world, they can only rule on the facts before them. For the reasons set forth above, Defendant's Motion to Dismiss will be granted as to Plaintiffs' Title VI claim and denied as to Plaintiffs' contract claim.

---

[19] The Court recognizes that Haverford has obligations to protect the privacy of students and participants in its disciplinary process. But courts are forums well-equipped to navigate these concerns through the use of protective orders that incorporate appropriate safeguards.

[20] At this stage, Plaintiffs have standing to pursue their breach of contract claim alone moving forward. The individual named Plaintiffs were all students at some point prior to the pendency of the litigation, making them parties to the contract and directly impacted by the breach. Jews at Haverford also still has associational standing. The *Hunt* factors for associational standing require that 1) at least one Plaintiff would have standing to sue in their own right, 2) the interests the organization seeks to protect are "germane to the organization's purpose," and 3) the claims and types of relief requested do not require individual participation of the members. *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 342-43 (1977). At least one student member of Jews at Haverford would have standing to sue for the breach of contract in their own right, and the organization surely has an interest in ensuring that Haverford's bias reporting system treats Jewish students committed to Israel equally. And while suits for monetary damages are generally inappropriate for associational standing due to the individualized determinations that are inherent to such a suit, where Plaintiffs' only available relief is a nominal damages award, individual plaintiffs need not participate for the claim's vindication. *See Clark v. McDonald's Corp.*, 213 F.R.D. 198 (D.N.J. 2003) ("there may be an exception to the rule forbidding associational standing on damages claims where an association seeks only nominal damages on behalf of its members without reference to their individual circumstances."). If, however, discovery ultimately reveals facts that undermine any element of the standing analysis, the case may still be dismissed on that basis for want of jurisdiction.

This dismissal is with prejudice. Plaintiffs have now filed three complaints, involving several rounds of briefing, a detailed memorandum from this Court specifically addressing the pleadings' shortcomings, and oral argument. Even where an issue is important, as antisemitism certainly is, a legal claim rises and falls on the facts, and Plaintiffs here have failed in three separate attempts to present facts sufficient to state a Title VI claim. *See In re: Domestic Drywall Antitrust Litig.*, No 13-2437, 2016 WL 3453147, at *4 (E.D. Pa. June 22, 2016) (holding that dismissal with prejudice was warranted where "Defendants have already expended resources filing motions to dismiss in response to each of Plaintiffs' three complaints," and "Plaintiffs have thus had two opportunities to amend their complaint to respond to Defendants' argument."). Oral argument was suffused with emotional rhetoric, giving this Court little comfort in the prospect for further refinement of facts adequate to support a claim.

An appropriate order follows.

 /s/ Gerald Austin McHugh
United States District Judge
